Walter McMILLIAN, Plaintiff,

v.

W.E. JOHNSON, et al., Defendants.

No. CV–93–A–699–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 17, 1995.

Robert B. McDuff, Jackson, MS, Bryan A. Stevenson, Bernard E. Harcourt, Alabama Capital Representation Resource Center, Montgomery, AL, for plaintiff Walter McMillian.

Andrew W. Redd, Alabama Dept. of Corrections, Legal Div., Montgomery, AL, for defendants W.E. Johnson, Morris Thigpen, Tom Allen, Marian Shinbaum and Charlie Jones, in their individual capacity.

William G. McKnight, Montgomery, AL, for defendants Simon Benson and Larry Ikner, in their individual capacity.

Bart Gregory Harmon, Daryl L. Masters, Kristi A. Dowdy, Webb & Eley, P.C., Montgomery, AL, Jack Booker Weaver, Windell C. Owens, Owens, Weaver & Associates, P.C., Monroeville, AL, for defendant Tom Tate, in his individual capacity.

David Earl Allred, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, for intervenor-defendant Ass'n of County Commissions of Ala. Liability Self Ins. Fund.

### MEMORANDUM OPINION AND ORDER

ALBRITTON, District Judge.

This cause is now before the court on the Motions for Summary Judgment filed by Defendants Tom Tate ("Tate"), Larry Ikner ("Ikner"), Simon Benson ("Benson"), Mike Barnett ("Barnett"), Morris Thigpen ("Thigpen"), Tom Allen ("Allen"), Marian Shinbaum ("Shinbaum"), W.E. Johnson ("Johnson"), and Charlie Jones ("Jones").[1] For the reasons stated below, the court finds that the Motions for Summary Judgment are due to be GRANTED in part and DENIED in part.

### I. STATEMENT OF THE CASE

Walter McMillian ("McMillian") filed this suit in this court on June 4, 1993, against: Tate, Sheriff of Monroe County; Ikner, an investigator for the Monroe County District Attorney; Benson, an investigator for the Alabama Bureau of Investigation ("ABI"); Barnett, an investigator for the Alabama Department of Public Safety; Thigpen, Commissioner of the Alabama Department of Corrections; Allen, the Associate Commissioner for Program Services of the Alabama Department of Corrections; Shinbaum, Director of Classification for the Alabama Department of Corrections; Johnson, Warden of Holman Prison (and later the Institutional Coordinator for the Alabama Department of Corrections); Jones, Warden of Holman Prison (after Defendant Johnson's tenure in

such office); and Monroe County. The complaint alleges that McMillian was unlawfully arrested, prosecuted, convicted, imprisoned, and sentenced to death for a murder he did not commit. McMillian seeks damages for alleged violations of his rights under the United States Constitution pursuant to 42 U.S.C. § 1983. McMillian also seeks relief for violations of his rights under the Alabama Constitution. Finally, McMillian makes claims for relief under Alabama tort law.

In 1993, Tate, Ikner, Benson, Barnett, and Monroe County filed Motions to Dismiss. On February 18, 1994, the court issued an order dismissing Monroe County from the case and dismissing all official capacity claims that had been brought against the individual Defendants.[2] In the same order, the court dismissed many of the individual capacity claims against the individual Defendants who had filed motions to dismiss. The DISCUSSION section of this opinion will specify precisely which claims were dismissed on the Motions to Dismiss.

Since the court issued its decision on the Motions to Dismiss, every Defendant remaining in the case has filed (either separately or jointly with other Defendants) a Motion for Summary Judgment. The court now decides the Motions for Summary Judgment.

### II. SUMMARY OF McMILLIAN'S ALLEGATIONS

The following statement of facts is a summary of the allegations made by McMillian in his Complaint. McMillian's allegations do not, of course, represent the factual findings of the court. These allegations are included in this opinion simply to provide the background necessary to place into context the matters in dispute. The court will analyze the evidence and resolve all matters in dispute which are capable of resolution by summary judgment in the DISCUSSION section of this opinion.

---

1. The court refers to Thigpen, Allen, Shinbaum, Johnson and Jones collectively as "D.O.C. Defendants."

2. Only Tate and Ikner were sued in their official capacities. Since the official capacity claims against them were dismissed, there are no official capacity claims remaining in the case.

On November 1, 1986, in the middle of the morning, a woman named Ronda Morrison was murdered in Monroeville, Alabama, inside a business establishment known as Jackson Cleaners. In June of 1987, Plaintiff Walter McMillian, a.k.a. Johnny D. McMillian, ("McMillian") was arrested and eventually charged with Ronda Morrison's murder. In August of 1988, McMillian was tried for the murder of Ronda Morrison. A jury convicted McMillian. In September of 1988, he was sentenced to death.

Following his arrest in June of 1987, McMillian was held in the Monroe County jail. On July 29, 1987, McMillian was transferred to the custody of the Alabama Department of Corrections. As a result of the actions of Tate, Ikner, Benson, and the D.O.C. Defendants, McMillian was incarcerated on Death Row in Holman Prison. These Defendants put McMillian on Death Row as a pretrial detainee for the purpose of punishing and intimidating him. McMillian remained on Death Row until his trial approximately one year later.

Tate, Ikner, and Benson were primarily responsible for the investigation of Ronda Morrison's murder. McMillian would not have been prosecuted or convicted but for the fact that these Defendants suppressed a great deal of exculpatory evidence. Tate, Ikner, and Benson suppressed evidence related to the testimony of Ralph Myers ("Myers") who was the key witness against McMillian at his trial for the Morrison murder. Myers testified falsely that he drove McMillian in McMillian's truck to Jackson Cleaners on the morning of the murder, and that McMillian went inside the Cleaners while Myers waited in the parking lot. Myers further testified that he heard gunshots and went inside the Cleaners. According to his testimony, when Myers went inside the cleaners he saw Ronda Morrison dead and McMillian with a gun.

Additionally, Tate, Ikner and Benson suppressed evidence indicating that Myers lied in his testimony. For example, on June 3, 1987, Myers was asked by Tate, Ikner, and Benson in a tape-recorded interview if McMillian had committed or ordered the murder of Ronda Morrison. Myers said that McMillian had nothing to do with the murder and offered to take a polygraph examination regarding this matter. From late May, 1987, until at least June 9, 1987, Myers repeatedly told Defendants during interrogations that McMillian was not involved in the murder.

Prior to McMillian's trial, Myers was sent to the Taylor Hardin medical facility for a psychiatric examination. While there, Myers told four hospital staff doctors that he was being pressured and threatened by law enforcement officials to frame an innocent man. Myers was referring to McMillian. On August 27, 1987, a man named Isaac Dailey told Benson, in a tape-recorded statement, that Myers had said he was going to frame McMillian for still another murder. All of this exculpatory evidence was known to Tate, Ikner, and Benson. However, McMillian could not use the evidence to defend himself in his criminal trial because these Defendants withheld and suppressed the evidence.

Furthermore, Tate, Ikner, and Benson pressured and threatened Myers in order to persuade him to give evidence implicating McMillian in the murder, evidence these Defendants knew, or should have known, was false. Among other things, these Defendants threatened Myers by telling him he would receive the electric chair if he did not implicate McMillian, but Myers would live if he did implicate McMillian. Also, these Defendants intimidated Myers by having him incarcerated on Death Row in 1987, even though Myers had not been convicted of capital murder or sentenced to death. All of this pressure and intimidation eventually caused Myers to implicate McMillian and to testify against McMillian.

The only other witnesses at the trial who gave testimony indicating that McMillian committed the murder were Bill Hooks, Jr. ("Hooks") and Joe Hightower ("Hightower"). Hooks testified falsely that he drove by Jackson Cleaners the morning of the murder and saw Myers and McMillian get into McMillian's truck and drive away. Hightower testified falsely that he saw McMillian's truck outside Jackson Cleaners on the morning of the murder.

Tate, Ikner, and Benson withheld and suppressed evidence relating to both Hooks and Hightower that was exculpatory for McMillian. For example, as a result of his willingness to testify falsely against McMillian, pending criminal charges against Hooks were dropped, other pending charges against him were never prosecuted, he was relieved from paying several fines he owed as a result of prior convictions, he received money from Tate, and he was promised an additional reward of $5,000.00 which he received after the trial. In addition to Tate, Ikner and Benson knew of these arrangements and helped bring them about. As a result of his willingness to testify falsely against McMillian, Hightower was promised a reward of $2,000.00 or more, which he received after the trial. Tate, Ikner, and Benson knew of this arrangement and were involved in bringing it about.

Both Hooks and Hightower, when testifying at trial about the truck they saw outside Jackson Cleaners, said the truck was a "low-rider" and low "to the ground." However, Tate, Ikner, and Benson learned well in advance of the trial that McMillian's truck had not been converted into a "low-rider" until several months after the murder.

Tate, Ikner, and Benson procured Hooks' false testimony in part by having Hooks look at McMillian's truck at the Monroe County Jail after McMillian had been arrested so Hooks could later describe this truck as the one he saw outside Jackson Cleaners.

Tate, Ikner, and Benson pressured, threatened, and intimidated Hooks and Hightower, as well as various other people, in an effort to persuade these people to give false evidence implicating McMillian in the murder. These Defendants also threatened potential witnesses in an effort to prevent them from coming forward with truthful testimony that would tend to exonerate McMillian.

In addition to the foregoing, Tate, Ikner, Benson, and Barnett withheld and suppressed evidence exculpatory to McMillian that was obtained from a man named Miles

Jackson. Jackson gave law enforcement officers a statement that was summarized in an Alabama Department of Public Safety report prepared by Barnett. In his statement, Jackson gave information regarding the timing of the murder that undermined the prosecution's theory of how the murder occurred. This evidence was not disclosed to McMillian.

Defendants suppressed additional exculpatory evidence. Barnett saw McMillian at his home around the time the murder was committed. Thus, Barnett could have testified to support McMillian's alibi defense. However, Barnett suppressed this evidence. Tate, Ikner, and Benson also knew of this evidence, yet they suppressed it. More evidence was suppressed. Tate, Ikner, and Benson suppressed statements from various individuals who gave descriptions of potential suspects near the scene of the crime that did not match the description of McMillian. Some individuals also gave descriptions of vehicles near the crime scene that did not match the description of McMillian's truck and contradicted the inculpatory testimony of Hooks and Hightower.

The actual arrest of McMillian occurred in June of 1987. Tate, Ikner, and Benson instigated and planned the arrest of McMillian, and Tate carried out the arrest on June 7. The June 7 arrest was based upon an accusation that McMillian sodomized Myers in Conecuh County, Alabama.[3] McMillian did not commit this crime. Defendants pressured Myers into concocting this phony charge so they could obtain custody of McMillian in order to construct evidence against him on the murder charge. However, these Defendants knew, or should have known, that the sodomy charge was false and that there was no factual basis or no probable cause for believing that McMillian committed such a crime.

Tate, Ikner, and Benson caused an application for a Conecuh County arrest warrant for sodomy, and an affidavit in support of that application, to be submitted when they knew, or should have known, that the affidavit and

---

**3.** Despite Myers' allegation that McMillian sodomized him in Conecuh County, these Defendants arrested McMillian and immediately incarcerated him in the Monroe County jail, rather than sending him to Conecuh County. McMillian was never sent to Conecuh County to answer the sodomy charges, and the charges were later dismissed.

application contained false information and were insufficient to establish probable cause and to support an arrest warrant. Moreover, these Defendants deliberately omitted crucial exculpatory information from the arrest warrant application and affidavit. These Defendants timed the arrest of McMillian so they could pick him up while he was driving his truck, impound the truck, and take it to the Monroe County jail where Hooks looked at the truck so he could later describe it as the truck he saw outside Jackson Cleaners on the morning of the murder.

Tate, Ikner, and Benson also instigated and carried out the subsequent arrest and prosecution of McMillian for the murder of Ronda Morrison. This subsequent arrest occurred on June 8, 1987, while McMillian was already in the Monroe County jail as a result of the arrest the previous day. These Defendants knew, or should have known, there was no probable cause for believing that McMillian committed the murder.

These Defendants caused an application and an affidavit to be submitted for a Monroe County arrest warrant for the murder when they knew, or should have known, the application and affidavit contained false information and were insufficient to establish probable cause and to support an arrest warrant. Moreover, these Defendants omitted crucial exculpatory information from the application and affidavit that would have demonstrated a lack of probable cause.

Some time after McMillian's arrest on charges of murder, Tate testified before a grand jury in Monroe County in an effort to obtain an indictment against McMillian for the Morrison murder. During that appearance, Tate gave testimony that he knew or should have known was false, and he deliberately omitted crucial facts that would have been exculpatory for McMillian and would have prevented the indictment from being issued. As a result of Tate's testimony, an indictment was issued against McMillian.

Racial discrimination was one of the motives of Tate, who is white, in instigating and effectuating the arrest and prosecution of McMillian, who is African–American. While McMillian was at the Monroe County jail following his June 7, 1987 arrest, Tate made racist remarks to him and used racial epithets. Tate, using racial epithets, told McMillian he would like to take McMillian out back and lynch him just like a African–American man who recently had been lynched by hanging in Mobile, Alabama.

The prosecution of McMillian for murder was instigated, effectuated, and maintained by Tate, Ikner, and Benson without probable cause, using evidence and testimony they knew, or should have known was false, and suppressing and withholding important exculpatory evidence.

Even after McMillian had been convicted and sentenced to death, Tate, Ikner, and Benson continued to threaten and intimidate potential witnesses in an effort to prevent them from giving exculpatory evidence during post-trial proceedings. In November of 1988, a man named Darnell Houston ("Houston") gave testimony in a hearing on a motion for new trial that contradicted the testimony of Hooks at McMillian's trial. According to Houston, Hooks could not have seen McMillian's truck outside Jackson Cleaners on the morning of the murder because Hooks was at work all day. In an effort to punish Houston for his testimony, and to discourage other exculpatory witnesses from coming forward, Tate engineered a prosecution and indictment of Houston for perjury. These perjury charges were later dismissed.

In the years after the trial, a great deal of exculpatory evidence came to light. Myers recanted his testimony implicating McMillian. Hooks and Hightower also recanted their inculpatory testimony. Later, McMillian discovered the exculpatory evidence that had been suppressed. In February of 1993, the Alabama Court of Criminal Appeals reversed McMillian's conviction because of the failure to disclose exculpatory evidence. In March of 1993, the State of Alabama dismissed the charges against McMillian, and he was set free after nearly six years on Death Row for a crime he did not commit. A new investigation was commenced to determine the identity of the person who committed the murder for which McMillian was wrongly arrested and convicted.

These are the factual allegations which form the basis of McMillian's claims. The court has examined all of the affidavits, depositions, transcripts, and other evidentiary submissions in support of and in opposition to the Motions for Summary Judgment. The relevant facts supported by these submissions will be discussed in the context of each count.

### III. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. at 2552–53.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See,* Fed.R.Civ.P. 56(c).

### IV. DISCUSSION

McMillian's Amended Complaint ("Complaint") contains twenty-seven counts. The first ten counts are brought pursuant to 42 U.S.C. § 1983, alleging deprivations of rights guaranteed by the United States Constitution. The remaining counts are brought pursuant to the Alabama Constitution and the statutory and common law of the State of Alabama. The court will address the counts in order. When the court refers generally to "Defendants" in the DISCUSSION section of this opinion, it is referring to the Defendants named in the count being discussed.

### A. McMILLIAN'S CLAIMS UNDER 42 U.S.C. § 1983

#### 1. General Requirements for Claims under Section 1983

McMillian seeks relief pursuant to 42 U.S.C. § 1983. Section 1983 provides a private cause of action for persons whose rights under the federal constitution or laws have been violated under color of state law. *See* 42 U.S.C. § 1983. In order to establish a claim under Section 1983, McMillian must prove that the Defendants acted under the cloak of state authority when they took the alleged actions against McMillian and that the actions deprived McMillian of a right or rights secured by the Constitution or by federal law. Thus, Section 1983 is not a source of rights, rather it is a means of vindicating federal rights. *Albright v. Oliver*, —— U.S. ——, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994). When a court begins to analyze a Section 1983 claim, it must first "identify the specific constitutional right allegedly infringed." *Id.* Whether a consti-

tutional violation has occurred can only be determined by applying the standards applicable to that particular constitutional provision. *See, Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989).

### 2. Qualified Immunity

Qualified immunity may be claimed by an individual defendant who is being sued personally for actions that he or she took while acting under color of state law. *Ansley v. Heinrich,* 925 F.2d 1339, 1344 (11th Cir. 1991). Qualified immunity is a question of law to be decided by the court prior to trial.

Defendants claim the protection of qualified immunity on nearly every count in which McMillian seeks to recover under 42 U.S.C. § 1983. Although the applicability of qualified immunity is discussed in greater detail in each count, the ubiquity of the defense justifies a preliminary discussion of the general principles of qualified immunity.

■ Qualified immunity is designed to allow officials who are entitled to qualified immunity to avoid the expense and disruption of going to trial, and is not merely a defense to liability. *Ansley,* 925 F.2d at 1345. As the Eleventh Circuit recently explained,

[t]hat qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities. Unless a government agent's act is so obviously wrong, in the light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. Because qualified immunity shields government actors in all but the exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Lassiter v. Alabama A & M Univ. Board of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (citations omitted).

■ The Supreme Court established a qualified immunity analysis which examines the objective reasonableness of the actions of the state official. *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982). Under this test, public officials performing discretionary functions which would objectively appear to be within the official's authority have qualified immunity if their challenged conduct did not violate a clearly established constitutional right of which a reasonable person would have known, given the circumstances and information possessed by the official at the time of the conduct. *Id.* at 818, 102 S.Ct. at 2738.

■ The objective-reasonableness test is a two part analysis. First, the defendant public official must prove that he was performing duties within the scope of his discretionary authority when the alleged violation occurred. *Hutton v. Strickland,* 919 F.2d 1531, 1537 (11th Cir.1990) (citations omitted). A government official may prove that he was acting within the scope of his authority by showing facts and circumstances that would indicate that his actions were part of his normal job duties and were taken in accordance with those duties. *See, e.g., Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir.1988); *Cronen v. Texas Dep't of Human Services,* 977 F.2d 934, 939 (5th Cir.1992) ("An official acts within his discretionary authority when he performs non-ministerial acts within the boundaries of his official capacity.") [4]

■ Once the defendant proves that he was acting within his discretionary authority, the burden then shifts to the plaintiff to prove that the defendant did not act in good faith. *Hutton,* 919 F.2d at 1537. The plaintiff may meet this burden by establishing that "the defendant public official's actions 'violated clearly established constitutional law.'" *Id.* (citations omitted). The second prong of the objective-reasonableness test has two sub-parts. *Id.* at 1538.

■ First, the court must find that the constitutional law in question was clearly established when the alleged violation occurred.

---

4. Defendants invoke qualified immunity as a defense to nearly every claim. The court notes that because McMillian does not challenge Defendants' assertion that they acted at all times within their discretionary authority, the court does not analyze this requirement.

*Id.* Second, the court must find that "there is a genuine issue of fact regarding the government official's engaging in conduct violative of the clearly established law." *Id.* "Clearly established" means that "[t]he contours of the [violated] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

> This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the pre-existing law the unlawfulness must be apparent.

*Id.* (citations omitted). The Eleventh Circuit recently explained that

> [f]or the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law. Qualified immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases.

*Lassiter,* 28 F.3d at 1149–50 (citations omitted). *Accord, Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.1989), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989) (*quoting Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)) ("To defeat a qualified immunity defense, the plaintiff bears the burden of showing that the 'legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, ... the law clearly proscribed the actions the defendant took.' ")

■ The Eleventh Circuit has said that the "most common error" it encounters as a reviewing court occurs when courts "permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract 'rights.' " *Lassiter,* 28 F.3d at 1150 (citations omitted). Clearly, it is the law of this circuit that

[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances.

*Id.*

If the plaintiffs satisfy their initial burden and show that the rights that defendants' conduct allegedly violated were clearly established at the time of defendants' conduct, the court must then determine whether the plaintiffs have adduced evidence sufficient to create a genuine issue of fact as to whether defendants actually engaged in conduct that violated clearly established law. *Rich,* 841 F.2d at 1564. *See also Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990). In this undertaking, the court must draw all inferences of fact in favor of the plaintiff when the plaintiff is the party opposing the motion. *Stewart,* 908 F.2d at 1503.

### 3. McMillian's Federal Claims

#### a. Count One: McMillian's Confinement on Death Row as a Pretrial Detainee

The court finds that McMillian has produced sufficient evidence in support of Count One to survive Defendants' motions for summary judgment. Thus, the Motions for Summary Judgment of the Defendants are due to be DENIED as they apply to Count One.

In Count One, McMillian alleges that Tate, Ikner, Benson, and the D.O.C. Defendants conspired to violate McMillian's rights under the Fourteenth Amendment to the United States Constitution by causing McMillian to be placed on Death Row while he was a pretrial detainee. *First Amended Complaint* ¶¶ 19 and 44. Defendants raise four grounds for summary judgment as to Count One: insufficient evidence of a conspiracy to violate McMillian's Fourteenth Amendment rights, statute of limitations, qualified immunity, and quasi-judicial immunity. The court will address each of these grounds separately.

### i. Sufficiency Evidence of a Conspiracy

█ The court finds that McMillian has produced sufficient evidence to raise a genuine issue of material fact regarding the existence of a conspiracy among Defendants to violate McMillian's Fourteenth Amendment rights by incarcerating him on Death Row as a pretrial detainee. To support a claim for conspiracy under § 1983, McMillian must show (1) that his federal rights were violated, (2) that such violation occurred as the result of an agreement among the defendants to violate the plaintiff's federal rights, and (3) an actionable wrong. *See, NAACP v. Hunt,* 891 F.2d 1555, 1563 (11th Cir.1990); *see also, Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988).

In the case at bar, there is evidence to support all three elements of the conspiracy claim alleged in Count One. In the following pages, the court will summarize all the evidence supporting Count One. First, however, the court must set out more precisely the constitutional violation alleged in Count One.

█ Under the Due Process Clause of the Fourteenth Amendment, "states may not punish pretrial detainees at all prior to their lawful conviction of a crime." *Hamm v. De-Kalb County,* 774 F.2d 1567, 1572 (11th Cir. 1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); *see also, Bell v. Wolfish,* 441 U.S. 520, 536, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). In determining whether a particular disability or condition accompanying pretrial detention amounts to punishment in the constitutional sense, the Supreme Court has advised lower courts as follows:

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination will generally turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

*Bell,* 441 U.S. at 538–39, 99 S.Ct. at 1873–74 (citations and internal quotation marks omitted). In the present case, there is no allegation that McMillian's pretrial detention on Death Row was "arbitrary or purposeless." Instead, both sides advance a specific reason for McMillian's detention on Death Row.

McMillian alleges that he was placed on Death Row as a pretrial detainee for the specific purpose of punishing him. If McMillian's allegation is true, his pretrial detention on Death Row was unconstitutional. Defendants allege that McMillian was placed on Death Row as a pretrial detainee for the specific purpose of keeping him secure from persons who had allegedly threatened him with harm. If Defendants are telling the truth, McMillian's pretrial detention on Death Row was "reasonably related to a legitimate governmental objective," and was permissible under the Constitution. Thus, the central issue involved in the conspiracy claim alleged in Count One is the nature of the understanding among those responsible for McMillian's detention on Death Row: did they understand that he was on Death Row as punishment, or did they understand that he was on Death Row for his own security? The following review of the evidence reveals that the court cannot answer this question itself within the bounds set by the summary judgment standard.

On July 27, 1987, McMillian had been arrested and incarcerated for his alleged sodomy of Myers and his alleged murder of Ronda Morrison. On that day, McMillian was being held at the Clarke County Jail but was transferred to the Conecuh County Jail in preparation for a hearing in the District Court of Conecuh County on the sodomy charge. Myers was also brought to Conecuh County, as he was to testify against McMillian on the sodomy charge. The hearing was

continued, and McMillian was transferred to Monroe County Jail "en route" (Tate Aff. p. 15) to Clarke County Jail. Myers remained at Conecuh County Jail.

During the early morning hours of July 28, 1987, two armed men broke into the Conecuh County Jail and went to the cell where Myers was being held. Three other inmates witnessed the break-in and signed written statements describing what they had seen. (Statements of Percy Vaughn, Douglas Montgomery, and John Alexander.) While these statements certainly corroborate that a break-in occurred, none of the three witnesses claims to have heard the substance of the conversation that took place between Myers and the two armed men. *Id.* Only Myers was capable of telling law enforcement officials what the two armed men said.

The Parties agree that Myers told law enforcement officials that the two armed men had threatened him. The Parties disagree about whether Myers told the law enforcement officers that the two armed men had threatened McMillian. Tate states in his affidavit that he "went to the Conecuh County Jail and listened as the investigation concerning the break-in was being conducted." (Tate Aff. p. 15.) Tate further states that Myers said that McMillian was threatened. *Id.* Benson states in his affidavit that he investigated the break-in along with Ikner, the Conecuh County Sheriff's Department, and the FBI. (Benson Aff. p. 3.) Benson wrote a report on the incident which states

that Myers indicated that the armed men had perhaps threatened McMillian's safety.[5] Jimmy Lambert, a Conecuh County Sheriff's Deputy who assisted Benson and Ikner in the break-in investigation, states in an affidavit that Benson's report is accurate. ("Jimmy" Lambert Aff. p. 1.) In another affidavit, Lambert states that Myers indicated that McMillian had been threatened. ("James" Lambert Aff. p. 1.) Thus, there is evidence that Myers did, indeed, tell those investigating the break-in that McMillian had been threatened by the armed men.[6]

In his affidavit, however, Myers testifies that he never told Tate, Ikner, or Benson that McMillian was threatened by the armed men who broke into Conecuh County Jail. (Myers Aff. 8/18/94 p. 2.) Thus, depending on who is telling the truth,[7] Tate, Ikner and Benson may or may not have had a genuine concern for McMillian's safety. If Tate, Ikner, and Benson are lying and they did not have a genuine concern for McMillian's safety, it would be reasonable to infer, given the other evidence discussed below, that they were involved in a conspiracy to have McMillian placed on Death Row as a pretrial detainee in order to punish him.

If Myers is telling the truth, Tate, Ikner and Benson must have lied to Theodore Pearson ("Pearson"), who was at that time the District Attorney for the 35th Judicial Circuit of the State of Alabama, consisting of Conecuh and Monroe Counties. Pearson states in his affidavit that he discussed the

---

**5.** That report reads, in pertinent part, as follows:

> [t]he suspects [who had broken into the jail] threatened Ralph Myers and stated if he testified against Johnny D. McMillian in the Ronda Morrison murder or the Vicky Lynn Pittman murder, they would kill him and his family. They also stated they wanted to know where Johnny D. McMillian was being held because he removed $71,000.00 from the dry cleaners in Monroe County when Ronda Morrison was killed.

(Benson's ABI Report pp. 1–2).

The first sentence of this excerpt cannot be read to imply that McMillian was threatened. Quite the contrary, it appears that the armed men were trying to protect McMillian by threatening Myers. It is arguable, however, that the information contained in the second sentence of the excerpt could have been construed as a possible threat to McMillian's safety.

**6.** The court notes that some of this evidence of what Myers said to various law enforcement officers is hearsay not within an exception and may not be admissible at trial.

**7.** The court recognizes the possibility, of course, that both Myers and Tate, Ikner, and Benson are telling the truth as best they can remember. That is, perhaps Myers' memory is not serving him well, and he did tell these Defendants that McMillian was threatened. Also, it is possible that these Defendants simply misunderstood Myers' description about what the two armed men said. However, these are issues properly decided by the jury. For now, the court holds that the Parties' dispute about what Myers said about the break-in, taken together with all the other evidence discussed under Count One, is sufficient to raise the inference that Tate, Ikner, and Benson lied about their concern for McMillian's safety.

investigation of the break-in with Tate, Ikner and Benson. (Pearson Aff. p. 3.) Pearson also states in his affidavit that Tate, Ikner and Benson

> expressed to [Pearson] their concern for the safety and well-being of [McMillian] and Mr. Myers. Afterwards, we decided for their safety, it would be best to transfer them from the local county jails.[8]

*Id.* Pursuant to the agreement reached among Pearson, Tate, Ikner, and Benson, on July 29, 1987, Pearson filed two separate motions with the Circuit Court of Monroe County, Alabama, asking that McMillian and Myers be transferred to the custody of the Alabama Department of Corrections to ensure the safety of McMillian and Myers. (Pearson Aff. pp. 2–3; Transfer Motions.) On or about July 29, 1987, Judge Robert E.L. Key,[9] Circuit Court of Monroe County, Alabama, granted both motions. (Transfer Orders.) Neither the motions to transfer nor the transfer orders mentioned Death Row or any other particular condition or place of confinement. The motions and orders merely concerned McMillian's and Myers' transfer to the custody of the Department of Corrections based on security considerations.[10]

In his deposition, McMillian testified that shortly before he was transferred from Monroe County Jail to the custody of the Department of Corrections ("D.O.C."), and at other times, Tate made a number of threatening and hateful remarks to McMillian. Some of those remarks were allegedly as follows:

> [Y]ou are a dead son of a bitch. You ain't never going to get out of this. We got all of these charges against you. You ain't never going to get out of it. You are a dead nigger and stuff like that. . . .

> [Tate] told me about the white women. He said he was going to stop us niggers from f__ing these white women himself. He told me he was going to stop that.

> [W]e were going to jail, going to Holman Prison, [Tate] mentioned something, you have got some daughters, we ought to take them out—ought to take one of them out and kill her and throw her out beside the road and let the maggots eat her. . . .

> [Tate] said I ought to take you off and hang you like we done that nigger in Mobile, but we can't stand that suit.

(McMillian Depo. V.I pp. 295–301.) Tate categorically denies that he made any such remarks. (Tate Aff. pp. 18–19.) However, ac-

---

8. Pearson goes on to state, "All information available to us [i.e., Pearson, Tate, Ikner and Benson] was a result of the investigation conducted by Conecuh County authorities." (Pearson Aff. p. 3). This statement seems to indicate that if anyone lied about the break-in in order to harm McMillian, it was the Conecuh County officials, none of whom are Defendants in this case. However, Pearson's statement is not consistent with the affidavits of Tate, Ikner, and Benson. Tate concedes that he was present when the investigation of the break-in was conducted. (Tate Aff. p. 15). Ikner states in his affidavit that he was actively involved in the break-in investigation, that he "talked to Ralph Myers and other witnesses," that he and others "made an oral report to the District Attorney," and that he and others gave "the District Attorney all the relevant information that [they] gathered about [the break-in] incident." (Ikner Aff. pp. 2–3). Benson states in his affidavit that he "investigated the [break-in] incident," and he "gave the prosecutor all of the relevant information that [he and others] gathered about [the break-in] incident." (Benson Aff. pp. 2–3). Thus, if anyone lied to Pearson about the details of the break-in incident, Tate, Ikner, and Benson would have had to participate in such lie.

9. McMillian does not allege, and the court certainly does not intimate, any wrongdoing on the part of Judge Key or District Attorney Pearson.

10. The motion to transfer McMillian, which is nearly identical to the motion to transfer Myers, reads, in its entirety, as follows:

> Comes now the State of Alabama and shows unto this Court that threats have been made against the said Walter McMillian while he was in custody in the Monroe County Jail.
> Therefore, the State requests that this Honorable Court order that prisoner be transferred to the Alabama Department of Corrections so that he may be placed in an Institution that is more secure, pending his trial in this matter.

The order to transfer McMillian, which appears on the same page as the motion to transfer McMillian, and which is identical to the order to transfer Myers, reads, in its entirety, as follows:

> The Court, after considering the above Motion, finds that it would be in the best interest of the defendant that he be placed in the custody of the Alabama Department of Corrections.
> IT IS THEREFORE ORDERED that the defendant be transferred to the Alabama Department of Corrections pending further Orders of this Court.

cepting McMillian's sworn deposition testimony as true, and viewing it in the light most favorable to McMillian, as the court must do for the purposes of these motions, such testimony helps to raise the inference that, by facilitating McMillian's pretrial detention on Death Row, Tate was more interested in punishing McMillian than in keeping him safe and secure.

Shortly after the transfer orders were entered, McMillian and Myers were transferred to Holman State Prison ("Holman"), a Department of Corrections facility in Atmore, Alabama. The D.O.C. Defendants received McMillian and Myers into D.O.C. custody despite the fact that Judge Key had no authority under Alabama law to order the transfers, *Ex parte Thigpen*, 513 So.2d 101 (Ala.Cr.App.1987),[11] and despite the fact that it was against D.O.C. policy to house pretrial detainees. (Shinbaum Depo. p. 25.) McMillian and Myers were then placed on Death Row at Holman. At least two of the D.O.C. Defendants could not remember a single pretrial detainee, other than McMillian and Myers, that had been held on Death Row. (Thigpen Depo. at pp. 16–18; Johnson Depo. p. 41.)

On July 7, 1987, shortly before McMillian and Myers were transferred to Holman and placed on Death Row, the Alabama Supreme Court scheduled the execution of Death Row prisoner Wayne Eugene Ritter for August 28, 1987, at Holman. (Ala.S.Ct. Order Setting Execution Date.) Ritter was, in fact, executed on that date in Holman's electric chair. Thus, shortly after McMillian was placed on Death Row at Holman, he experienced, to some extent, the drama and the fear that a Death Row convict feels when a fellow inmate is executed.[12]

In his affidavit, Myers testifies that Tate, Ikner, and Benson came by to speak with

---

11. Compare *Ex parte Thigpen*, which came down at approximately the same time that McMillian and Myers were received at Holman, to the case at bar. In *Ex parte Thigpen*, a Clay County Circuit Court ordered a pretrial detainee in Clay County Jail transferred to the St. Clair Correctional Facility, an Alabama Department of Corrections institution, in order to allow the pretrial detainee access to a law library. The Alabama Department of Corrections filed a petition for writ of mandamus in the Alabama Court of Criminal Appeals against the circuit judge, arguing that a "circuit judge has no jurisdiction to order a pretrial detainee/prisoner to be incarcerated in the Alabama Department of Corrections." *Ex Parte Thigpen*, 513 So.2d at 101. The appeals court agreed with the Department of Corrections, stating "We have been cited to no authority authorizing a circuit judge to order an accused awaiting trial in the county jail transferred to a state prison for any reason." *Id.* at 102. Finally, the appeals court held as follows:

> Since the circuit judge acted beyond his jurisdiction, the petition for writ of mandamus is granted. [The circuit judge] is directed to order the Sheriff of Clay County to take custody of [the pretrial detainee] from the Alabama Department of Corrections and transport him to the Clay County Jail.
> PETITION GRANTED.
> All judges concur.

*Id.*

In the case at bar, the Department of Corrections treated Judge Key's transfer orders much differently. On June 10, 1988, Defendant Thigpen did write a letter to Judge Key on behalf of the Department of Corrections. Defendant Thigpen asked permission to transfer McMillian and Myers back to the Monroe County jail because McMillian and Myers "are awaiting trial and cannot at this time be classified as inmates sentenced to the Alabama Department of Corrections." (Thigpen Letter to Judge Key). While this letter represents an attempt to correct McMillian's and Myers' improper placement at Holman, the letter was not sent until over ten months after the transfers to Death Row took place, and still nothing was ever done to correct the situation. Nothing in the evidence now before the court explains the reason for the difference in treatment of the pretrial detainee involved in *Ex parte Thigpen*, and McMillian and Myers.

12. In his affidavit, Myers described what it felt like to be on Death Row at the time of Ritter's execution:

> What was the most frightening thing of all was to go through the execution that took place that summer. Before the execution, it was real noisy every day more than usual and when they got ready to execute him, it was like someone cut the lights off. No one was talking, the atmosphere was ungodly and extremely frightening. The man that was executed was named Ritter. His execution simply terrified me.

(Myers Aff. p. 1). In his deposition, McMillian described the experience as follows:

> It just—they just really—it just does something to you. You can't hardly—I mean, it just hurts you ... You can see all the motion. I am up high and you can see the ambulance when they come in. And the time the execution is over with, you can see all the people go out. Some be crying and some be, you know.

(McMillian's Depo. V.2 pp. 280–281).

him after Ritter's execution. In the course of a discussion regarding the execution, Myers states that Tate, Ikner, and Benson said something to the effect that "I bet you [McMillian's] ass is so tight you couldn't get a safety pin (or a nail) in there." (Myers Aff. 8/18/94 p. 1.) This evidence, taken as true, indicates that Tate, Ikner, and Benson were well aware that McMillian's presence on Death Row, especially at the time of Ritter's execution, was probably causing McMillian to suffer psychologically.

While McMillian remained on Death Row as a pretrial detainee until his conviction some thirteen months later,[13] Myers remained on Death Row only about three months initially. In late October of 1987, Myers was transferred from Holman's Death Row to the Monroe County Jail. Then, in February of 1988, Myers was transferred back to Holman's Death Row. The Parties disagree about why Myers was transferred back and forth between Death Row and county jail.

Defendants allege that Myers was held on Death Row out of concern for his security. Myers was taken off of Death Row in October of 1987 and transferred to Monroe County Jail, Defendants say, so that he could attend an arraignment hearing. At that time, George Elbrecht, Myers' attorney, asked Judge Key to allow Myers to remain in the Monroe County Jail so that Myers would be closer to Elbrecht, who was having to meet with Myers frequently. Judge Key granted Elbrecht's request, and Myers remained at Monroe County Jail. In February of 1988, just before McMillian's criminal trial was scheduled to begin, Myers told Elbrecht that Myers was afraid to testify against McMillian. Because Myers was afraid, McMillian's trial was continued and Myers was placed back on Holman's Death Row for protection. Myers stayed on Death Row until after McMillian's trial. All of the allegations contained in this paragraph are supported by the affidavit of George Elbrecht. (Elbrecht Aff. pp. 1–3.) Elbrecht concludes his affidavit with these words:

On both occasions that Mr. Myers was under the care and custody of the Department of Corrections as a pre-trial detainee, it was my firm belief, and it is my belief today, that he was incarcerated there for his own protection and out of concern for his safety. At no time did I ever believe, and do I believe at this date, that Mr. Myers or Mr. McMillian, for that matter, were incarcerated at the Holman Correctional Facility as a means to punish them.

(Elbrecht Aff. p. 3.)

McMillian disputes the allegations of the foregoing paragraph. McMillian again offers the affidavit of Myers. In his affidavit, Myers describes the reasons for his transfers to and from Death Row as follows:

After I gave another statement about Walter McMillian, I was taken back to the Monroe County jail and I stayed there, as far as I can remember, until it was time to go to court on Walter McMillian's trial. When I refused to testify against Walter McMillian, I was placed back on Death Row. Again, when I was on Death Row, I felt like I had to do anything I could to get off Death Row.

(Myers Aff. 8/18/94 p. 2.) Drawing all inferences in favor of McMillian, as the court must do, Myers' above statement supports two crucial points. First, the transferring of Myers to Monroe County Jail and back to Holman's Death Row, apparently without any written court orders, shows that there must have been some communication and understanding between Monroe County law enforcement officials and the D.O.C. Defendants about why such transfers were taking place and ultimately why McMillian and Myers were really being held on Death Row. Second, Myers' statement indicates that Defendants were using Death Row as a means to punish, intimidate, and coerce Myers to testify against McMillian. If Defendants were using Death Row to punish Myers, it is reasonable to infer that Death Row was also being used to punish McMillian.

---

**13.** McMillian was placed on Death Row in late July or early August of 1987. He was convicted of capital murder in August of 1988, and he was sentenced to death in September of 1988. After July/August of 1987, McMillian remained on Death Row until his release from prison in March of 1993.

Thus, to summarize the law and the evidence relevant to the merits of the conspiracy claim in Count One, the court first reiterates that McMillian has raised a general issue of material fact as to each of the three elements of a Section 1983 conspiracy claim: (1) a violation of his federal rights, (2) an agreement among the Defendants to violate such rights, and (3) an actionable wrong.

■ First, McMillian has presented evidence that his Fourteenth Amendment right to Due Process was violated when he was placed on Death Row as a pretrial detainee for the alleged purpose of punishing him. It is undisputed that McMillian spent approximately thirteen months on Death Row prior to his trial. As for the Defendants' intent to punish, there is evidence that Tate, Ikner and Benson lied about having concerns for McMillian's security. There is evidence that Tate made threatening and hateful remarks to McMillian. There is evidence that Tate, Ikner, and Benson mentioned to Myers that McMillian must have been extremely frightened when Wayne Eugene Ritter was executed. There is evidence that Myers was transferred to and from Death Row depending on his willingness to testify against McMillian. There is also evidence that the D.O.C. Defendants placed McMillian on Death Row even though such placement was contrary to law, was contrary to D.O.C. policy, and was unprecedented. All of this evidence taken together raises an inference that McMillian was held on Death Row for the purpose of punishment.

■ Second, McMillian has presented evidence, much of it described in the preceding paragraph, that, when taken together, raises an inference of an agreement among Defendants to use Death Row as a means of punishing McMillian. There is evidence that Tate, Ikner, and Benson did not like McMillian and enjoyed scaring and intimidating him. There is also evidence that it was unlawful and unprecedented for a pretrial detainee to be held on Death Row by the D.O.C. Defendants. Moreover, there is evidence of detention arrangements being made between Monroe County law enforcement officials and the D.O.C. Defendants without the benefit of written court orders. This evidence is enough to raise an inference of an agreement among the Defendants.

■ Finally, for the conspiracy claim in Count One to satisfy the third and final element, it must be "actionable." Perhaps, by the word "actionable" the Eleventh Circuit means there must be state action. State action is clearly satisfied in this case. Perhaps the Eleventh Circuit means the claim must not be barred by the statute of limitations and must not be subject to any immunities. As explained below, the court finds that Count One is not necessarily barred by the statute of limitations or by any immunities. Therefore, evidence submitted in support of Count One satisfies all the elements of a § 1983 conspiracy claim.

### ii. Statute of Limitations

The court finds that there is a genuine issue of material fact as to whether Count One is barred by the statute of limitations. All Parties to this action agree that Section 1983 actions in Alabama are governed by a two-year statute of limitations. *Lufkin v. McCallum*, 956 F.2d 1104, 1106 (11th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 246 (1992). The Parties disagree about when McMillian's claim under Count One accrued. The Eleventh Circuit has stated the rule for accrual of Section 1983 claims as follows:

> In Section 1983 cases, the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights. Thus Section 1983 actions do not accrue until the plaintiff knows or has reason to know that he has been injured. Nor will a Section 1983 action accrue until the plaintiff is aware or should have been aware who has inflicted the injury.

*Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir.1987) (internal quotation marks and citations omitted).

■ In the case at bar, McMillian was not aware of the facts necessary to support Count One, and therefore Count One did not accrue, until Myers contacted McMillian's counsel and offered to cooperate with him.

When McMillian heard all that Myers had to say,[14] McMillian realized he might have a valid Section 1983 action for the time he spent on Death Row as a pretrial detainee. This is not to say that prior to Myers' contact, McMillian did not suspect that his pretrial detention on Death Row was unlawful. McMillian did suspect, almost immediately, that his pretrial detention on Death Row was unlawful (McMillian Depo. V. II pp. 343–345), and as explained above, such detention was, indeed, contrary to Alabama law and D.O.C. policy. This knowledge alone, however, was not enough to support the constitutional claim McMillian has now brought under Count One. To bring Count One, McMillian had to know that his pretrial detention on Death Row was the result of a conspiracy among particular state officials to punish him prematurely.[15] Until Myers' offered his cooperation to McMillian, McMillian and his lawyers did not have sufficient information to know about such conspiracy or who precisely was involved in it. Thus, Count One did not accrue until Myers began cooperating with McMillian and his legal team.

■ While the court finds that the two-year limit did not begin to run until Myers made contact with McMillian's counsel, the court is not able to determine the approximate date of such contact. In his deposition, J.L. Chestnut, Jr., who was one of McMillian's lawyers at the criminal trial, describes how Myers called him from prison to tell him that he had testified falsely against McMillian at the trial and wanted to set things right. (Chestnut Depo. pp. 63–66.) Since Chestnut was no longer representing McMillian, Chestnut put Myers in touch with Bryan Stevenson who was then McMillian's lawyer.

*Id.* pp. 65–67. According to Chestnut, Stevenson met with Myers just a few days later, and Myers gave Stevenson much information which is now being used by McMillian to support many of his claims including Count One. *Id.* at 67. Chestnut states that all of this happened in 1989 or maybe a little later. *Id.* at 65. If Chestnut's testimony is accurate, the two-year statute of limitations began to run in 1989, maybe 1990, and McMillian's action, which was filed on June 4, 1993, is barred.

However, in an affidavit executed on August 28, 1991, Myers refers to the same initial contact between himself and Chestnut that Chestnut describes. (Myers Aff. 8/28/91 p. 2.) According to Myers, he first contacted Chestnut in late July or early August of 1991. *Id.* If Myers' affidavit is accurate, Count One is clearly not barred by the two-year statute of limitations. Because the affidavits of Chestnut and Myers are inconsistent with respect to the timing of Myers' first contact with McMillian's counsel, there is an issue of fact that must be decided at trial. Therefore, Defendants are not entitled to summary judgment on Count One based on the statute of limitations, and their Motions for Summary Judgment on that basis are due to be DENIED.

■ McMillian makes additional arguments in an attempt to save Count One from the statute of limitations, but the court is not persuaded by any of them. First, McMillian argues that, under *Heck v. Humphrey,* —— U.S. ——, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Count One did not accrue until his conviction was overturned in February of

---

14. The court is referring here to all the information provided by Myers that the court relied upon in this opinion to raise an issue of fact regarding the existence of the alleged conspiracy. The court will not repeat the substance of Myers' testimony here. The court is of the opinion, however, that Myers' testimony was absolutely necessary to support an inference that Defendants conspired to hold McMillian on Death Row to punish him.

15. Defendants cite the court to the deposition testimony of the two lawyers who represented McMillian when he was a criminal defendant. They testify that as soon as McMillian was placed on Death Row in 1987, they thought that such

placement may have been unconstitutional. (*See, e.g.,* Boynton Depo. pp. 39–40). Neither lawyer indicates, however, that he thought that McMillian had the kind of claim now brought under Count One, i.e., a Fourteenth Amendment Due Process claim for conspiracy to place McMillian on Death Row for purposes of punishment. McMillian and his lawyers had no reason to know of the alleged plot to punish McMillian by housing him on Death Row as a pretrial detainee, or exactly who was involved in such plot, until Myers came forward with his testimony which called into doubt Defendants' professed concerns for McMillian's safety.

1993. In *Heck*, the United States Supreme Court held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* at ——, 114 S.Ct. at 2372 (footnote and citation omitted). Since a Section 1983 McMillian may not bring a § 1983 action to recover damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" until such conviction or sentence is overturned, such an action would not accrue, and the statute of limitations would not begin to run, until the conviction or sentence was overturned. Thus, if Count One were a claim for harm caused by actions whose unlawfulness would render McMillian's conviction or sentence invalid, the statute of limitations would not bar Count One, because McMillian's conviction and sentence were not overturned until February of 1993. However, Count One is based on actions by Defendants that are totally unrelated to McMillian's conviction and sentence, and therefore, *Heck* does not apply.

McMillian attempts to squeeze Count One under the rule of *Heck* by arguing that McMillian's pretrial detention on Death Row was a factor in his conviction because it undermined the preparation of his defense. However, McMillian is unable to offer any evidence that his defense was hurt by his pretrial detention on Death Row. McMillian also argues that his pretrial detention on Death Row contributed to his conviction by creating a stigma that made the jury more likely to convict him. However, McMillian offers no evidence that any of the jurors knew or even could have known that McMillian was being held on Death Row. Thus, Count One is not saved from the statute of limitations by *Heck*.

■ McMillian next argues that although the two-year statute of limitations applies generally to Section 1983 claims in Alabama, Tate and Thigpen can still be sued under Count One because they are subject to the special ten-year statute of limitations contained in § 6–2–33(3) of the Code of Alabama.[16] However, the United States Supreme Court has held that one and only one statute of limitations applies to Section 1983 claims in each state. *Owens v. Okure*, 488 U.S. 235, 250, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989) (explaining that simplicity and predictability require the application of one statute of limitations to all Section 1983 actions in each state). In Alabama, that statute of limitations extends two years. *Lufkin v. McCallum*, 956 F.2d at 1106. Thus, § 6–2–33(3) does not help McMillian to overcome the statute of limitations.

■ Next, McMillian argues that the statute of limitations for Count One should be equitably tolled because a prisoner fighting a capital murder charge should not be required to timely bring a Section 1983 suit for damages. While this argument is appealing, the court is not prepared to apply such a broad rule without any supporting authority from the Eleventh Circuit or the Supreme Court.

■ Finally, McMillian argues that Count One should be tolled by § 6–2–8(a) of the Alabama Code which tolls the running of the statute of limitations for persons "imprisoned on a criminal charge for any term less than for life."[17] This provision does not

---

**16.** Section 6–2–33(3) reads as follows:
 The following must be commenced within 10 years:

 . . . . .

 (3) Motions and other actions against sheriffs, coroners, constables, and other public officers for nonfeasance, misfeasance, or malfeasance in office.

**17.** In Section 1983 actions, the state's tolling provisions apply to toll the running of the statute of limitations. *Hardin v. Straub*, 490 U.S. 536, 544, 109 S.Ct. 1998, 2003, 104 L.Ed.2d 582 (1989).

apply to Count One because McMillian was never imprisoned for a term of years. Before he was convicted, McMillian was imprisoned awaiting trial. After he was convicted, McMillian was imprisoned awaiting execution. Thus, by its terms, § 6–2–8(a) does not apply to McMillian's case. *See, Whitson v. Baker,* 463 So.2d 146, 150 (Ala.1985) (holding that tolling statute does not apply to pretrial detainees).

The court holds, therefore, that the statute of limitations defense presents a jury question. That question is when did Myers first inform McMillian of the facts necessary to support the claim McMillian has brought under Count One.

### iii. Qualified Immunity

The court finds that none of the Defendants is entitled to qualified immunity on Count One. "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter,* 28 F.3d at 1149 (internal quotation marks and citations omitted). The focus of the qualified immunity issues in this case centers on the question: should the court consider the subjective intent of the Defendants with respect to their placement of McMillian on Death Row as a pretrial detainee? To resolve this issue the court starts with the *Lassiter* opinion.

In *Lassiter,* the Eleventh Circuit states as follows:

The subjective intent of government actor defendants plays no part in qualified immunity analysis.... Objective legal reasonableness is the touchstone.

*Id.* at 1150 (citations omitted). McMillian argues that while the Eleventh Circuit is stating the general rule that qualified immunity analysis is limited to an objective inquiry, the court has to consider the defendants' subjective intent in a claim such as Count One where an unlawful intent is an essential element of the underlying constitutional (or statutory) violation. Defendants, on the other hand, argue that the Eleventh Circuit has never recognized the exception to the objective reasonableness rule that McMillian suggests.

The court finds that there can be, indeed there must be, an inquiry into the subjective intentions of the defendants in qualified immunity analysis where an essential element of the underlying constitutional violation is an unlawful intent. In the present case, McMillian alleges that Defendants placed him on Death Row as a pretrial detainee for the specific purpose of punishing him. To decide whether Defendants are entitled to qualified immunity for such conduct, the questions the court must ask are: (1) whether, at the time Defendants acted, it was clearly established that state officials could not, in accordance with the Constitution, place a pretrial detainee on Death Row for the purpose of punishing him; and (2) whether McMillian has adduced evidence sufficient to create a genuine issue of material fact as to whether Defendants actually engaged in conduct which violated clearly established law. In doing so, the court must consider the intent or the purpose of the placement on Death Row because such intent or purpose is an element of the alleged constitutional violation.[18]

As it turns out, it was clearly established in 1987, when McMillian was first put

---

**18.** The court notes that while the Eleventh Circuit apparently has not yet addressed how to apply qualified immunity where the constitutional violation contains a subjective intent element, the circuits that have addressed the issue have all come to the same conclusion as this court. *See, Tompkins v. Vickers,* 26 F.3d 603, 607 (5th Cir. 1994) ("Every Circuit that has considered the question has concluded that a public official's motive or intent must be considered in the qualified immunity analysis where unlawful motivation or intent is a critical element of the alleged constitutional violation.").

If, in performing qualified immunity analysis, courts could not consider the subjective intent of the defendants even where such intent was an essential element of the alleged constitutional violation, then government officials could never be sued for constitutional violations that contained an intent element. In effect, government officials would be absolutely immune to suit for these violations. The court does not think Congress intended such a result.

on Death Row, that state officials could not, in accordance with the Constitution, put a pretrial detainee on Death Row for the purpose of punishment. *See, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447; *Hamm v. DeKalb County,* 774 F.2d 1567. In fact, state officials could not impose any restrictions or conditions of confinement on pretrial detainees for the purpose of punishment. *Id.* The court has already found that there is an issue of fact with respect to an alleged conspiracy on the part of Defendants to place McMillian on Death Row as a pretrial detainee for the purpose of punishing him. Therefore, Defendants are not entitled to qualified immunity on Count One.

### iv. Quasi–Judicial Immunity

■ Finally, the court finds that Tate is not entitled to quasi-judicial immunity. Tate raises this defense which provides law enforcement officials with absolute immunity for actions they take pursuant to facially valid court orders. *See, Roland v. Phillips,* 19 F.3d 552, 556 (11th Cir.1994). Tate argues that he is immune from suit for any actions he took pursuant to Judge Key's order transferring McMillian to D.O.C. custody.

While the court agrees that Tate is immune from suit for actions he took pursuant to Judge Key's order, Tate is not being sued under Count One for actions he took pursuant to Judge Key's order. He is being sued ultimately for incarcerating McMillian on Death Row as a pretrial detainee. Judge Key's order did not mention Death Row at all; such order merely transferred McMillian to D.O.C. custody. Furthermore, McMillian contends that Judge Key's order itself was issued as a result of the unlawful actions of Tate and the other Defendants.

Tate's alleged actions that resulted in McMillian's placement on Death Row include lying to the District Attorney and agreeing with the D.O.C. Defendants to punish McMillian by placing him on Death Row. These actions, if indeed taken, were not taken pursuant to a court order. Therefore, Tate is not entitled to quasi-judicial immunity to Count One.

For all of the foregoing reasons, the court finds that there are genuine issues of material fact that preclude summary judgment in favor of Defendants on Count One. Thus, the Motions for Summary Judgment on Count One are due to be DENIED.

### b. Count Two: Withholding and Suppressing Exculpatory Evidence

The court finds that McMillian has produced sufficient evidence in support of Count Two to survive Defendants' Motions for Summary Judgment.

In Count Two, McMillian alleges that Tate, Ikner, Benson, and Barnett violated his rights under the Fourteenth Amendment to the United States Constitution by withholding and suppressing exculpatory evidence. *First Amended Complaint* ¶ 45. Defendants raise two grounds for summary judgment as to Count Two: qualified immunity and absolute prosecutorial immunity. The court will address each of these grounds separately.

### i. Qualified Immunity

The court finds that qualified immunity protects Defendants from civil liability as to some of the pieces of exculpatory evidence that were allegedly withheld, but it does not protect Defendants as to all of the pieces.

As previously mentioned in this opinion, "[q]ualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter,* 28 F.3d at 1149 (internal quotation marks and citations omitted). In its opinion reversing McMillian's conviction and death sentence, the Alabama Court of Criminal Appeals held that McMillian's clearly established due process rights, as defined by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, were violated because a number of pieces of exculpatory evidence were not turned over by the State to McMillian and his defense counsel. *McMillian v. State,* 616 So.2d 933 (Ala.Cr.App.1993). The Alabama Court of Criminal Appeals also held that McMillian's

rights were violated whether it was the prosecutor who failed to disclose the exculpatory evidence to the defense, or the law enforcement officers assigned to the case (Defendants in this case) who failed to disclose such evidence to the prosecutor. *Id.* at 946.

■ This court agrees that McMillian's clearly established constitutional rights were violated by the State's failure to disclose to him a number of pieces of exculpatory evidence.[19] Thus, the issue now before this court is not whether McMillian's constitutional rights were violated. They were. The issue now before this court is whether these particular individual Defendants[20] can be held civilly liable for their personal actions in regard to the undisclosed evidence. To resolve that issue, the court must determine to what extent law enforcement officers in the years 1987 and 1988, when McMillian was arrested and prosecuted for the Morrison murder, had a clearly established duty to turn exculpatory evidence over to the prosecutor who was responsible for disclosing such evidence to the defense. The court looks to the Supreme Court's landmark decision, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, for the resolution of this issue.

Undeniably, the holding in *Brady* imposes a duty first and foremost upon prosecutors: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Bra-*

*dy,* 373 U.S. at 87, 83 S.Ct. at 1196–97. Since *Brady* came down, however, it has been clear to every reasonable law enforcement officer that his or her conduct could impact greatly upon the constitutional right articulated in *Brady.* Obviously, if law enforcement officials, who investigate cases and develop the evidence, do not turn exculpatory evidence over to the prosecutor, the prosecutor is unable to properly perform his duties under *Brady.* The court holds, therefore, that in 1987 and 1988, *Brady* had imposed a clearly established duty upon law enforcement officers to not intentionally withhold clearly exculpatory evidence from the prosecutor. *See, Geter v. Fortenberry,* 849 F.2d 1550, 1559 (5th Cir.1988) (holding that *Brady* clearly established a law enforcement officer's duty not to deliberately conceal exculpatory evidence). McMillian has cited no authority that would impose a greater duty on law enforcement officials in the Eleventh Circuit in 1987.[21]

■ Thus, the court holds that in order to defeat qualified immunity on this claim McMillian must come forward with evidence from which a reasonable jury could infer that Defendants intentionally withheld clearly exculpatory evidence from the prosecutor, having no reason to believe that the prosecutor had or knew of it.

The court will now analyze each piece of evidence cited by McMillian to determine whether it is clearly exculpatory and whether there is sufficient evidence from which a reasonable jury could infer that Defendants intentionally withheld it. First, the court

---

**19.** On the basis of this very fact, the Alabama Court of Criminal Appeals properly reversed McMillian's criminal conviction and death sentence. This is not to say that the prior determination by the Alabama court has the effect of collateral estoppel; rather, the court merely notes that the state court reached the same conclusion which this court now reaches.

**20.** Unfortunately for McMillian, he cannot sue the prosecutor for money damages because prosecutors are absolutely immune to civil suits for money damages for failure to disclose exculpatory evidence. *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 996, 47 L.Ed.2d 128 (1976).

**21.** *Courson v. McMillian,* 939 F.2d 1479, 1497–98 and n. 32 (11th Cir.1991) (For a constitutional duty to be clearly established, the duty must have

been recognized by the United States Supreme Court, the Eleventh Circuit, or the state supreme court at the time the actions at issue occurred); *see also, Kelly v. Curtis,* 21 F.3d 1544, 1551 n. 6 (11th Cir.1994) (indicating that the law cannot be clearly established for qualified immunity purposes by non-binding precedent). Indeed, the Eleventh Circuit has recently held that there is no clearly established duty on the part of a police officer to ferret out exculpatory evidence, or to turn exculpatory evidence over to the court, defense counsel, or even to a prosecutor when the officer has reason to believe that the prosecutor already has or knows of the evidence. *Kelly v. Curtis,* 21 F.3d at 1553.

will first discuss the undisclosed evidence for which Defendants cannot be held civilly liable. Next, the court will discuss the evidence for which a jury could assign liability.[22]

### ii. The Evidence

*Ralph Myers' June 1, 1987 Statement*

 Ralph Myers' June 1, 1987 statement [23] is not clearly exculpatory, and therefore, Defendants cannot be held liable for its nondisclosure. This statement was taken shortly after Myers was arrested for the murder of a woman named Vicky Lynn Pittman. In this statement, Myers implicates McMillian and a woman named Karen Kelly in the murder of Vicky Lynn Pittman.[24] Ronda Morrison's name is mentioned a few times during the statement, but Myers makes no allegations regarding the Morrison murder. Defendants cannot be held liable in regard to this statement.

*September 2, 1987, Taped Telephone Conversation Between Tate and Myers*

 The court finds that the taped telephone conversation between Tate and Ralph Myers on September 2, 1987, is not clearly exculpatory; nor is there any evidence that it was intentionally withheld.

On September 2, 1987, Myers telephoned Tate at his office and gave him a statement over the phone that was tape recorded. In this statement, Myers describes how he heard shots while he was waiting for McMillian outside Jackson Cleaners. Myers explains that he entered the cleaners to find Ronda Morrison dead, and McMillian with a gun. (Myers Statement of 9/2/87.) The statement is clearly inculpatory for McMillian, not exculpatory. McMillian argues that the September 2, 1987 statement would have been helpful to his defense because it is inconsistent with Myers' trial testimony. The only inconsistency McMillian can point to, however, is that in this statement, Myers says that he saw McMillian taking money and "dope" from the cleaners, whereas in the trial testimony, Myers does not mention the dope. The court does not find this inconsistency to be material, and the September 2 statement, as a whole, certainly is not clearly exculpatory.

Tate explains in his affidavit that he kept the tape of this phone conversation in his custody at the instruction of District Attorney Pearson. "Mr. Pearson stated that if we went to Holman Correctional Facility and Mr. Myers gave a statement to the same information after he had been *mirandized,* that this tape would not be necessary for use in trial." (Tate Aff. p. 28.) Tate, Ikner, and Benson did go visit Myers at Holman on September 14, 1987. Unlike the telephonic statement of Myers on September 2, Myers' September 14 statement begins with Myers formally waiving his *Miranda* rights. Myers then proceeds to give virtually the same

---

22. The court notes that, while McMillian lists several items of evidence which were improperly intentionally withheld, he does not discuss all of the items in his Memorandum [Corrected] in Opposition to Defendants' Motion[s] for Summary Judgment. In his Memorandum on pages 25 and 26, McMillian lists the following items but does not discuss them in his argument under Count Two: false statements by Myers in connection with Pittman, false statements by Kelly in connection with Pittman, and Hooks' fine and charge dismissal information. Without argument, case authority or a discussion of the record which indicates that these items were clearly exculpatory and intentionally withheld or at least that there is a factual dispute, the court cannot say that McMillian has made sufficient efforts to defeat Defendants' Motions for Summary Judgment on Count Two as they apply to these items of evidence.

23. The Alabama Court of Criminal Appeals held that the State's failure to disclose this statement did not violate McMillian's due process rights. *McMillian,* 616 So.2d at 949. The court does not hold that this prior determination has the effect of collateral estoppel, but merely notes that the state court reached the same conclusion which this court now reaches.

24. Myers, Kelly, and McMillian were indicted for the murder of Vicky Lynn Pittman. (Godwin Aff. pp. 2–3). The charges against McMillian were eventually dropped. (*Plaintiff's (Corrected) Memorandum in Opposition to Defendants' Motion[s] for Summary Judgment* p. 26 n. 10). The court is not certain whether the charges against Myers and Kelly were dropped. The court does know, however, that neither Myers nor Kelly nor McMillian was ever tried for the murder of Vicky Lynn Pittman. (Godwin Aff. pp. 2–3). Michael D. Godwin, the District Attorney for Escambia County, where the Pittman murder occurred, is still hoping to one day prosecute those responsible for the Pittman murder. *Id.*

statement to Tate, Ikner, and Benson that he had given to Tate over the phone. (Myers Statement of 9/14/87.) This September 14, 1987 statement was turned over to District Attorney Pearson, and ultimately, to McMillian and his defense counsel.

Given the above-described circumstances, the court finds that Tate did notify District Attorney Pearson of the September 2, 1987 phone conference with Myers and of the tape of that conference. There can be no liability on the part of the Defendants regarding this tape.

### Taylor Hardin Medical Reports

■ While these reports are clearly exculpatory, the court finds no evidence that such reports were intentionally withheld from the prosecutor.

Sometime during the first few months of 1988, Judge Key ordered that Ralph Myers be mentally evaluated by doctors at the Taylor Hardin Secure Medical Facility. At least four different doctors wrote reports on Myers. Some of these reports indicated that Myers was being pressured by law enforcement officials to implicate an innocent man in the murder of Ronda Morrison. This information would have been useful to McMillian and his defense counsel at McMillian's criminal trial.

Defendants insist that they never saw such reports or knew of their contents. (Benson Aff. pp. 4–5; Ikner Aff. p. 4; Tate Aff. p. 31.) In *McMillian,* the Alabama Court of Criminal Appeals found [25] that the reports had been sent directly to the clerk of the Monroe County Circuit Court, that the prosecutor had access to them there, that the prosecutor suppressed them, and that such suppression violated McMillian's due process rights. *McMillian,* 616 So.2d at 948. McMillian has produced no evidence, however, that would suggest that any of the Defendants ever had any control over the reports, knew of their contents, or withheld them from the prosecutor. Thus, the court finds that Defendants cannot be liable for intentionally suppressing the Taylor Hardin medical reports.

### Polygraph Test of Bill Hooks, Jr.

■ The polygraph test of Bill Hooks, Jr., is not clearly exculpatory; nor is there any evidence that Defendants intentionally withheld such test.

In his deposition, Benson mentioned that Bill Hooks, Jr., was given a polygraph test as part of the investigation into the Morrison murder. McMillian argues that he should have been given a copy of the test results since Hooks testified against McMillian at trial. McMillian argues that the polygraph test indicated that Hooks was lying. McMillian relies on Benson's deposition, in which Benson stated, in pertinent part, as follows:

Q: Okay. What did Mr. Sutton report to you about the results of Mr. Hooks' polygraph?

A: He didn't send the report back to us. He came out after the polygraph and said there was only one area that he was concerned that he was holding something back, what he thought. And he went back in and talked with him, and he came back out and said he's sticking to the same thing. And until the—to my knowledge he was not given another test.

(Benson Depo. p. 145.) The court does not agree that Benson's testimony indicates that Hooks was lying. In his affidavit, Benson states that, "I was told that Hooks was holding something back but based on my recollection of the conversation with the polygraph operator I did not understand that it was anything of a material nature." (Benson Aff. 9/16/94 p. 1.) In his affidavit, Tate states that he has "never been informed that the results [of the Hooks polygraph examination] were anything but positive, in that the results supported the validity of Hooks' testimony." (Tate Aff. p. 2.) Furthermore, McMillian could not have used the polygraph results to impeach Hooks' trial testimony. *See, Ex parte Hinton,* 548 So.2d 562, 569 (Ala.), *cert. denied,* 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (holding that results of polygraph test proffered by defendant were inadmissable at the guilt phase

---

**25.** As before, the court does not hold that this prior determination has the effect of collateral estoppel, but notes that the state court based its opinion on stated facts which are not challenged by McMillian.

and the sentencing phase of a capital murder trial). For all these reasons, the court finds that Hooks' polygraph results are not clearly exculpatory.

Even if the results were exculpatory, all the evidence indicates that none of the Defendants ever had possession of the test results. In his deposition, Benson testified that he was not given a copy of the report prepared on the Hooks' polygraph test. (Benson Depo. p. 145.) Agent Sutton, who is not a Defendant in this case, kept a copy of the report, and a copy was probably sent to the ABI's polygraph examination unit in Montgomery. (Benson Depo. p. 146.) There is no evidence that any of the Defendants in this case ever had possession of the report.

Since the Hooks' polygraph examination report is not clearly exculpatory, and there is no evidence showing that any of the Defendants ever had possession of such report, the court holds that Defendants cannot be held liable for intentionally suppressing it.

### Barnett's Visit to McMillian's Residence

██ The court finds that Defendant Barnett's visit to Plaintiff's residence on November 1, 1986, the day of the Morrison murder, does not constitute clearly exculpatory evidence; nor is there any evidence that Barnett intended to withhold the fact of his visit from the prosecutor or McMillian.

This piece of evidence is apparently the result of a remarkable coincidence. On the day of Ronda Morrison's murder, in the afternoon, Barnett was on his way to the murder scene when he noticed a car matching the description of a car that was seen at an unrelated crime that had also occurred that morning. Barnett followed the car back to a residence where it stopped. After speaking with the passengers in the car, Barnett decided the car was not the one involved in the crime, and he left. It turns out that the residence at which the suspect car and Barnett stopped was McMillian's residence. (Barnett Aff. pp. 1–4.)

It is undisputed that Barnett did not see McMillian that day at his residence. (Barnett Aff. p. 4.) It is also undisputed that Barnett's visit occurred in the afternoon while the Morrison murder occurred in the morning. (Barnett Aff. p. 4; Carolyn McMillian Aff. p. 1.) Nevertheless, McMillian argues that Barnett could have helped his defense at trial.

McMillian points out that his entire defense at trial was based upon alibi. He claims that he was at home on the day of the murder where a fish fry was in progress. McMillian argues that Barnett could have testified at trial that he visited McMillian's house on the day of the murder and there was, indeed, a fish fry in progress. Such testimony by Barnett, McMillian argues, would have bolstered his alibi witnesses who were all friends and relatives. The court finds that testimony by Barnett that there was a fish fry at McMillian's house on the day of the murder is not clearly exculpatory, and almost certainly would not have affected the outcome of McMillian's trial.

Even assuming that Barnett's visit to McMillian's house is clearly exculpatory, the evidence does not support an inference that Barnett intentionally withheld the fact of his visit. The evidence shows that Barnett did not know that he had stopped at McMillian's house the day of the murder until well after McMillian's trial. (Barnett Aff. pp. 2–4.) Carolyn McMillian states in her affidavit that she told Barnett when he visited Plaintiff's home on the day of the murder that "he was at the home of Johnny D. McMillian and that we were having a fish fry for the church." (Carolyn McMillian p. 1.) However, there is no reason the name "Johnny D. McMillian" would have meant anything to Barnett that day. McMillian was not arrested for the Morrison murder until June 8, 1987, over seven months later. McMillian points out that when Barnett wrote the case summary in the fall of 1987, he included in the summary the name and address of McMillian in the summary. However, the summary was written almost a year after Barnett's visit. It is not reasonable to infer that McMillian's name and address must have jogged Barnett's memory regarding his stop at Plaintiff's house. Barnett states in his affidavit that he did not make the connection between his stop at the house the day of the murder and McMillian until December of 1992 when he met with a number of other ABI agents to

discuss the Morrison case. (Barnett Aff. p. 3–4.) At that meeting, Barnett was told that McMillian's family members had alleged that an FBI agent in a black car had stopped at their house the day of the murder. Then Barnett realized that he was the "FBI agent," and he had been at McMillian's house on the day of the murder. *Id.*

McMillian has produced no evidence that would call Barnett's testimony into question. Thus, the court finds that Barnett's visit to McMillian's home on the day of the murder is not clearly exculpatory. Furthermore, there is no evidence to raise an inference that Barnett or any of the other Defendants intentionally withheld from the prosecutor or from McMillian and his defense counsel evidence of Barnett's visit.

### Statements by Crime Scene Witnesses

▪ The court finds that the statements by the crime scene witnesses are not clearly exculpatory, and there is no evidence that Defendants intentionally withheld the statements from the prosecutor.

Shortly after the murder of Ronda Morrison, a number of statements were collected from people who had passed by Jackson Cleaners on the morning of the murder. Statements were taken from Keith Hughes, Hal McGilberry, Larry Mitchell, Rae Fountain, Irene Barnes, Jo Ann Ikner, Edith Petty, Ricky Kelly, and Albaro Banos. None of these witnesses described seeing a truck like Plaintiff's truck in the Jackson Cleaners' parking lot.

Taken en masse, and in hindsight, these statements are arguably exculpatory, especially given the fact that many of these statements contain a reference to a green sedan. Conceivably, McMillian could have used the statements or witnesses to try to convince a jury that the green sedan was the killer's car. However, the court does not find these statements to be clearly exculpatory. Even according to Myers' trial testimony, McMillian's truck was in the cleaners' driveway only momentarily. For most of the time McMillian was (according to Myers' trial testimony) in the cleaners, Myers was sitting in McMillian's truck which was in the parking lot of the Piggly Wiggly. (Trial Transcript R–319–320 and R–336–337.) Thus, passers-by would not

necessarily have noticed the truck in the Piggy Wiggly parking lot.

More important, there is no evidence that these statements were intentionally suppressed. McMillian points to the following testimony by Ikner to support his allegations of intentional suppression:

> If we determined they had nothing to do with it no, sir, we didn't necessarily keep it on file. You probably couldn't stack in this courtroom if we had kept statements from everybody we talked with on the street or everything. I mean it was just a tremendous—everybody was talking.

*(Plaintiff's (Corrected) Memorandum in Opposition to Defendants' Motion[s] for Summary Judgment p. 39.)* The court finds nothing unlawful about Defendants' behavior as described by Ikner. McMillian has cited the court to no authority that says that the State must retain every bit of information it ever collects in connection with a case, even the information determined to be irrelevant. Law enforcement officers must be afforded some discretion if they are to be expected to correctly resolve cases within reasonable bounds of time and expense.

Thus, Defendants may not be held civilly liable for any of the above evidence because none of it can be characterized as clearly exculpatory evidence which was intentionally withheld from the prosecutor. The following three pieces of evidence, however, are clearly exculpatory, and sufficient evidence exists to find that each was intentionally withheld by one or more of the Defendants. Therefore, one or more of the Defendants may be held liable for the following three pieces of evidence.

### Ralph Myers' June 3, 1987 Statement

▪ The statement given by Myers on June 3, 1987, is clearly exculpatory. The failure of the prosecutor to disclose it to McMillian was held by the Alabama Court of Criminal Appeals to be a due process violation and to require a reversal of McMillian's conviction and death sentence. While this finding does not preclude this court from concluding otherwise, the court agrees with the finding of the Alabama Court of Criminal Appeals.

In his June 3, 1987 statement, which was given in the presence of Tate, Ikner and Benson, Myers spoke about both the Vicky Lynn Pittman murder, which occurred in Escambia County, Alabama, and the Ronda Morrison murder. Myers' assertions regarding the Morrison murder were clearly exculpatory for McMillian:

Q: ... I want the details of Ronda Morrison's death. I can tell you what caused the death: she was shot. I want, from the start to the finish, why Johnny D. had you kill Ronda Morrison.

A: I didn't kill Ronda Morrison. And Johnny D. didn't get me to kill Ronda Morrison.

Q: Did you kill her on your own?

A: I did not kill Ronda Morrison period, Mr. Simon.

Q: OK. So you don't deny that Johnny D. gave you a .25 automatic that he had to kill Ronda Morrison.

A: Johnny D. has never given me a .25 automatic. He has never given me no gun, period....

Q: Well, would you face anyone in the world today that you know exists in the world and sit or stand and look them in the eyes and tell them that they do not know for a fact that Johnny D. had you to kill ...

A: You're damn right, I yes sir ...

Q: ... Ronda Morrison.

A: ... Mr. Simon, I would.

Q: Listen, let's, let's finish, let's, let's understand, o.k. What you said, no one can put you at the cleaner when Ronda Morrison was killed.

A: No sir, I was not at no cleaner.

. . . . .

Q: And you would take a polygraph to the fact that you did not shoot Ronda Morrison in the dry cleaners.

A: That's right, yes sir, I certainly will.

Q: That you never had Johnny D.'s magnum or .25 automatic.

A: That's right, I will, I, I sure will.

Q: That you do not know who killed Ronda Morrison.

A: That's right.

Q: You would take a polygraph.

A: That's right.

(Myers June 3, 1987 Statement.) This statement would obviously have been helpful to McMillian at his criminal trial. Myers, the main witness for the prosecution, is alleging in this statement that he does not know who killed Ronda Morrison. Myers, who testified at trial that he saw McMillian in the cleaners right after Morrison was murdered, states in his June 3, 1987 statement that he was not at the cleaners the day of the Morrison murder.

McMillian and his defense team were not made aware of this statement before McMillian's trial. Benson placed the tape of the statement only in the Pittman murder file which was kept in the office of Michael D. Godwin, District Attorney for Escambia County. (Benson Aff. p. 5; Godwin Aff. p. 3.) Since there was not a copy of the tape in the Morrison file in Monroe County, the tape was not disclosed to the prosecutor in the Morrison case.

This statement was taken in an interview attended by the Sheriff of Monroe County (Tate) and an investigator for the Monroe County District Attorney (Ikner). They were investigating the Morrison murder which occurred in Monroe County. They had no involvement in the investigation of the Pittman murder which occurred in Escambia County. Benson, who was an investigator for the ABI and who was assigned to both murder cases, knew that much of the interview concerned the Morrison case. Yet, the statement was placed only in the Pittman murder file. No copy of the statement was placed in the Morrison murder file, and the Monroe County District Attorney apparently was not told of the statement, even though Tate and Ikner were interested only in the Morrison murder. Although the Defendants' failure to place a copy in the Morrison file may well have been inadvertent or negligent, rather than intentional, a reasonable jury could infer from Defendants' actions and from the totality of the evidence [26] that Tate,

---

26. Including such things as the prosecutor's ar- gument to the jury that Myers had told the same

Ikner, and Benson intended to shield the prosecutor in Monroe County from the statement so that he would not have knowledge of it and furnish it to McMillian and his defense team. A reasonable investigator would clearly have known that this was a violation of due process under *Brady*. Therefore, Tate, Ikner and Benson are not entitled to qualified immunity with respect to the alleged intentional suppression of this statement based on the evidence presently before the court. Since Barnett was in no way connected to the June 3, 1987 Myers statement, however, he cannot be held liable with respect to the alleged suppression of such statement.

### Isaac Daily Statement

■ Isaac Daily's statement is clearly exculpatory, and the court, like the Alabama Court of Criminal Appeals, holds that its suppression was a due process violation.

In this statement, dated August 27, 1987, and taken by Benson and Escambia County District Attorney Godwin, Isaac Daily states that he was in the Monroe County Jail the same time as Myers. Daily alleges that he heard Myers say that Myers and Karen Kelly had killed Vicky Lynn Pittman and that Myers and Kelly were plotting together to blame the Pittman murder on McMillian. (Daily Statement p. 2.) This information would clearly have been helpful to McMillian at his criminal trial to show that Myers, the State's key witness against McMillian, was willing to falsely accuse McMillian of a murder he did not commit.

The Isaac Daily statement, like the Myers' statement of June 3, 1987, was placed, apparently by Benson or District Attorney Godwin, only in the Pittman murder file. (Godwin Aff. p. 3.) Therefore, McMillian's defense counsel in the Morrison case did not receive the Isaac Daily statement.

Given the totality of the evidence, including the evidence concerning the failure to place the Myers statement of June 3, 1987, in the Morrison file and to advise the Monroe County prosecutor of it, a reasonable jury

might infer that Benson intentionally failed to notify the Monroe County prosecutor of Isaac Daily's statement, also. Therefore, Benson is not entitled to qualified immunity with respect to the Isaac Daily statement. Since there is no evidence that Tate, Ikner, or Barnett knew of Daily's statement, they cannot be held liable with respect to his statement.

### Miles Jackson Statement

■ The statement given by Miles Jackson is clearly exculpatory, and the Alabama Court of Criminal Appeals held that its suppression was a due process violation. The court agrees with that conclusion.

Shortly after the murder of Ronda Morrison occurred, Miles Jackson, a former owner of Jackson Cleaners, came forward and gave a statement to Barnett. (*Amendment to Reply Brief of Defendant Mike Barnett* p. 1.) Jackson stated that he was in the cleaners on the morning of the murder at 10:30, and Ronda Morrison was alive and well. This information, had it been known to the defense, would have been very damaging to the prosecution's theory of the crime. The prosecution alleged that the murder was committed in the morning between 10:15, when Morrison had last been seen alive (Jackson's statement apparently having been undisclosed to the prosecutor or ignored by him) and 10:45 or 10:50, when Morrison was found dead. That half-hour window provided just enough time for Myers' version of events to sound credible. If the defense could have pointed out that Myers' version of events must have taken place in approximately fifteen minutes, the jury may well have rejected Myers' testimony.

It is not exactly clear why both the prosecution and the defense failed to bring the jury's attention to Jackson's crucial timing evidence. There does not appear to be an original record of Jackson's statement, but it is mentioned in a case summary that was written by Barnett in the fall of 1987. The case summary's only references to Miles Jackson regard the timing of his visit to the cleaners:

story from the beginning, Tate's and Ikner's involvement in the trial where Myers was not cross examined about this statement, the suppression

of other evidence, the general handling of the prosecution, and actions of the Defendants directed toward Myers and the Plaintiff.

Witness Miles Jackson stated that he was in the cleaners at 10:30 a.m. and that Ronda Morrison was alive and that there was no one else in the cleaners.

AND

Miles Jackson[:] In cleaners at 10:30 a.m. Last person to see victim alive.

(ABI Report pp. 2 and 7.)

Barnett states in his affidavit that he and Benson met in the fall of 1987 to put their files together and write a case summary. (Barnett Aff. p. 3.) The case summary was written, and it, along with the rest of the file, was sent to an ABI office in Dothan, Alabama to be typed. *Id.* Barnett states that at the time the file was sent to Dothan it contained all the evidence he had collected during the Morrison investigation. *Id.* Benson's affidavit is consistent with Barnett's affidavit. Benson states that he delivered the entire consolidated case file to District Attorney Pearson. (Benson Aff. p. 4.) Benson also states that he was present when District Attorney Pearson told McMillian's defense counsel that he could look through the file and copy what he wanted. *Id.*

The problem with Benson's affidavit is that it fails to explain why neither the prosecutor nor the defense seems to have known of the Jackson statement. Either the statement was accidently omitted from the file, lawyers on both sides negligently overlooked the statement, or someone in the chain of custody of the statement intentionally withheld the statement from the prosecutor and defense counsel. It will be the jury's job to decide which of the three explanations is most plausible.

The court would be remiss if it did not mention an important piece of evidence relevant to the Jackson statement. Defendants have produced a transcript of the voir dire conducted in Plaintiff's criminal trial. This transcript shows that Miles Jackson's name was on the State's witness list, and McMilli-

an's defense counsel questioned the potential jurors about any connections they might have to Miles Jackson. (Voir Dire Transcript R. 58–60.) It is clear, therefore, that both sides knew that Miles Jackson was relevant to the Morrison murder case. Despite this fact, however, as explained above, neither the prosecution nor the defense seems to have known of the substance of Jackson's statement and potential exculpatory testimony. The prosecutor argued to the jury that the victim was last seen alive at 10:15, and the defense did not call Jackson to testify that he saw her alive at 10:30. Such ignorance of an immensely important piece of exculpatory evidence could raise an inference from which a reasonable jury could find that the statement was intentionally withheld from the prosecution and the defense.

The only issue left to be decided is which Defendants were connected to the Jackson statement. Barnett took the Miles Jackson statement and prepared the case summary which mentions it. (*Amendment to Reply Brief of Defendant Mike Barnett,* p. 1; Barnett Aff. p. 3.) Benson claims that he is the one who delivered the case file with the summary in it to the prosecutor. (Benson Aff. p. 4.) Thus, Barnett reported the statement in a summary which came into Benson's possession. No evidence suggested intentional withholding of the statement by Barnett. Ikner never denies knowledge of the statement. (*Reply Brief of Defendants Benson & Ikner to Plaintiff's Brief in Opposition to Summary Judgment* p. 8; Ikner Aff. p. 4.) Drawing all inferences in favor of McMillian, the court will assume for now that Ikner knew about the statement before the trial.[27] As for Tate, he states in his affidavit that he read the case summary containing the Jackson statement. (Tate Aff. pp. 31–32.) He does not make clear when such reading took place. *Id.* The court will assume, for now, as it must, that he read the

---

27. Ikner states in his affidavit that, "I kept the District Attorney informed of all developments in the [Morrison] case." (Ikner Aff. p. 4). It seems logical that Defendant Ikner, who was an investigator for the Monroe County District Attorney, would have considered his job to be primarily keeping the Monroe County District Attorney in-

formed of all developments in each major case. Thus, if Ikner knew of Miles Jackson's important statement, and the District Attorney did not, a reasonable jury could infer, absent some reasonable explanation, that Ikner intentionally withheld Jackson's statement from his boss.

summary and knew of the Jackson statement before trial.[28]

Thus, Barnett cannot be held liable for withholding the Miles Jackson statement, but Tate, Ikner and Benson are not entitled to qualified immunity with respect to this statement.

In sum, the current state of the evidence warrants a finding of qualified immunity in regard to some of the evidence, but not all of it. As to some clearly exculpatory evidence which was withheld from McMillian, there is a question for the jury to determine whether Tate, Ikner or Benson, but not Barnett, intentionally withheld that evidence from the prosecutor and, ultimately, from McMillian. If any Defendant did intentionally withhold from the prosecutor clearly exculpatory evidence with no reason to believe that the prosecutor had or knew of it, he can be held civilly liable under *Brady.*

### iii. Absolute Prosecutorial Immunity

The court finds that Defendants are not protected from civil liability under Count Two by absolute prosecutorial immunity.

Tate points out that prosecutors are absolutely immune to civil suits for money damages for failure to disclose exculpatory evidence. *See, Imbler v. Pachtman,* 424 U.S. at 431, 96 S.Ct. at 996. *Imbler* held that a prosecutor cannot be held personally liable for deciding to initiate a prosecution or for presenting a case at trial. *Id.* This immunity is grounded in common law which afforded prosecutors and judges absolute immunity for the conduct of trial. *Id.* at 422–24, 96 S.Ct. at 991–92. Tate also quotes the following language from a recent United States Supreme Court case: "When the functions of prosecutors and detectives are the same, . . . the immunity that protects them is also the

same." *Buckley v. Fitzsimmons,* —— U.S. ——, ——, 113 S.Ct. 2606, 2617, 125 L.Ed.2d 209 (1993) (holding that prosecutor loses absolute immunity when he or she acts as an investigator). Given these premises, Tate argues that law enforcement officials cannot be held civilly liable for failing to disclose exculpatory evidence to the prosecutor, disclosure of evidence being a uniquely prosecutorial function.

■■■ As the court explained in its order on Defendants' motions to dismiss, "[A]n investigator or law enforcement officer is not functioning as a prosecutor when he or she decides which evidence to give to the prosecutor." (*Memorandum Opinion* of February 18, 1994 at p. 19.) Tate cites no case which holds that law enforcement officers act as prosecutors when they decide what evidence to disclose to the prosecutor; nor does Tate cite any case that extends absolute prosecutorial immunity to law enforcement officers. It is the prosecutor who has the duty to inform the Defendant of exculpatory evidence. Law enforcement officers cannot intentionally suppress clearly exculpatory evidence from the prosecutor and at the same time be absolutely protected by the prosecutor's immunity. For these reasons, the court rejects Tate's claim to absolute prosecutorial immunity.[29]

For the foregoing reasons, the court holds that Tate, Ikner, and Benson are not entitled to summary judgment on Count Two; Barnett is. As explained above, Tate, Ikner and Benson may be liable for one or more pieces of evidence that were not disclosed to McMillian when he was a criminal defendant. Thus, the Motions for Summary Judgment on Count Two are due to be DENIED and to

---

**28.** McMillian alleges in his brief that Tate attended the capital murder trial of McMillian. (*Plaintiff's (Corrected) Memorandum in Opposition to Defendants' Motion[s] for Summary Judgment* p. 45). Tate never denies this allegation. Assuming such allegation is true, and assuming Tate was aware of the Miles Jackson statement, a reasonable jury could find that Tate intentionally withheld the Miles Jackson statement from the prosecution when it became obvious that the prosecutor, who kept referring to a thirty-minute period for the murder, was not aware of such statement.

**29.** The court notes that at least one District Court in the Eleventh Circuit has held that "when IRS agents investigate and refer cases for criminal investigations, they do not enjoy absolute immunity for their actions." *Heller v. Plave,* 743 F.Supp. 1553, 1563 (S.D.Fla.1990) (denying IRS agents, who violated a taxpayer's clearly established constitutional rights, the protection of absolute immunity under *Imbler.*)

Tate, Ikner and Benson, and GRANTED as to Barnett.

### c. Count Three: Improper Coercion of Witnesses

The court finds that McMillian has produced evidence sufficient to survive Defendants' Motions for Summary Judgment on Count Three as it applies to some of the witnesses.

In Count Three, McMillian alleges that Tate, Ikner, Benson, and the D.O.C. Defendants improperly coerced, pressured, threatened or otherwise induced several witnesses in an effort to get them to testify falsely against McMillian. McMillian contends that Tate, Ikner, Benson, and the D.O.C. Defendants improperly induced Myers to testify falsely against McMillian. He contends that Benson and Ikner pressured Clay Kast. False testimony given by Hooks, McMillian contends, was the product of pressure by Tate, Ikner and Benson. McMillian alleges that Tate and Ikner improperly influenced Hightower's testimony against McMillian. McMillian also alleges that Tate threatened Karen Kelly in an effort to influence her potential testimony.

Defendants assert that their Motions for Summary Judgment are due to be granted as to Count Three for several reasons.[30] The D.O.C. Defendants contend that McMillian's claims against them under Count Three for facilitating the manipulation of Myers are vague, conclusory and factually unsupported. Tate asserts that he is entitled to summary judgment because McMillian's Count Three claims are barred by the statute of limitations and fail to create a genuine issue of material fact. Ikner and Benson argue that they are due summary judgment on Count Three for several reasons including: the statute of limitations has run on these claims; no evidence supports the claims; McMillian lacks standing to assert the constitutional rights of others; and qualified immunity protects them from Count Three. After analyzing McMillian's claims and Defendants' as-

serted defenses, the court will discuss the evidence regarding each witness separately.

### i. Statute of Limitations

Tate, Ikner, and Benson argue that McMillian's claim that they improperly coerced witnesses is barred by the statute of limitations. The claim in Count Three is subject to a two year statute of limitations. *Lufkin v. McCallum,* 956 F.2d at 1106. This period begins to run when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Mullinax v. McElhenney,* 817 F.2d at 716.

The court finds that the claim which McMillian asserts in Count Three is one which seeks damages for allegedly unconstitutional conviction and imprisonment and as such is one which did not become cognizable until his conviction and sentence were invalidated by the Alabama Court of Criminal Appeals in February 1993. As discussed previously, the Supreme Court has held that

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* —— U.S. at ——, 114 S.Ct. at 2372. In fact, *Heck* instructs district courts to examine Section 1983 cases filed by inmates carefully and to dismiss a complaint if the judgment would necessarily imply the invalidity of the plaintiff's sentence or conviction when the sentence or conviction has not been invalidated. *Id.* The *Heck* court also addressed the statute of limitations issue di-

---

**30.** Barnett points out that Count Three does not contain allegations that he was involved in the alleged improper activity, and consequently, he should be granted summary judgment on Count

Three. The court agrees that no claims are made against Barnett on Count Three, and for that reason need not grant him judgment on that count as it does not apply to him.

rectly and opined that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at ——, 114 S.Ct. at 2374.

The question for the court then is whether McMillian's Count Three claim is of the kind discussed in the *Heck* opinion. Put another way, the question is whether the claim that law enforcement officers improperly influenced, threatened, and coerced witnesses necessarily implies that his conviction and sentence were invalid. The court finds that the Count Three claims do lead to that implication. McMillian's complaint is based on his contention that he was wrongfully convicted because of the unlawful acts of the defendants, not simply that the defendants acted in a wrongful manner. Therefore, this claim did not accrue until February 1993 when McMillian's conviction was invalidated. Thus, the statute of limitations is not a bar to this claim.

In light of the foregoing authority, the court finds that Tate, Benson and Ikner's Motions for Summary Judgment are due to be DENIED to the extent that they are based on McMillian's failure to file within the time provided by the applicable statute of limitations.

### ii. Standing

■ McMillian lacks standing to assert that police interrogation tactics utilized against witnesses Myers, Hooks, Hightower, or Kelly violated the constitutional rights of these individuals. *See, United States v. Fredericks,* 586 F.2d 470, 480 (5th Cir.1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *United States v. Scallion,* 533 F.2d 903, 916 (5th Cir.1976), *cert. denied,* 429 U.S. 1079, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977).[31] Instead, McMillian can claim that the police treatment of these individuals violated his personal due process rights, thereby obviating any standing problem. *See, Wilcox v. Ford,* 813 F.2d 1140, 1148 n. 13 (11th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987); *United States v. Merkt,* 764 F.2d 266, 274

(5th Cir.1985); *Fredericks,* 586 F.2d at 480. Thus, to the extent that Ikner and Benson base their Motion for Summary Judgment on the argument that McMillian lacks standing to assert the claims contained in Count Three, their motion is due to be DENIED.

### iii. Constitutional Violations Involved and Qualified Immunity

Plaintiff relies upon several Alabama cases to define the contours of permissible police conduct in obtaining confessions. Plaintiff contends that *Ex parte Matthews,* 601 So.2d 52 (Ala.1992), *Luttrell v. State,* 551 So.2d 1126 (Ala.Cr.App.1989), *Womack v. State,* 281 Ala. 499, 205 So.2d 579 (1967), *Ex parte Weeks,* 531 So.2d 643 (Ala.1988), and *Harris v. State,* 280 Ala. 468, 195 So.2d 521 (1967) support his Count Three claims against the Defendants. The court finds that these cases are inapposite. These cases address the admissibility or voluntariness of a criminal defendant's own confession. The heart of the allegations of Count Three is not that McMillian was coerced or improperly threatened into confessing to a crime he did not commit. Rather, Count Three raises the claim that the Defendants improperly influenced several witnesses into giving false testimony against McMillian at his trial and otherwise interfered with witnesses. The question before this court is whether that states a claim for the deprivation of a clearly established federal right.

### Sixth & Fourteenth Amendments: "Due Process"

■ According to the Supreme Court, a criminal defendant has a constitutional right to "present his own witnesses to establish a defense." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Although this right is specifically found in the Sixth Amendment right to compulsory process, the Court held that the right was so fundamental to a fair trial that it is guaranteed by the Due Process Clause of the Fourteenth Amendment. *Id.* Subsequent cases have held that various types of governmental interference can deprive a defendant

**31.** In *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit rendered prior to October 1, 1981.

of this due process right. *See, e.g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (defense witness intimidated by remarks of trial judge which implied he could be prosecuted for perjury); *United States v. Heller,* 830 F.2d 150 (11th Cir.1987) (IRS agent intimidated defense witness into changing testimony by threatening to make him a defendant); *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979) (defense witness intimidated by remarks of FBI agent regarding another case in which witness had been indicted); *United States v. Hendricksen,* 564 F.2d 197 (5th Cir.1977) (plea bargain by which codefendant, whose testimony tended to exonerate defendant, agreed not to testify violated due process). Courts refer to this right as either a Sixth Amendment right or a Fourteenth Amendment Due Process right. *Hammond,* 598 F.2d at 1012 n. 3.

 This circuit has repeatedly affirmed that

> [s]ubstantial interference with a defense witness's free and unhampered choice to testify violates due process rights of the defendant. When such a violation of due process rights occurs, a court must reverse the conviction without regard to prejudice to the defendant.

*Demps v. Wainwright,* 805 F.2d 1426, 1433 (11th Cir.1986), *cert. denied,* 484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987) (citations omitted). In fact, the former Fifth Circuit has said that "[t]hreats against witnesses are intolerable." *United States v. Goodwin,* 625 F.2d 693, 703 (5th Cir.1980). Interference occurs when a defense witness may reasonably interpret a government official's comments as threat of prosecution. *See, Hammond,* 598 F.2d at 1013.

The *Heller* case presents a good example of this kind of impermissible police conduct. In *Heller,* a defendant in a criminal tax case established that the government's unwarranted threat to prosecute his accountant deprived Heller of an important defense witness. *Heller,* 830 F.2d at 154. An IRS agent threatened the accountant with criminal charges and immediately thereafter the accountant's lawyer informed the government that the accountant had decided that he wanted to be a witness for the prosecution and not a defendant. *Id.* at 153. The accountant gave false testimony against Heller at trial which lead to Heller's conviction. *Id.* at 154. The Eleventh Circuit held that the actions of the IRS agents amounted to a violation of Heller's rights under the Sixth Amendment and granted Heller a new trial. *Id.* In a subsequent civil suit for damages, a district court surveyed the state of the law in 1979 and held that the IRS agents were not protected by qualified immunity for the actions they took to intentionally interfere with an important defense witness which amounted to a deprivation of Heller's constitutional rights. *Heller v. Plave,* 743 F.Supp. at 1563–65.

*Hammond* is another of these cases which clearly establishes a criminal defendant's right to be free of substantial governmental interference with defense witnesses. In *Hammond,* the former Fifth Circuit was asked to determine if the comments of a FBI agent to a witness for the defendant amounted to a violation of the defendant's constitutional rights to due process and to present his own witnesses. *Hammond,* 598 F.2d at 1012. During a recess of defendant's trial, the FBI agent approached a defense witness and brought up the fact that the witness had been indicted in another state. *Id.* The FBI agent told the witness that if he continued to testify for the defendant he would have "nothing but trouble" in Colorado. *Id.* As a result of this exchange, the witness refused to give further testimony for the defendant and another defense witness who had heard of the exchange also refused to testify for the defendant. *Id.* At the court's suggestion, the parties stipulated to what the defense witnesses would have said. *Id.* The judge carefully instructed the jury that the stipulation deserved the same weight as live testimony. *Id.* On appeal, the court discussed the right of a criminal defendant to present his own witnesses and the prohibition on governmental interference which can deprive the defendant of this right. *Id.* Finding that "it was certainly reasonable for [the defense witness] to interpret [the agent's] comments as threats to retaliate if [the witness] continued to testify," the court held that the governmental interference amounted

to a deprivation of the defendant's constitutional rights. *Id.* at 1013. The *Hammond* court went on to reject the argument that the criminal defendant needed to show he had been prejudiced by the deprivation and held that "this type of due process violation is harmful per se." *Id.* On the basis of its finding of a constitutional violation, Hammond was granted a new trial. *Id.* at 1013–15.

■ What these cases clearly establish is that law enforcement officers cannot threaten a defense witness with prosecution or with adverse legal consequences. Any action by officers which a reasonable witness could interpret as a threat of prosecution amounts to a constitutional violation. The court is satisfied that the rights that Defendants' conduct allegedly violated were clearly established at the time of Defendants' conduct. Thus, the Defendants are not entitled to qualified immunity for any actions they took which constitute such a violation of McMillian's Sixth and Fourteenth Amendment rights. The court must now determine whether McMillian has adduced evidence sufficient to create a genuine issue of fact as to whether Defendants actually engaged in conduct that violated this clearly established law. The court will do so on a witness by witness basis after a brief discussion of other constitutional violations which this allegation might raise.

### Fifth Amendment: Fair Trial & Perjured Testimony

The Sixth Amendment only protects defense witnesses from interference by police officers. Thus, the court looks beyond the aforementioned cases for authority on the permissible conduct of law enforcement officers when dealing with prosecution witnesses or co-defendants.

■ In the Eleventh Circuit, police misconduct which leads to the admission at trial of improperly obtained statements and which result in a fundamentally unfair trial may violate a defendant's Fifth Amendment right to a fair trial. *See, Wilcox,* 813 F.2d at 1148. The Eleventh Circuit has stated that while some police conduct in obtaining inculpatory statements from witnesses does not violate the Fifth Amendment,

the prosecution certainly would not be allowed to admit statements wrung from one of four criminal suspects through torture and unremitting prolonged interrogation in the trial of the other three suspects.

*Fredericks,* 586 F.2d at 481. The *Fredericks* decision outlines two objections to the introduction of statements "extracted from a nondefendant by extreme coercion and inquisitional tactics." *Fredericks,* 586 F.2d at 481 n. 14.

First, there is the distinct possibility that the jurors will be captivated by the high degree of relevance such statements often possess and will fail to take into account the increased likelihood that the statements are unreliable. Second, the use of statements derived through shocking and intentional police misconduct offends the fundamental fairness essential to due process of law.

*Id.* While both the *Wilcox* decision and the *Fredericks* opinion acknowledge that some level of police misconduct in interrogating potential prosecution witnesses may cause a constitutional violation, neither case finds a constitutional violation despite some very questionable police conduct.

■ For example, in *Wilcox,* the police interrogated three men seeking information with which to convict Wilcox. Police officers told one witness that they planned to hold him indefinitely and that they would "fry his ass." Police threatened another of the witnesses with everything from lynching to eternal damnation to murder charges. The third witness was interrogated for eight and a half hours without food or water. During this time, the police threatened the witness with the electric chair and told him he would die in prison. The Eleventh Circuit reversed the District Court's holding that such interrogation shocked the conscience and rose to the level of a due process violation, saying that the police misconduct was not "so extreme that it violates a sense of 'fundamental fairness, shocking to the universal justice' as far as Wilcox's constitutional rights are concerned." The court further held that the facts of the case did not present the rare egregious circumstances which justify a find-

ing that Wilcox's due process rights were violated. The court emphasized that the record was devoid of evidence of "physical abuse or threats or improper inducements or promises in exchange for a statement implicating the defendant." *Wilcox,* 813 F.2d at 1147–48.

The *Wilcox* court next addressed Wilcox's claim that the admission of statements from these witnesses rendered his trial fundamentally unfair. The Eleventh Circuit found no violation in the admission of these statements because the witness was competent to testify and under no threat of future torture by the police and because the defendant had "adequate tools in hand to challenge their reliability before the jury." Thus, the trial was still fair and the Fifth Amendment guarantee was not compromised. *Wilcox,* 813 F.2d at 1149.

The court recognizes that an argument could be made that where, as here, the defendant did not have adequate tools in hand to challenge the reliability of the statements as the statements were presented to the jury, the defendant is deprived of a fundamentally fair trial. Indeed, if law enforcement plays a role in improperly encouraging witnesses to testify for the prosecution and the defendant is not aware of this improper influence, the defendant cannot challenge the reliability of such testimony. Although this reasoning is plainly implicit in the holding of *Wilcox,* the court cannot say that this constitutes a "clearly established" constitutional right. Therefore, to the extent that McMillian argues that he is entitled to recover for improper actions taken by the law enforcement defendants in an attempt to coerce witnesses other than defense witnesses to testify truthfully against McMillian, he is defeated by qualified immunity.

 However, due process rights are also infringed where by active conduct or connivance of the prosecution a conviction is obtained by the state's knowing use of perjured testimony. *See, e.g., Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply only because the false testimony goes only to the credibility of the witness."); *Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 178–79, 87 L.Ed. 214 (1942) (Habeas petitioner's allegations that he was imprisoned as a result of perjured testimony knowingly used by the State authorities to obtain his conviction and of deliberate suppression by the same authorities of evidence favorable to him were sufficient to support a deprivation of rights guaranteed by the constitution.); *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791, *reh'g denied,* 294 U.S. 732, 55 S.Ct. 511, 79 L.Ed. 1261 (1935) (Due process requires the State to refrain from deliberate deception of the court and jury by the presentation of testimony known to be perjured.)[32] Moreover, the Supreme Court has recognized that where responsible officers of the state knowingly used false testimony which was extorted from a witness by violence and torture, the defendant convicted by such testimony may claim the protection of the Fourteenth Amendment's Due Process Clause against the conviction. *See Hysler v. Florida,* 315 U.S. 411, 413, 62 S.Ct. 688, 689–90, 86 L.Ed. 932 (1942). The facts alleged in *Hysler* as the basis of petitioner's claim for relief on a writ of habeas corpus were that a witness had been tortured in order that incriminating statements could be gained regarding the defendant who had not himself been tortured; and that, later, the witness recanted his testimony. *Id.* Thus, McMillian's right not to be convicted on the basis of perjured testimony, especially perjured testimony extracted by violence or torture, knowingly used by the state, was a clearly established constitutional right when the Defendants allegedly acted in a way which could be said to violate it.

### iv. The Witnesses

*Hooks & Hightower*

In light of the foregoing authority, the court finds that there is insufficient evidence

---

**32.** The court notes that while McMillian does not rely on these cases in the section of his Opposition Brief dedicated to Count Three, he does rely on some of these cases in Count Four to argue that Tate, Ikner and Benson violated his rights under the Fourteenth Amendment by threatening and coercing witnesses.

of a violation of McMillian's clearly established constitutional rights which arises from the actions of Tate, Ikner or Benson in securing the testimony from Hooks and Hightower. Thus, to the extent that those defendants base their Motions for Summary Judgment on the argument that their treatment of these witnesses did not violate McMillian's clearly established constitutional rights, the motions are due to be GRANTED.

Hooks and Hightower both testified at McMillian's trial. Their testimony put McMillian's truck in the vicinity of the building where Ronda Morrison was murdered at the time of the murder. They were both clearly prosecution witnesses, and therefore, as the court will explain, McMillian has no argument that Defendants violated his constitutional rights by improperly interfering with defense witnesses.

 McMillian does contend that these witnesses were improperly coerced by the Defendants into giving false testimony against him at his trial. As previously explained, a violation of a clearly established constitutional right would exist if Defendants knowingly used perjured testimony from Hooks and Hightower to convict McMillian, especially if this perjured testimony was extorted from these witnesses by torture or violence. McMillian offers no evidence from which a reasonable jury could infer that any of the Defendants knowingly used perjured

testimony.[33] Moreover, McMillian offers no evidence from which a reasonable jury could infer that the allegedly perjured testimony was extorted from Hooks or Hightower by violence or torture. Additionally, the affidavits of Hooks and Hightower, even when read in the light most favorable to McMillian, contain no indication whatsoever that Defendants did anything to Hooks or Hightower which would rise to the level of a violation of McMillian's constitutional rights. Thus, to the extent that Defendants base their Motions for Summary Judgment on the argument that McMillian fails to create a genuine issue of material fact as to their alleged improper coercion of Hooks and Hightower, their motions are due to be GRANTED.

### Clay Kast

 In light of the foregoing authority, the court finds that there is insufficient evidence of a violation of McMillian's clearly established constitutional rights which arises from the contacts between Benson and Ikner and Clay Kast ("Kast"). Thus, to the extent that Benson and Ikner base their Motion for Summary Judgment on the argument that their treatment of Kast did not violate McMillian's clearly established constitutional rights, the motion is due to be GRANTED.

In opposition to Defendants' motions, McMillian points to incidents which he believes constitute improper law enforcement attempts to interfere with Kast.[34] In his

33. McMillian would have the court find that a reasonable jury could read the ABI reports which he submits as Plaintiff's Exhibit 46 and Plaintiff's Exhibit 47 and conclude that Defendants knowingly used perjured testimony from Hooks and Hightower. These reports are not admissible evidence as they are double hearsay. The first layer of hearsay is that each report itself is an out of court statement by an investigator, offered for the truth of the matter asserted—that Hooks or Hightower admitted they had perjured themselves when testifying against McMillian due to law enforcement pressure. The second layer of hearsay is that the reports each summarize the contents of out of court statements made by Hooks and Hightower. Neither out of court statement is saved by an exception to the hearsay rule; thus, the reports are not admissible under the Federal Rules of Evidence. Moreover, hearsay problems also keep out the testimony of Cole and Taylor (the ABI agents to whom Hooks and Hightower made statements concerning Defendants pressuring them into perjuring themselves

to convict McMillian) to the extent that it would recount the statements made to them by Hooks and Hightower out of court. Such inadmissible evidence cannot be said to be evidence from which a reasonable jury could infer anything. Hooks and Hightower now say that they testified truthfully at trial. While evidence that they previously said otherwise might be admissible as impeachment, such hearsay is not admissible as affirmative proof of the truthfulness of the previous statements.

34. Kast is the person who converted McMillian's truck into a low rider in May of 1987, some seven months after Ronda Morrison was killed. His testimony contradicts testimony given by Hooks and Hightower to the effect that they had seen McMillian's truck, in its converted form and color on the day of the murder, near the dry cleaning store where Ronda Morrison was killed. The court cannot ascertain from the submissions whether Kast testified at McMillian's trial.

affidavit Kast describes these encounters. The first involves Benson and an unnamed prosecutor, and Kast gave the following description of the encounter.

> I was at the Baldwin County Courthouse on the first day of Walter McMillian's trial. That morning Simon Benson and a prosecutor took me to an office where we were alone and Benson told me that they had to take a statement from me before I could testify in court. Benson asked me whether I was the one that had worked on Johnny D.'s truck and I told him yes I was. Benson then tried to get me to say that Johnny D. had asked me to convert and paint the truck in a hurry. Benson tried to get me to say that Johnny D. needed me to get the job done overnight. I told him the truth. I felt that Benson was putting pressure on me to get me to say things which were not true.

(Kast Aff. p. 1.) Kast gives the following description of the second encounter with law enforcement regarding the testimony that he was to give on McMillian's behalf.

> I was called as a witness at a hearing in Bay Minette in April 1992 after Walter McMillian was convicted and sentenced to death. Larry Ikner came up to me in the hallway and asked me if I had my dates straight. He tried to get me to say that I had done the work in December. When I told him I had my dates straight, he tried to get me to say that Walter had asked me to do the work overnight. When I told him the truth, he told me that I had better re-read my statement. I took this as a threat. Larry Ikner then told me that I had better get my ducks in a row, which I again took as a threat. It was clear from the tone of his voice that he was trying to tell me to say that I or my family might get hurt if I didn't say what he wanted to hear.

(Kast Aff. pp. 1–2.) In their Brief in Support of their Motion for Summary Judgment, Benson and Ikner deny that they ever interviewed or questioned Kast about McMillian's case.

The court finds that while this conduct of Benson and Ikner, if true, may not be commendable, it does not rise to the level of a violation of McMillian's clearly established constitutional rights. Given the abundance of case law on the subject, Ikner and Benson, as reasonable law enforcement officers, should have known that their treatment of Kast, a defense witness, could violate McMillian's constitutional rights. The case law made it clear that law enforcement could not make statements to defense witnesses which would leave a reasonable witness feeling as if he faced a threat of prosecution for something if he testified for the defendant. Simply put, law enforcement may not use threats of legal retaliation to intimidate defense witnesses. The cases which establish the contours of this right, however, have not yet extended the meaning of threats of retaliation beyond threats of legal retaliation i.e. perjury charges against the witness, other criminal charges against the witness, or "trouble" in another case involving the witness. *See, e.g., Webb,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330; *Heller,* 830 F.2d 150; *Hammond,* 598 F.2d 1008; *Hendricksen,* 564 F.2d 197.

The court cannot find that the statements allegedly made to Kast raise an inference that a reasonable witness could have thought he was being threatened with criminal prosecution or other legal trouble. Kast himself characterizes the threats of the kind which lead him to believe he or his family could be hurt. Consequently, this court cannot say that other interference with a defense witness, such as that Ikner and Benson allegedly engaged in with Kast, amounts to a clearly established violation of McMillian's constitutional rights under the Sixth and Fourteenth Amendments. Thus, Ikner and Benson are protected by qualified immunity from McMillian's claims that they improperly interfered with Kast, and their Motion for Summary Judgment to the extent it is premised on qualified immunity is due to be GRANTED.

### *Karen Kelly*

In light of the foregoing authority, the court finds that there is sufficient evidence from which a reasonable jury could infer a violation of McMillian's clearly established constitutional rights which arises from Tate's actions when he interviewed Karen Kelly ("Kelly"). Thus, to the extent that Tate bas-

es his Motion for Summary Judgment on the argument that McMillian has not established that his treatment of Kelly violated McMillian's clearly established constitutional rights, the motion is due to be DENIED.

In a footnote in his opposition to Defendants' Motions for Summary Judgment, McMillian summarized the evidence that there was improper coercion and influence of Kelly by stating that "Karen Kelly reported to Simon Benson that Sheriff Tate made racist threats to her. P.Exh. 36 (Taped Conversation of Karen Kelly)" *Plaintiff's (Corrected) Memorandum in Opposition to the Defendants' Motion for Summary Judgment* n. 26.[35] The exhibit to which McMillian refers is a transcript of a telephone conversation between Kelly and Benson. During this conversation, Kelly described an earlier interrogation where Tate told Kelly that she was "going to go to Tutwiler for that f___ing nigger." (Plaintiff's Exhibit 36 p. 9.) Kelly indicates that she was very troubled by this statement. *Id.* Although, McMillian contends that this exhibit is evidence from which a jury could infer that Tate substantially interfered with Kelly, the court notes that this exhibit is not admissible affirmative evidence, and therefore, a jury could not rely on it to reach that conclusion. The exhibit, a transcript, is double hearsay. Although one layer of hearsay, Tate's statements to Kelly, is within the exception for admissions of a party opponent, the court finds that the other layer of hearsay makes the exhibit inadmissible. Fortunately for McMillian, Kelly made this same statement in her deposition. At that time, Kelly again stated that Tate had told her that she was going to go to prison because of McMillian. (Kelly Depo. p. 104.) This is evidence upon which a jury can rely.

In his reply brief, Tate denies that he ever made any racist threats to Kelly and argues that even if he had made threats it would not have amounted to a constitutional violation because Kelly never testified at McMillian's trial. Tate contends that McMillian therefore has not explained the relationship between the threats and the alleged constitutional violation. What Tate misses is the fact that the threats are, in and of themselves, a constitutional violation.

Given the fact that Kelly initially implicated Myers, not McMillian, for the Morrison murder, Defendants knew she was a potential defense witness. Because the court finds that McMillian may be able to prove a reasonable defense witness might understand the statement allegedly made by Tate as a threat of criminal prosecution in retaliation for testimony in favor of the defendant, the court finds that Count Three of McMillian's Complaint survives Tate's Motion for Summary Judgment. Arguably, Tate threatened Kelly with imprisonment in Tutwiler. A reasonable jury might find that Tate's threats violated McMillian's clearly established Sixth and Fourteenth Amendment right to be free from substantial government interference with his witnesses. Such interference, if proven, is a per se violation of McMillian's constitutional rights; that Kelly did not testify at McMillian's trial is simply not relevant.[36] *See, Demps,* 805 F.2d at 1433; *Goodwin,* 625 F.2d at 703. Thus, to the extent that Tate bases his Motion for Summary Judgment on the argument that his treatment of Kelly did not violate McMillian's clearly established constitutional rights, his motion is due to be DENIED.

### Myers

In light of the foregoing authority, the court finds that the interactions between Tate, Ikner and Benson and Myers raise an inference of a violation of McMillian's clearly established constitutional right. Thus, to the

---

35. The court notes that this argument only addresses conduct by Tate which may amount to a constitutional violation. McMillian offers neither evidence nor argument that support an interference with Kelly by Ikner, Benson or the other defendants. Thus, to the extent that they seek summary judgment on the allegations of improper conduct with this witness, it is due to be GRANTED.

36. Tate's argument focuses on Kelly's failure to give inculpatory testimony at McMillian's trial. He overlooks the possibility that Kelly failed to give testimony which might have tended to exculpate McMillian. Kelly's failure to testify does preclude the court from finding sufficient evidence of a *Hammond/Heller*-type due process violation.

extent that those defendants base their Motions for Summary Judgment on the argument that their treatment of Myers did not violate McMillian's clearly established constitutional rights, the motions are due to be DENIED.

■ McMillian argues that Defendants violated his constitutional rights by improperly interfering with the testimony of Myers. The court finds that it is undisputed that Myers was a codefendant, not a third-party defense witness. Therefore, the court finds that McMillian cannot argue that the conduct of Tate, Ikner and Benson violated a clearly established Sixth and Fourteenth Amendment rights not to have law enforcement officers interfering with a defense witness. This type of violation cannot carry Count Three over the summary judgment hurdle.

Moreover, as the court noted earlier, McMillian has not pointed to cases which clearly establish that conduct of the sort in which Tate, Ikner and Benson engaged violates his constitutional right as a criminal defendant not to have law enforcement officers improperly coercing non-defense witnesses into giving truthful testimony. Thus, qualified immunity prevents McMillian from using this type of violation to save Count Three from summary judgment.

The only argument McMillian has left to support Count Three is that the behavior of the Defendants violated his Fifth Amendment right not to be convicted by state actors who have knowingly obtained and used false testimony to convict him. The very heart of this alleged violation is proof that McMillian was convicted because Myers perjured himself and the Defendants knew and approved of this perjury.

The Court of Criminal Appeals of Alabama reviewed the factual findings of the trial court, including the court's finding at the post trial hearing that Myers' testimony at McMillian's trial was not false, and concluded that it could not say that the trial court's ruling was clearly erroneous. *McMillian v. State*, 616 So.2d at 941. Defendants contend that the doctrine of collateral estoppel bars McMillian from relitigating the issue of whether Myers testified truthfully or perjured himself during his testimony at McMillian's trial, and thus precludes McMillian from arguing that the Defendants committed this kind of violation of his constitutional rights.[37] The court disagrees.

### Collateral Estoppel

■ Collateral estoppel[38] is a means of relieving parties of the cost and vexation of multiple lawsuits, preventing inconsistent decisions, encouraging reliance on adjudication and conserving judicial resources. *See, Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980). As the Supreme Court explained,

> [u]nder collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.

*Id.* (citation omitted.) Federal law requires federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgment emerged would do so. *Id. See also, Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 80–81, 104 S.Ct. 892, 895–96, 79 L.Ed.2d 56 (1984); 28 U.S.C. § 1738.[39] This means that federal courts must look to the state collateral estoppel law to determine whether the prior state court judgment precludes relitigation in the subsequent federal court suit.

---

**37.** Defendants raised this argument for the first time in their reply briefs. Due to the importance of this issue not only to summary judgment on Count Three, but also to the trial strategies which McMillian will be able to employ, the court ordered further briefing on the applicability of collateral estoppel to this case.

**38.** Collateral estoppel is also referred to as issue preclusion.

**39.** The full faith and credit statute provides in pertinent part that

> [s]uch Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State,

Territory or Possession from which they were taken.

28 U.S.C. § 1738.

*See, e.g., Vasquez v. Metropolitan Dade County,* 968 F.2d 1101, 1106 (11th Cir.1992); *Farred v. Hicks,* 915 F.2d 1530, 1533 (11th Cir.1990). Additionally, in federal actions, including actions brought pursuant to 42 U.S.C. § 1983, a state court judgment should not be given preclusive effect unless the party against whom an earlier court decision is asserted had a full and fair opportunity to litigate the issue when it was decided by the first court. *See, e.g., Haring v. Prosise,* 462 U.S. 306, 313, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595 (1983); *Parker v. Williams,* 862 F.2d 1471, 1474–75 (11th Cir.1989).

In light of these authorities, the court must determine if under Alabama law the prior decisions by courts reviewing McMillian's convictions preclude McMillian from relitigating in this lawsuit the issue of whether Myers perjured himself during his testimony at McMillian's trial. The court must also ascertain whether or not McMillian had a full and fair opportunity to litigate the issue of Myers' alleged perjury during the state court hearings before it may give the rulings on the issue preclusive effect.

■ Under Alabama law, the defense of collateral estoppel is only available in cases in which four requisite elements exist: (1) the issue is identical to the issue litigated in the prior suit; (2) the issue was actually litigated in the prior suit; (3) the resolution of the issue was necessary to the prior judgment; and (4) the parties in the first suit must be identical to the parties in the second suit. *See, Pierce v. Rummell,* 535 So.2d 594, 596–97 (Ala.1988). *Accord, Jones v. Blanton,* 644 So.2d 882, 885–86 (Ala.1994); *Watkins v. U.S.,* 789 F.Supp. 1141, 1144 (M.D.Ala.1992); *Dairyland Ins. Co. v. Jackson,* 566 So.2d 723, 726 (Ala.1990); *Lott v. Toomey,* 477 So.2d 316, 319 (Ala.1985); *Wheeler v. First Alabama Bank of Birmingham,* 364 So.2d 1190,

1199 (Ala.1978).[40] A party to the second suit will not be estopped from relitigating an issue unless all of the requisite elements exist. It is noteworthy that Alabama has not followed the trend of abolishing the requirement that parties be identical, sometimes referred to as the mutuality of estoppel requirement. An exception is made to this requirement for parties in privity with a party to the prior action. *See, Dairyland,* 566 So.2d at 726–27. Thus, under Alabama law collateral estoppel is not available when the same parties, or their privies, are not involved in both the first suit and the second suit.

■ Defendants contend that the issue of whether Myers perjured himself when he testified at McMillian's trial cannot be relitigated in this case. Defendants argue that the Alabama Court of Criminal Appeals affirmed a Circuit Court's factual finding on remand that Myers had not perjured himself in McMillian's trial. What defendants overlook is that collateral estoppel cannot apply because the mutuality requirement has not been met.

The Eleventh Circuit dealt with a very similar situation in *Farred,* 915 F.2d 1530. A police officer detained Farred for questioning regarding a burglary. When Farred failed to produce identification and refused to accompany the officer to the scene of the crime, the officer cuffed him, searched him and took him to the scene of the crime where the witnesses identified Farred as the burglar. Prior to his criminal trial, Farred brought a motion to suppress all evidence from the search and seizure on the grounds that the officer lacked probable cause. The state trial court denied this motion, but a state jury later acquitted Farred on the burglary charges. *Id.* at 1531.

---

**40.** Both Plaintiff and Defendants cite *Wheeler v. First Alabama Bank of Birmingham,* 364 So.2d 1190, for the requisite elements for collateral estoppel. The court agrees that this opinion contains the requirements, and because both McMillian and Defendants seem to have overlooked the most important requirement for purposes of this case, the court will highlight the relevant language in that case.

**Collateral estoppel operates where the subsequent suit between the same parties** is not on

the same cause of action. Requirements for collateral estoppel to operate are (1) issue identical to one involved in previous suit; (2) issue actually litigated in prior action; and (3) resolution of the issue was necessary to the prior judgment. If these elements are present, the prior judgment is conclusive as to those issues actually determined in the prior suit. *Wheeler,* 364 So.2d at 1199 (emphasis added and citation omitted.)

After his acquittal, Farred brought an action pursuant to 42 U.S.C. § 1983 for alleged violations of his Fourth Amendment right to be free from unreasonable searches and seizures. The law enforcement defendants moved for a dismissal arguing that Farred was collaterally estopped from litigating his claims relating to the reasonableness of the search and seizure.

Specifically, the police officers argued that those issues (e.g. whether the search and seizure were supported by probable cause) had been the subject of the motion to suppress in the state criminal case, and had been decided adversely to Farred.

*Id.* at 1532. The District Court converted the motion to dismiss on the basis of collateral estoppel into a summary judgment motion and carefully reviewed the transcript of the suppression hearing which had been held in state court. The district court granted the motion on the basis of collateral estoppel, and Farred appealed contending, inter alia, that the District Court had improperly applied the Georgia law of collateral estoppel. *Id.*

The Eleventh Circuit explained that collateral estoppel rules do apply in Section 1983 cases and that these rules can give prior state criminal judgments preclusive effect in subsequent civil rights actions. *Id.* at 1533. The Eleventh Circuit then applied Georgia collateral estoppel law to see if Farred was precluded from relitigating the reasonableness of the search and seizure. After explaining that Georgia retains a mutuality rule which requires identity of the parties before collateral estoppel applies, the Eleventh Circuit held that "Farred [was] not collaterally estopped from litigating his claims in federal court because the police officers failed to satisfy the 'mutuality' requirement." *Id.* at 1533–34. The court explained that the defendants in the Section 1983 suit were neither parties in the prior criminal proceeding nor were they in privity with the state of Georgia, the party in the prior criminal proceeding. *Id.*

*Farred* compels the court to find that McMillian is not estopped from relitigating the issue of whether Myers perjured himself at McMillian's trial. Alabama, like Georgia at the time of the *Farred* decision, requires identity of parties for collateral estoppel to apply. McMillian was a party to the prior criminal proceedings in which the issue of Myers' veracity was litigated, but Tate, Ikner and Benson were not. The other party in the prior criminal proceedings was the State of Alabama. Tate, Ikner and Benson were not in privity with the State of Alabama. *See, Dairyland Ins. Co.*, 566 So.2d at 726. Thus, Tate, Ikner and Benson fail to demonstrate the existence of this prerequisite to the application of collateral estoppel and McMillian is not barred from litigating the issue of whether Myers perjured himself when he testified at McMillian's trial. The court does not imply that the other prerequisites to the application of collateral estoppel are satisfied; rather, the court need not reach those issues because without the mutuality requirement Defendants may not collaterally estop McMillian from litigating his claim that Myers' perjured himself when he testified at McMillian's trial. *See, Farred,* 915 F.2d at 1534.

### Evidence of the Violation

In light of the court's finding that McMillian is not estopped from litigating the issue of whether Myers' testimony at McMillian's trial was perjured, the court finds that McMillian may support his claims for relief under Count Three by offering evidence that Defendants violated his clearly established due process rights when they knowingly obtained McMillian's conviction using Myers' perjured testimony. *See, e.g., Napue v. Illinois,* 360 U.S. at 269, 79 S.Ct. at 1177; *Pyle v. Kansas,* 317 U.S. at 216, 63 S.Ct. at 178–79; *Mooney v. Holohan,* 294 U.S. at 112, 55 S.Ct. at 341–42; *Hysler v. Florida,* 315 U.S. at 413, 62 S.Ct. at 689–90.

McMillian offers evidence from which a reasonable jury could conclude that Defendants pressured Myers into implicating McMillian and then used Myers' statements which they knew to be perjured to convict McMillian. In his affidavit, Myers refers to his testimony at McMillian's trial as "false testimony [he] was forced to give." (Myers Aff. 8/28/91 p. 1.) Myers also states that he testified falsely against McMillian, that he was shown pictures of the crime scene that helped him to fabricate his testimony against

McMillian, and that he was told to make up testimony about being threatened by McMillian and about seeing McMillian standing over the body of Morrison. *Id.* at pp. 1 and 2.

Although Myers does not name in his affidavit the individuals who caused him to perjure himself, there is evidence from which a reasonable jury could infer that Tate, Ikner and Benson were responsible. In both of the recorded interviews of Myers, Defendants threatened Myers with the death penalty if he did not implicate McMillian and promised him less severe punishment if he helped convict McMillian. (June 1, 1987 Interview Transcript pp. 51–52 & June 3, 1987 Interview p. 117.) Further support from this inference is the fact that Myers was interviewed in sessions which were not recorded. As previously discussed in Count One, the pattern of transfers of Myers between Death Row (when he wasn't cooperating) and County Jail (when he was cooperating) supports McMillian's claims.[41]

For the foregoing reasons, the court finds that the Motions for Summary Judgment on Count Three of Tate, Ikner and Benson are due to be DENIED.

### D.O.C. Defendants

 As for the D.O.C. Defendants, McMillian alleges that they violated a clear policy when they placed Myers on Death Row in 1987. McMillian contends that the D.O.C. Defendants contributed to the illegal and improper coercion of Myers by facilitating the transfer of Myers on and off Death Row when it suited the purposes of the other Defendants. At best, this seems to be an allegation that the D.O.C. Defendants conspired with Tate, Ikner and Benson to deprive McMillian of his constitutional rights. The D.O.C. Defendants argue that this vague allegation is unsupported.

The court finds that McMillian has produced sufficient evidence to raise a genuine issue of material fact regarding the existence of a conspiracy between Tate, Ikner, Benson and the D.O.C. Defendants to violate McMillian's Sixth and Fourteenth Amendment rights by pressuring Myers to give false testimony against McMillian, by placing him on Death Row. To support a claim for conspiracy under § 1983, McMillian must show (1) that his federal rights were violated, (2) that such violation occurred as the result of an agreement among the defendants to violate the plaintiff's federal rights, and (3) an actionable wrong. *NAACP v. Hunt,* 891 F.2d at 1563; *see also, Strength v. Hubert,* 854 F.2d at 425.

In the case at bar, McMillian offers sufficient evidence in support of the conspiracy claim alleged in Count Three.[42] It is undisputed that Myers was transferred back and forth between county jails and Death Row. He remained on Death Row only about three months initially. In late October of 1987, Myers was transferred from Holman's Death Row to the Monroe County Jail. Then, in February of 1988, Myers returned to Holman's Death Row. The parties disagree about why Myers was transferred back and forth between Death Row and county jail.

The court has discussed in detail regarding Count One the evidence from which a reasonable juror could infer that the D.O.C. Defendants were part of a conspiracy to punish McMillian before he was ever tried. The same evidence is relevant to the Plaintiff's claim that Myers was coerced into giving false testimony and that the D.O.C. Defendants were involved.

Accordingly, McMillian's claim against the D.O.C. Defendants on Count Three is sufficient to survive summary judgment, and the D.O.C. Defendants' Motion is due to be DENIED as it applies to their involvement in a conspiracy to coerce Myers into perjury.

---

**41.** Some of the other evidence on which McMillian relies to prove that Tate, Ikner and Benson coerced Myers into perjuring himself, such as the reports of various doctors at Taylor–Hardin Secure Medical Facility and the transcript from prior court proceedings appears to be inadmissible hearsay not within an exception, and the court does not base it ruling on such evidence.

**42.** In his deposition, Myers testified that he was not threatened by the officers at Holman or the D.O.C. Defendants. (Myers Depo. pp. 341–49). McMillian neither argues nor presents evidence that the D.O.C. Defendants ever directly attempted to influence Myers; therefore, the court treats his claim under Count Three as a conspiracy claim.

#### d. Count Four: McMillian's Federal Malicious Prosecution Claim

The court finds that Count Four of McMillian's Complaint fails to survive Defendants' Motions for Summary Judgment.

In Count Four, McMillian alleges that Tate, Ikner and Benson instigated and effectuated the prosecution of McMillian for sodomy and for murder in a malicious and capricious manner in violation of McMillian's Fourteenth Amendment rights. Specifically, McMillian contends that Defendants suppressed and withheld material exculpatory evidence, pressured and threatened witnesses to testify falsely against McMillian and used evidence and testimony that they knew was false to convict McMillian.[43] McMillian also contends that Defendants prosecuted him without probable cause in violation of his Fourth Amendment rights. McMillian argues that lack of probable cause and malice are fact-intensive questions and that his evidentiary submissions raise genuine issues of material fact precluding summary judgment.

Tate contends that his Motion for Summary Judgment on Count Four is due to be granted because qualified immunity protects Tate and because there exists no genuine issue of fact as to an essential element of McMillian's malicious prosecution claim, namely, whether Tate had probable cause to arrest and prosecute McMillian. Additionally, Tate asserts in his reply brief that he is due summary judgment because his actions are protected by quasi-judicial immunity. Similarly, Ikner and Benson base their Motion for Summary Judgment on an argument that McMillian cannot establish facts supporting the requisite elements of the cause of action, namely, lack of probable cause and malice and on a contention that they are protected by qualified immunity.

#### i. Malicious Prosecution Claims under Section 1983 [44]

 In *Albright v. Oliver*, —— U.S. at ——, 114 S.Ct. at 810 (plurality opinion) the Supreme Court made clear that to the extent a malicious prosecution claim is cognizable under Section 1983, it is not grounded in the Fourteenth Amendment's substantive due process clause. Instead, a majority of the Justices in *Albright*, held that allegations of arrest without probable cause must be analyzed under the Fourth Amendment. *Albright*, —— U.S. at ——, ——, 114 S.Ct. at 811, 817. In light of this holding, the court finds that Defendants' Motions for Summary Judgment on Count Four are due to be GRANTED to the extent that they are based on an argument that the conduct of Tate, Ikner and Benson violated the substantive due process component of the Fourteenth Amendment. To the extent that McMillian argues that the actions of Tate, Ikner and Benson have deprived him of other rights, further analysis is required.

 The former Fifth Circuit has held that there is a federal right to be free from bad faith prosecutions. *Shaw v. Garrison*, 467 F.2d 113, 120 (5th Cir.), *cert. denied*, 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972), (Enjoining a perjury prosecution brought in bad faith against a witness from a previous criminal trial on the basis that such a prosecution violated the witness' federal right to be free from bad faith prosecutions.) However, other former Fifth Circuit cases seem to contradict the availability of Section 1983 for redress in malicious prosecution cases. *See, Cook v. Houston Post*, 616 F.2d

---

43. McMillian's contentions that Tate, Ikner and Benson suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 and that they threatened witnesses and introduced false testimony in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 and *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 are addressed in other sections of this opinion where McMillian's claims more properly raise these issues. The court will confine its analysis of the malicious prosecution claim to McMillian's other proposed bases for his malicious prosecution claim, namely, that Defendants lacked probable cause in violation of McMillian's Fourth Amendment rights.

44. That malicious prosecution can form the basis of a Section 1983 claim is not disputed by the Defendants. In accordance with the Supreme Court's directive that a court's first task when analyzing a Section 1983 claim is to identify the textual footing of the right allegedly infringed, the court nonetheless will examine the basis for the federal right to be free of malicious prosecution.

791, 794–95 (5th Cir.1980) ("Appellants' interest with reputation, false arrest, malicious prosecution, libel and slander are matters which the State protects by virtue of its tort law, providing a forum for those interests by means of damage actions.... Having been deprived of no rights secured under the Constitution, appellants have no claim cognizable under § 1983.") Subsequent Eleventh Circuit cases approved the use of Section 1983 to redress deprivations of that right. *See, NAACP v. Hunt*, 891 F.2d at 1563; *Strength v. Hubert*, 854 F.2d at 425. According to the most recent of these cases, the Eleventh Circuit requires a plaintiff to prove the following elements in order to prevail on a claim for malicious prosecution: (1) initiation of a judicial proceeding by the defendant against the plaintiff; (2) lack of probable cause; (3) malice; (4) termination of the judicial proceeding in the plaintiff's favor; and (5) damage to plaintiff. *NAACP v. Hunt*, at 1563.

Although these cases do not offer a clear discussion of the root of the federal right to be free from malicious prosecution, *Strength* adopts by reference the analysis the Fifth Circuit implemented in *Wheeler v. Cosden Oil and Chem. Co.*, 734 F.2d 254 (5th Cir. 1984) to understand the constitutional origin of this right. *Strength*, 854 F.2d at 426. The *Wheeler* Court determined that the federal right to be free from malicious prosecutions mentioned in *Shaw* existed and could be redressed by a Section 1983 suit against a state actor who had subverted the prosecutor from the performance of his probable cause determination by "maliciously tendering false information to the prosecutor which [lead] him to believe probable cause existed where there [was] none." *Wheeler*, 734 F.2d at 260. The *Wheeler* Court found authority for its holding in the Fourth and Fourteenth Amendments to the United States Constitution. *Wheeler*, 734 F.2d at 258–260. Thus, the court finds that even after the holding in *Albright* malicious prosecution claims under Section 1983 are viable as they are premised on a permissible constitutional basis.

### ii. Qualified Immunity

■ As previously mentioned, the Eleventh Circuit's most recent en banc discussion of qualified immunity principles emphasizes that liability does not attach to a government agent unless his "act is so obviously wrong, in light of **pre-existing law,** that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Lassiter,* 28 F.3d at 1149 (citations omitted and emphasis added). The Eleventh Circuit has stated

> [f]or qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law **in the circumstances.**

*Lassiter,* 28 F.3d at 1150.

Prior to Defendants' alleged unconstitutional conduct which McMillian contends amounts to malicious prosecution, the only case in existence in the Eleventh Circuit which discussed the contours of the federal right to be free of bad faith prosecution was *Shaw v. Garrison,* 467 F.2d 113. Unless a reasonable officer reading this case would know that the actions of the Defendants violated the federal right to be free from "bad faith prosecution," the Defendants are entitled to the protection of qualified immunity and summary judgment on Count Four.

In *Shaw* the old Fifth Circuit affirmed the issuance of a permanent injunction which enjoined a state prosecutor from further prosecution of a perjury case against Clay Shaw. In a previous case, the prosecutor had unsuccessfully attempted to convict Shaw of conspiracy to assassinate President Kennedy. During the conspiracy trial, Shaw took the stand in his own defense and testified that he did not know Lee Harvey Oswald or David Ferrie, his alleged co-conspirators in the assassination plot. The first working day after the jury acquitted Shaw, the prosecutor filed an information charging Shaw with perjury. Specifically, the information charged that Shaw perjured himself when he testified that he did not know Oswald and Ferrie. *Shaw,* 467 F.2d at 114–15.

Shaw resorted to federal court seeking an injunction against the perjury prosecution. Shaw based his request for relief in part on Section 1983 and the United States Constitu-

tion. Specifically, Shaw alleged that he was suffering grave and irreparable injury as a result of the state perjury prosecution brought in "bad faith" and "in furtherance of [the prosecutor's] scheme of harassment and intimidation." *Id.* at 115–16.

After a hearing, the United States District Court issued a permanent injunction restraining the prosecution of Shaw. The basis of the court's decision [45] was its holding that "[t]he perjury charge was brought in bad faith and for purposes of harassment." The court based its findings of bad faith and harassment on the history of the prosecutor's pursuit of Shaw, including the events leading to the state conspiracy trial as well as the events incident to the state perjury prosecution. *Id.* at 116.

The court found that there existed serious questions regarding the prosecutor's basis for his decision to investigate Shaw for the Kennedy assassination three years after it had occurred. There was no basis for the prosecutor's initial interview of Shaw and the prosecutor offered no basis or cause for his office's interrogation of Shaw for the Kennedy assassination. *Shaw,* 467 F.2d at 116–17.

The District Court also found that "extreme measures" implemented by the state to extract information from a witness and his testimony at Shaw's conspiracy trial were "incompatible with the American System of Justice." The witness had been given sodium pentothal and subjected to hypnosis. There was some evidence which suggested that the treatment of this witness altered his testimony. *Id.* at 117.

The District Court noted that the prosecutor's investigation of Shaw's involvement in the Kennedy assassination was funded by private sources. The District Court also found that the prosecutor's handling of Shaw's arrest on the conspiracy charges evidenced bad faith and harassment. The prosecutor evidently informed the media of the arrest and paraded Shaw past various reporters and photographers in a manner the District Court described as "outrageous and inexcusable." The prosecutor's pre-trial conduct evidenced a "total disregard of [Shaw's]

rights." Specifically, the prosecutor released information to the medial that he had refused to give to Shaw. *Id.* at 117–18.

The District Court also noted several facts which it believed demonstrated the prosecutor's bad faith and harassment in the events relating to Shaw's perjury prosecution. Specifically, the court noted that no one could recall a case in which a defendant who had taken the stand in his own defense and been acquitted only to then be charged with perjury. Additionally, none of the other witnesses who gave testimony at the conspiracy trial were charged with perjury despite the fact that their testimony contradicted previous sworn testimony. Moreover, the state had no new witnesses which it planned to use to prove the perjury charges. In fact, the prosecutor's key witness was unreliable, and no one knew that better than the prosecutor himself. This witness arguably would not testify at a perjury trial since he asserted his Fifth Amendment rights and refused to testify at the District Court's hearing on the injunction. Finally, the prosecutor had a significant personal financial interest in continuing Shaw's prosecution. The prosecutor stood to benefit from increased publicity surrounding the case because he had written a book on the case and entered into contracts to write three more books. *Shaw,* 467 F.2d at 118–19.

The real issue before the Fifth Circuit was whether or not Shaw had sufficiently demonstrated the requisite irreparable injury such that the District Court could properly enjoin the state criminal prosecution for perjury. The *Shaw* court held that "a showing of bad faith or harassment is equivalent to a showing of irreparable injury for the purposes of the comity restraints defined in *Younger,* because there is a federal right to be free from bad faith prosecutions." *Id.* at 120. Finding that the District Court's findings of bad faith and harassment were not clearly erroneous, the Fifth Circuit affirmed the issuance of the injunction. *Id.* at 122.

■ It seems that after the Fifth Circuit decided this case, a reasonable officer would

---

**45.** The former Fifth Circuit carefully reviewed the basis of the District Court's actions. The

following description of the District Court's findings is based on the Appellate Court's opinion.

have known that he was a violating a suspect's constitutional rights if he engaged in a pattern of activities similar to those described in *Shaw* which led the *Shaw* court to conclude that there had been impermissible bad faith and harassment. The specific pattern of impermissible conduct which the court found to be harassment and bad faith included: instigating a criminal prosecution in order to derive personal benefit from the publicity; instigating a criminal prosecution without adequate evidence or reliable witnesses; **and** instigating a criminal prosecution in circumstance which support an inference of a personal vendetta or an intent to punish someone for taking the stand in his own defense.[46] The allegations of McMillian's Complaint do not match the *Shaw* pattern.

While the *Shaw* case may establish some of the principles of law which later evolved into a federal right to be free from malicious prosecution, it did not establish the right to be free from malicious prosecution as it is defined today. The elements which McMillian contends the facts establish in support of his malicious prosecution claim are not the same as the elements described in *Shaw*. Most notably absent is the requirement that a plaintiff prove a termination of the judicial proceeding in the his favor. Thus, the court finds that the kind of federal right to be free from malicious prosecution for which McMillian seeks recovery in Count Four was not sufficiently clearly established at the time of Defendants' alleged acts to warrant stripping Defendants of the protection of qualified immunity for those acts. Accordingly, Defendants' Motions for Summary Judgment on Count Four are due to be GRANTED.[47]

### e. Count Five: Maintaining a Prosecution Without Probable Cause

In Count Five, McMillian alleges that Tate, Ikner and Benson instigated, ef-

fectuated, and maintained a prosecution of McMillian without probable cause in violation of McMillian's rights under the Fourth and Fourteenth Amendment. For the reasons stated below, the Motions for Summary Judgment on Count Five filed by Tate, Ikner and Benson are due to be GRANTED.

In *Plaintiff's (Corrected) Memorandum in Opposition to Defendants' Motion for Summary Judgment,* McMillian emphasizes that Count Five does not state a claim for malicious prosecution and that Count Five does not state a claim for wrongful arrest. McMillian asserts that those claims are covered in Counts Four and Six. The core of Count Five, McMillian asserts, is that Defendants wrongfully **maintained** the prosecution of McMillian without probable cause from his arrest on June 8, 1987 to his release from Holman Prison on March 3, 1993. In essence, McMillian asserts that after Tate, Ikner and Benson arrested him, they encountered so much evidence which either supported McMillian's alibi or discredited the evidence which arguably supported the initial arrest of McMillian that probable cause to continue to prosecute McMillian ceased to exist. McMillian argues that the actions Tate, Ikner and Benson took after probable cause allegedly ceased amount to a constitutional violation. Tate, Ikner and Benson contend that their Motions for Summary Judgment are due to be granted because they are protected by qualified immunity from McMillian's claims as alleged in Count Five.

No one disputes the fact that Tate, Ikner and Benson were acting within their discretionary authority. Because discretionary authority is not an issue, once Tate, Ikner and Benson assert the qualified immunity defense the burden of showing that the federal rights allegedly violated were clearly established at

---

**46.** The court notes that *Shaw* seems to focus on the federal rights violations which occur when a prosecution is instigated without probable cause. McMillian's other counts raise this type of violation, but Count Four specifically seeks relief for "malicious prosecution." Malicious prosecution is not the appropriate vehicle for the relief McMillian seeks because it was not a clearly established vehicle at the time Defendants acted. To the extent that McMillian alleges that Defen-

dants engaged in the kind of conduct prohibited by *Shaw*, the court will address these allegations in its treatment of Counts Six and Seven.

**47.** In light of the court's holding that Defendants are entitled to summary judgment on the allegations of Count Four on the basis of qualified immunity, the court need not and does not decide the other bases for Defendants' motions.

the time of the alleged violation shifted to McMillian. *See, e.g., Rodgers v. Horsley,* 39 F.3d 308, 310 (11th Cir.1994); *Barts,* 865 F.2d at 1190. "Clearly established" means that "[t]he contours of the [violated] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. As previously noted, the "most common error" the Eleventh Circuit encounters as a reviewing court occurs when courts "permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" *Lassiter,* 28 F.3d at 1150 (citations omitted).

After clarifying the nature of the claim, the only argument McMillian makes in opposition to summary judgment on Count Five is that the fact intensive nature of probable cause precludes summary judgment. McMillian offers no cases describing either the elements or existence of a violation of the sort he alleges Tate, Ikner and Benson committed. Thus, McMillian does not cite a single case which clearly establishes the contours of the Fourth Amendment and Fourteenth Amendment rights which he alleges Tate, Ikner and Benson violated. The court cannot allow McMillian to discharge his burden under the qualified immunity paradigm by simply pointing to general principles such as the idea that the Fourth and Fourteenth Amendment require probable cause to support a prosecution. McMillian must provide the cases which clearly establish this right. Since he has failed to meet this burden, the Motions for Summary Judgment of Tate, Ikner and Benson are due to be GRANTED as they pertain to Count Five.

**f. Counts Six & Seven: False Arrest**

In Count Six, McMillian alleges that Tate, Ikner and Benson obtained a warrant and effectuated his arrest for the pretextual crime of sodomy in violation of McMillian's Fourth and Fourteenth Amendment rights. Specifically, McMillian alleges that Defendants effectuated his arrest for sodomy by pressuring Myers into concocting the false accusation. McMillian asserts that the sodomy arrest was a pretext which Defendants used to construct a case against him for the

Morrison murder. Additionally, McMillian alleges that the Defendants displayed a reckless disregard for the truth because they knew or should have known that the sodomy charge was false and that there was no probable cause to believe McMillian sodomized Myers.

Tate contends that he is entitled to summary judgment on Count Six for the following reasons: he effectuated McMillian's arrest on the basis of a facially valid arrest warrant, probable cause existed to support the warrant, qualified immunity shields him from this claim, and he is entitled to quasi-judicial immunity. Benson and Ikner argue that they were not involved in obtaining the warrant for McMillian's arrest on sodomy charges. Benson and Ikner assert that there is no evidence in support of this claim. Benson and Ikner also claim qualified immunity as their shield.

In Count Seven, McMillian alleges that Tate, Ikner and Benson obtained a warrant and effectuated his arrest for capital murder and held McMillian on those charges all in violation of McMillian's Fourth and Fourteenth Amendment rights. Specifically, McMillian claims that Defendants did not have probable cause supporting the warrant for McMillian's arrest for capital murder. Instead, Defendants based this warrant on evidence obtained from Kelly and Hooks which the Defendants knew or should have known was false. Defendants gathered further evidence from Myers and Hightower which they knew or should have known was false. Despite all of this and other evidence that allegedly indicated that probable cause did not exist in support of the charges against McMillian, Defendants persisted in maintaining the capital murder charges against McMillian. McMillian argues that lack of probable cause is a fact-intensive issue and that in this case the facts are in dispute making summary judgment inappropriate.

Tate argues that he is entitled to summary judgment on Count Seven for the following reasons: probable cause existed for the arrest warrant for murder and for the subsequent holding and prosecution of McMillian; qualified immunity protects Tate; and quasi-

judicial immunity protects Tate. Benson and Ikner argue that they are due summary judgment on Count Seven for the following reasons: they had probable cause to arrest McMillian for the Morrison murder; Pearson and Ikner obtained the warrant; McMillian's conviction is prima facie evidence of probable cause; and qualified immunity protects them from McMillian's claims.

For the reasons stated below, the Motions for Summary Judgment on Counts Six and Seven filed by Tate, Ikner and Benson are due to be GRANTED.

### Qualified Immunity

It is important to note here that these counts make federal law claims, not claims under state law. State law claims for false arrest are the subject of later counts. Thus, the first question for consideration as to Counts Six and Seven is not whether there is a fact issue as to a state law claim for false arrest, but whether false arrest as alleged in these counts is a clearly established violation of the Fourth and Fourteenth Amendments to the U.S. Constitution. In other words, should any reasonable official at the times alleged have known that the alleged actions violated the Plaintiff's constitutional rights.

The Defendants all contend that they are due the protection of qualified immunity from McMillian's claims under Count Six. As with the other counts, what this really boils down to is whether McMillian has met his burden of producing cases which demonstrate that the kind of behavior in which the Defendants allegedly engaged constitutes a violation of clearly established federal law. The Eleventh Circuit makes clear that

> [t]o defeat a qualified immunity defense, **plaintiff bears the burden of showing** that "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, ... the law clearly proscribed the actions the defendant ... took." Plaintiff **cannot discharge her burden simply by making general, conclusory allegations of some constitutional violation or by stating broad legal truisms.** Rather, as the courts have plainly stated, plaintiff must prove the existence of a clear, **factually-defined,** well-recognized right of which a reasonable officer should have known.

*Barts,* 865 F.2d at 1190 (citations omitted; emphasis added). Practically speaking, this means that for McMillian to survive Defendants' Motions for Summary Judgment, which are based at least in part on the defense of qualified immunity, he must produce a factually analogous case or cases which clearly define the contours of the constitutional right which he claims Defendants offended by their actions. *See, Rodgers,* 39 F.3d at 310–11. McMillian fails to produce such cases in support of the claims he makes in Counts Six and Seven.

In fact, the only cases McMillian even cites in relation to Counts Six and Seven are inadequate. McMillian cites *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), *United States v. Johnson,* 820 F.2d 1065 (9th Cir.1987), *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), and *Delchamps v. Larry,* 613 So.2d 1235 (Ala.1993). The court will explain why each of these cases fails to suffice. *Lafayette* addresses whether the police may make a warrantless search of a shoulder bag carried by an arrestee when that person arrives at the police station. The case establishes the ability of the police to make an inventory search in such circumstances so long as the search is made in accordance with established inventory procedures. *Lafayette,* 462 U.S. at 648, 103 S.Ct. at 2610–11. It is clearly irrelevant to the claims in Counts Six and Seven. *Johnson* is from the Ninth Circuit and cannot be used to satisfy the requirement that the law in the Eleventh Circuit was clearly established at the time of Defendants' alleged actions. *See, Courson v. McMillian,* 939 F.2d 1479, 1497–98 (11th Cir. 1991) (The relevant courts which can clearly establish the law for qualified immunity purposes in this circuit are the United States Supreme Court, the Eleventh Circuit Court of Appeals, and in certain circumstances, the Alabama Supreme Court.) *Delchamps v. Larry,* 613 So.2d 1235 is an Alabama Supreme Court case which deals exclusively with the state law tort of malicious prosecution. The court does not find any of the principles discussed in this opinion of assis-

tance for purposes of either Count Six or Count Seven.

Of all the cases McMillian cites, *Malley* is the most relevant to McMillian's false arrest claims. In *Malley* the Supreme Court discussed the availability of absolute and qualified immunities to a police officer who submitted an affidavit in support of a warrant which ultimately resulted in the arrest of Briggs and others for drug possession. *Malley*, 475 U.S. at 337–38, 106 S.Ct. at 1094–95. After the charges against Briggs and friends were dropped, they filed suit under 42 U.S.C. § 1983 alleging that the law enforcement officer had violated their rights under the Fourth and Fourteenth Amendment. The law enforcement officer was granted immunity from the suit, but on appeal the First Circuit reversed. The law enforcement officer appealed to the Supreme Court urging a reversal on the basis of absolute immunity, or in the alternative, on the basis of qualified immunity. The Supreme Court affirmed. The clear holding of this case is that an officer who applies for a warrant is not absolutely immune from suit. *Id.* at 342–43, 106 S.Ct. at 1096–97. The court also held that

> the same standard of objective reasonableness that [it] applied in the context of a suppression hearing in [*United States v.*] *Leon* [468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ], ... defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest. Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will the shield of immunity be lost.

*Malley*, 475 U.S. at 344–45, 106 S.Ct. at 1098. After stating its holding, the court remanded the case rather than deciding whether the law enforcement officer's conduct was in fact objectively reasonable. *Id.* at 345 n. 8, 106 S.Ct. at 1098 n. 8. *Malley* does not hold that the behavior of the law enforcement officers violated any constitutional right. Thus, *Malley* supports the Defendants' argument that qualified immunity is available in such cases, but it fails to clearly establish a bright line for unconstitutional conduct.

The only other potential source of authority in McMillian's brief is his citation to the Fourth and Fourteenth Amendments themselves. The court takes McMillian's reference to the Fourteenth Amendment as an acknowledgement that the Fourth Amendment provisions are incorporated to the states by the Fourteenth Amendment. The court recognizes that the Fourth Amendment requires that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and **no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.**

U.S. Const. amend. IV (emphasis added). However, "[t]he Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). The language of the Fourth Amendment itself is insufficient to meet the "clearly established" test when applied to Defendants' alleged actions, since it refers to the requirements for *issuance* of a warrant, not for *seeking* the issuance of a warrant.

What McMillian fails to produce are opinions from the United States Supreme Court or the Eleventh Circuit, including binding cases from the former Fifth Circuit, which make it clear that the protections enunciated in the Fourth Amendment include a prohibition on law enforcement officers pressuring witnesses into appearing before a magistrate to seek an arrest warrant as McMillian alleges in Count Six.[48] None of the cases upon which McMillian would have this court rely have anything to say about police officers pressuring others into swearing out warrants or failing to prevent a crime victim from swearing out a warrant when he is not credi-

---

48. Before this court is a certified copy of the affidavit and warrant which Ralph Myers sought from a Magistrate in Conecuh County, Alabama on June 5, 1987. Myers' signature attests to the fact of his appearance before the Magistrate to aver that Walter McMillian engaged in deviate sexual intercourse with him by forcible compulsion in violation of Alabama law. (Tate Ex. 1.)

ble. Thus, the court cannot say that Count Six alleges a violation of clearly established law as required in this circuit.

McMillian does no better at producing cases which show the alleged behavior of the Defendants in securing the arrest warrant for the Morrison murder. The fact that the affidavit to obtain the warrant for McMillian's arrest for the murder of Ronda Morrison was executed by one of the law enforcement defendants[49] does bring the claims in Count Seven closer to the facts of *Malley.* But, as previously explained, that case establishes the contours of the available immunities, not the contours of the alleged constitutional violation. Without case law which holds that law enforcement officers cannot act as McMillian alleges in Count Seven that Defendants acted, this court cannot strip Tate, Ikner and Benson of the protection of qualified immunity. McMillian points to no binding precedent which clearly establishes that the Fourth Amendment is offended by law enforcement officers when they obtain a warrant on the basis of evidence which they knew or should have known did not support probable cause to believe the arrestee committed the crime. Truth of the broad proposition of law aside, McMillian fails to meet his burden under the qualified immunity paradigm which requires him to produce authority which clearly establishes that the behavior violates a federal right.

Since, Ikner and Benson are due the protection of qualified immunity from McMillian's Count Six and Count Seven claims, the court need not and does not reach the other bases for summary judgment which these Defendants proffer.

### g. Count Eight: Grand Jury Testimony

In Count Eight, McMillian alleges that Tate violated McMillian's rights under the Fourth, Fifth and Fourteenth Amendment by testifying before the Grand Jury in an effort to obtain an indictment against McMillian. The court dismissed Count Eight on February 18, 1994 for failure to state a claim.

---

**49.** Ikner signed as the affiant on the warrant.

### h. Count Nine: Racial Discrimination Against McMillian

In Count Nine, McMillian alleges that Tate instigated and effectuated McMillian's arrest and prosecution for racially discriminatory motives in violation of McMillian's Fourteenth Amendment rights. For the reasons stated below, Tate's Motions for Summary Judgment on Count Nine is due to be GRANTED.

Tate contends that he is entitled to summary judgment in Count Nine for several reasons. Tate argues that the statute of limitations bars Count Nine. Additionally, Tate argues that he is entitled to the protection of qualified immunity because he did not deprive McMillian of clearly established federal right. Finally, Tate asserts that to the extent the allegations of Count Nine can be characterized as a "selective prosecution" claim, McMillian fails to offer evidence sufficient to raise a jury question on one of the necessary elements of the claim.

#### i. Statute of Limitations

Tate argues that the statute of limitations bars McMillian's claim that Tate improperly instigated and effectuated McMillian's prosecution for racially discriminatory motives. The claim in Count Nine is subject to a two year statute of limitations. *Lufkin v. McCallum,* 956 F.2d at 1106. This period begins to run when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Mullinax v. McElhenney,* 817 F.2d at 716.

■ The court finds that the claim which McMillian asserts in Count Nine is one which seeks damages for allegedly unconstitutional conviction and imprisonment and, as such, is one which did not become cognizable until his conviction and sentence were invalidated by the Alabama Court of Criminal Appeals in February 1993. As discussed in Count Three, the Supreme Court has held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Heck,* —— U.S. at ——, 114 S.Ct. at 2374.

(Tate Ex. 4.)

The question for the court then is whether McMillian's Count Nine claim is of the kind discussed in the *Heck* opinion. Put another way, the question is whether the claim that Tate improperly instigated and effectuated McMillian's prosecution for racially discriminatory motives necessarily implies that his conviction and sentence were invalid. The court finds that the Count Nine claim does lead to that implication, and therefore, did not accrue until February 1993 when McMillian's conviction was invalidated. Thus, the statute of limitations is not a bar to this claim.

In light of the foregoing authority, the court finds that Tate's Motion for Summary Judgment is due to be DENIED to the extent that it is based on McMillian's failure to file within the applicable statute of limitations.

### ii. Qualified Immunity & Selective Prosecution

As with the other counts in which qualified immunity is raised as a defense, McMillian bears the burden of showing that Tate's behavior was so obviously wrong in light of pre-existing law that Tate should be stripped of the protection of qualified immunity. As previously discussed, it is the facts of cases, not general principles, which clearly establish the law to the point that the violation is obvious.

 McMillian argues that the central concern of the Fourteenth Amendment is ending governmental discrimination on account of race. The majority of cases on which McMillian relies are cases which establish the right of African–Americans to serve on juries and the Fourteenth Amendment right of every criminal defendant to not have jurors stricken on the basis of their race. *See, Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879). McMillian also relies upon a famous employment discrimination case, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), as an example of another Fourteenth Amendment violation which requires an inquiry into a defendant's intent to discriminate on the basis of race. These cases, while they do support McMillian's general proposition, are not sufficiently factually similar to clearly establish the constitutional violation as alleged by McMillian in Count Nine. The court agrees with McMillian's characterization of the purpose of the Fourteenth Amendment, but such a general principle alone is simply not sufficient to alert reasonable state actors in circumstances which are factually dissimilar from these cases establishing this principle.

Additionally, McMillian relies on the language of *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) which makes it clear that the Equal Protection Clause of the Fourteenth Amendment is violated when a decision-maker acts with a discriminatory purpose. In *McCleskey,* the Supreme Court heard a challenge to McCleskey's capital sentence which was based on complex statistical studies which indicated that improper racial considerations may make it more likely that African–Americans would receive the death penalty. The Supreme Court rejected McCleskey's challenge. In the portion of the opinion in which the Supreme Court engaged in its equal protection analysis, it stated that

> [o]ur analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving "the existence of purposeful discrimination." *Whitus v. Georgia,* 385 U.S. 545, 550 [87 S.Ct. 643, 646, 17 L.Ed.2d 599] (1967). A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him. *Wayte v. United States,* 470 U.S. 598, 608 [105 S.Ct. 1524, 1531, 84 L.Ed.2d 547] (1985). Thus, to prevail under the Equal Protection Clause, McCleskey must prove that the decision-makers in his case acted with discriminatory purpose. He offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence.

*McCleskey v. Kemp,* 481 U.S. at 292, 107 S.Ct. at 1767 (footnote omitted). As with the other cases on which McMillian relies, this case is not factually similar enough to the

events giving rise to the claim in Count Nine to satisfy the qualified immunity analysis.

Tate contends that Count Nine is best characterized as a "selective prosecution" claim. Saying only that one of the cases upon which Tate relies is inapposite and that Tate's argument is "mistaken," McMillian denies the applicability of the selective prosecution case law from this circuit to his claims under Count Nine. In light of the absence of cases on point which support McMillian's contention that all he must show is evidence which raises an inference of impermissible motive on the part of Tate, McMillian's only hope for his Count Nine claims is selective prosecution. To the extent that McMillian's Count Nine claims attempt to reallege that Tate arrested McMillian without probable cause, the court notes that this argument is thoroughly addressed in Counts Six and Seven. What that leaves in Count Nine is an allegation that Tate, acting on racially discriminatory motives, singled out McMillian for prosecution on account of his race and did not prosecute white defendants who were similarly situated.

■ The first question the court must consider is whether McMillian can seek a remedy under Section 1983 if he has been subjected to selective prosecution. As usual, this involves an inquiry into the rights deprived by selective prosecution and whether the contours of the right were sufficiently developed when the defendant acted.

A defendant seeking to establish impermissibly selective vindictive prosecution must meet a substantial burden. He must show both that (i) others who have committed the same acts have not been prosecuted, and (ii) that the reason he was prosecuted was a "constitutionally impermissible motive such as racial or religious discrimination or [retaliation for his] exercise of constitutional rights."

*United States v. Lamberti,* 847 F.2d 1531, 1535 (11th Cir.), *cert. denied,* 488 U.S. 970, 109 S.Ct. 501, 102 L.Ed.2d 537 (1988). *Accord, Fillingim v. Boone,* 835 F.2d 1389, 1399 (11th Cir.1988); *Owen v. Wainwright,* 806 F.2d 1519, 1523 (11th Cir.1986), *cert. denied,* 481 U.S. 1071, 107 S.Ct. 2466, 95 L.Ed.2d 875 (1987); *United States v. Pleasant,* 730 F.2d 657, 663 (11th Cir.), *cert. denied,* 469 U.S. 869, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984); *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). Thus, courts in this circuit have long recognized that selective prosecution, if based on improper motives, can violate constitutional guarantees of equal protection. *See, Lichenstein,* 610 F.2d at 1281. In light of these cases, it seems that the prohibition on selective prosecution was clearly established at the time of Tate's conduct.

A court's qualified immunity analysis is "separate and distinct from the merits of the case." *Lassiter,* 28 F.3d at 1151. It is clear that the subjective intention of an individual defendant are irrelevant to a qualified immunity analysis. *Id.* at 1150. If the law is so clearly established that the defendant is not entitled to qualified immunity on the claim and there is sufficient evidence to create a genuine issue of fact regarding whether the government officials engaged in conduct which violates clearly established law, then qualified immunity does not afford the defendant protection from the claim.

■ After this qualified immunity analysis is completed, the court turns its attention to the sufficiency of the evidence. If the cause of action is one which has as an element a particular mental state such as malice, then a court faced with a motion for summary judgment must examine the evidence to determine whether sufficient evidence exists from which a reasonable jury could find that the defendant's subjective intentions were of the impermissible variety. Thus, the qualified immunity analysis and the analysis of the prima facie case are separate and distinct. Although a defendant's subjective intent is irrelevant to qualified immunity as it is now defined, it may be highly relevant to an analysis of the evidence in support of a plaintiff's cause of action.

■ Selective prosecution is only a constitutional violation when the prosecution is brought on the basis of an impermissible motive, e.g., an intent to discriminate on the basis of race. Tate's subjective intent is relevant to the court's analysis of the cause

of action. McMillian offers evidence from which a reasonable jury could infer that Tate in part acted with an impermissible motive in instigating and effectuating the arrest of McMillian. McMillian fails to offer sufficient evidence to support an inference that others who were similarly situated and committed the same acts had not been prosecuted. Thus, Tate's Motion for Summary Judgment on Count Nine is due to be GRANTED.

### i. Count Ten: Monroe County's Liability for Tate's Actions

In Count Ten, McMillian alleges that Monroe County is liable for all of the constitutional violations allegedly committed by Tate and that Tate and Ikner are liable in their official capacities for their actions. The court dismissed Count Ten on February 18, 1994 for failure to state a claim.

### B. MCMILLIAN'S STATE LAW CLAIMS

Counts Eleven through Twenty–Seven of McMillian's Complaint contain various claims under the Alabama Constitution and Alabama common law. As discussed below, several of these claims were dismissed on motion of the Defendants in February 1994. After a brief discussion of the applicability of sovereign immunity to these claims, the court will address each of McMillian's remaining state law claims.

#### 1. Immunity Issues

■ In his Motion for Summary Judgment, Tate contends that sovereign immunity and the state law doctrine of discretionary immunity shield him from all of McMillian's state-law based damage claims.[50] Tate argues that he, as a sheriff, is an executive officer of the State of Alabama, and as such, he is afforded protection from suit by the Alabama Constitution of 1901. The specific constitutional provision at issue is Article I,

§ 14 which states that "the State of Alabama shall never be made a defendant in any court of law or equity." Tate contends that McMillian's claims do not fall into any of the judicially created exceptions to this broad grant of immunity, and so they must fail. Tate further asserts that the doctrine of discretionary immunity provides an additional source of immunity from McMillian's state law claims.

In response to Tate's assertions of immunity, McMillian points out that in ruling on the Motions to Dismiss, the court concluded that sovereign immunity, in any form, was not a bar to his state law claims. In the interest of clarity, the court will revisit Tate's immunity claims.

McMillian's claims are against the defendants in their **individual,** not their official, capacities. Moreover, all of McMillian's state law claims are premised on **intentional wrong-doing** by the individual defendants, rather than mere negligence or wantonness. Together these two key facts distinguish McMillian's claims from the kinds of claims addressed in the cases upon which Tate relies. *See, e.g., King v. Colbert County,* 620 So.2d 623 (Ala.1993) (immunizing a sheriff who acted **negligently or wantonly** from suit against him in his individual and official capacities); *Taylor v. Shoemaker,* 605 So.2d 828 (Ala.1992) (providing discretionary immunity where state officer acted **merely negligently**); *Crocker v. Shelby County,* 604 So.2d 350 (Ala.1992) (granting discretionary function immunity to a sheriff's deputy on the basis of *White v. Birchfield* ); *Coleman v. City of Dothan,* 598 So.2d 873 (Ala.1992) (providing absolute immunity to a sheriff sued only in his **official** capacity for trespass); *Boshell v. Walker County Sheriff,* 598 So.2d 843 (Ala.1992) (applying immunity to sheriff sued in his **official** capacity for assault and false arrest); *Hereford v. Jefferson*

50. In a single sentence in their Reply Brief, Ikner and Benson make a similar attempt to claim immunity from suit on sovereign immunity grounds. Unlike Tate, Ikner and Benson fail to provide the court with case law applying the sovereign immunity doctrine to similarly situated state officers. Because the argument and case authority upon which Tate relies specifically discusses the application of immunity to **sheriffs,** Ikner and Benson cannot ride the coat-tails of Tate's brief (Ikner is an investigator for a state district attorney, and Benson is an investigator for the Alabama Bureau of Investigation). The court finds their sovereign immunity argument unpersuasive and to the extent that Ikner and Benson seek summary judgment on the basis of sovereign immunity, their motion is due to be DENIED.

*County,* 586 So.2d 209 (Ala.1991) (dealing with liability of sheriff in his official and individual capacities for **negligently** or **wantonly** releasing a dangerous prisoner); *White v. Birchfield,* 582 So.2d 1085 (Ala.1991) (denying absolute immunity, but granting substantive immunity to a sheriff sued for **negligently** injuring plaintiff); *Oliver v. Townsend,* 534 So.2d 1038 (Ala.1988) (allowing immunity to sheriffs sued for **negligent and wanton** supervision of prisoner's health).

The authority cited by Tate does not address the real issue in this case, namely, is a sheriff, who has been sued in his individual capacity, entitled to absolute or discretionary immunity when he intentionally exceeded his grant of authority and in doing so committed a tort such as malicious prosecution, abuse of process, or outrage. The Alabama Supreme Court has provided the answer to this question. In considering whether the state officials in *Phillips v. Thomas,* 555 So.2d 81 (Ala.1989) were entitled to "sovereign immunity of any kind[,]" the court stated that

> [The Alabama Supreme Court] has recognized that a state officer or employee may not escape individual tort liability by "arguing that his mere status as a state official cloaks him with the state's constitutional immunity." Clearly, a state officer or employee is not protected by § 14 when he acts willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law.

*Phillips,* 555 So.2d at 83 (citations omitted) *Accord, Lumpkin v. Cofield,* 536 So.2d 62, 65–66 (Ala.1988) ("The defense of sovereign immunity does not bar suits against state officers and employees for torts committed willfully, maliciously, and outside the scope of their authority.") Only when a court is satisfied that the defendant has not so acted does the court analyze questions of absolute or discretionary immunity. *Phillips,* 555 So.2d at 83. Thus, where as here the types of torts for which a plaintiff seeks recovery include an element of intentional or malicious wrongdoing, sovereign immunity does not provide a shield. Tate's Motion for Summary Judgment to the extent that it is based on immunity from McMillian's state law claims is due to be DENIED.

## 2. The Claims

### a. Counts Eleven Through Nineteen: State Constitutional Claims

■ Counts Eleven through Nineteen contain various claims for recovery based on alleged violations of McMillian's rights under the Alabama Constitution. Most of the counts contained allegations against Tate, Ikner and Benson. Counts Eleven and Thirteen also contained claims against the D.O.C. Defendants. On February 18, 1994, when McMillian was unable to cite the court to any state statutes affording a separate cause of action based upon violation of state constitutional rights, as 42 U.S.C. § 1983 does for violation of rights under the U.S. Constitution, the court ruled on the Motions to Dismiss filed by Tate, Ikner, Benson, Barnett and Monroe County, Alabama and dismissed Counts Eleven through Nineteen for failure to state a claim. Because the D.O.C. Defendants did not move for a dismissal, the order dismissing Counts Eleven through Nineteen did not dismiss Counts Eleven and Thirteen as they applied to the D.O.C. Defendants. McMillian concedes that in light of the court's previous holding regarding these claims, the claims are not viable against the D.O.C. Defendants. For the reasons stated in that opinion, the court now extends the dismissal of these counts to the D.O.C. Defendants. Therefore, the court does not reach the argument of the D.O.C. that they are entitled to summary judgment on Counts Eleven and Thirteen. Thus, McMillian's claims in Counts Eleven and Thirteen, as they apply to the D.O.C. Defendants are due to be DISMISSED.

### b. Count Twenty: State Law Malicious Prosecution Claim

In Count Twenty, McMillian alleges that Tate, Ikner and Benson committed the Alabama common law tort of malicious prosecution by their actions instigating and effectuating the arrest and prosecution of McMillian. Specifically, McMillian alleges that Tate, Ikner and Benson maliciously instigated a prosecution against McMillian for a crime he

did not commit. Defendants allegedly did so without probable cause. McMillian asserts there is ample evidence in support of each of the requisite elements and that he unquestionably was damaged by his many years of incarceration for a crime which he did not commit.

Tate contends that McMillian has failed to offer adequate evidence of each of the elements of malicious prosecution to survive summary judgment. Tate denies instigating a prosecution against McMillian; he argues that a grand jury indicted McMillian and that he did not participate in obtaining the indictment. Tate contends that there was probable cause to arrest McMillian and that he did not possess the requisite malice to make him liable for this tort. Finally, Tate disputes McMillian's claim that he has been damaged. The court notes that Tate does not dispute the existence of one of the elements of the claim, namely, a prior judicial proceeding which terminated in McMillian's favor. Ikner and Benson contend only that they are entitled to summary judgment on McMillian's malicious prosecution claim because they had probable cause supporting their actions and not malice.

In accordance with the following analysis, Defendants' Motions for Summary Judgment are due to be DENIED as they apply to Count Twenty.

#### i. Malicious Prosecution

■ The plaintiff in a malicious prosecution case must prove each of the following elements: (1) a prior judicial proceeding; (2) instigated by the present defendant; (3) without probable cause; (4) malice; (5) the termination of the judicial proceeding favorably to the present plaintiff; and (6) damages. *See, e.g., Delchamps, Inc. v. Larry,* 613 So.2d 1235, 1238 (Ala.1992); *Robinson v. McPherson,* 602 So.2d 352, 354 (Ala.1992); *Whitlow v. Bruno's Inc.,* 567 So.2d 1235, 1237 (Ala.1990) (citation omitted); *Lumpkin v. Cofield,* 536 So.2d at 64; *Alabama Power Co. v. Neighbors,* 402 So.2d 958, 962 (Ala.1981). If any one of these elements is missing, the result is fatal to the action. *See, Kitchens v. Winn–Dixie Montgomery, Inc.,* 456 So.2d 45, 47 (Ala.1984).

■ In *Alabama Power Co. v. Neighbors,* the Alabama Supreme Court explained why such a heavy burden of proof is necessary in malicious prosecution cases "[t]he plaintiff must prove [all the elements] in order to prevail because an action for malicious prosecution is not favored at law." 402 So.2d at 962. Thus, for McMillian's common law malicious prosecution claim to survive Defendants' Motions for Summary Judgment he must demonstrate that material issues of fact exist as to the disputed elements of his claim: prior judicial proceeding instigated by the defendants, lack of probable cause, malice, and damages.

#### ii. Factual Analysis of the Malicious Prosecution Claim

***Prior Judicial Proceeding Instigated by the Defendants***

As previously stated, one of the essential elements of an action for malicious prosecution requires the plaintiff to prove that "the defendant instigated, without probable cause and with malice, a prior judicial proceeding against the plaintiff ..." *Lumpkin,* 536 So.2d at 64. *Accord, Alabama Power Co.,* 402 So.2d at 962. Some opinions of the Alabama Supreme Court do use the phrase "a judicial proceeding initiated by the defendant" to describe this element. *See, e.g., National Sec. Fire & Casualty Co. v. Bowen,* 447 So.2d 133, 138 (Ala.1983); *S.S. Kresge Co. v. Ruby,* 348 So.2d 484 (Ala.1977). Yet, these opinions do not seem to mean that the defendant must have been the person to actually file the charges to be liable for malicious prosecution.

For example, in *National Sec. Fire,* the court held that

> [t]he evidence shows that the criminal charges against [the plaintiff] were initiated by National Security's agents. It was they who obtained false information from Ronnie Worrells and "Frog" Williamson that, along with appearances before the grand jury by Deputy Sheriff Harrell and [one of the agents], formed the basis of the indictment.

*National Sec. Fire,* 447 So.2d at 139. In *National Sec. Fire,* the Court found that the defendant's agent had both bribed witnesses

and testified before the grand jury which indicted the plaintiff.

*Lumpkin* takes the liability for malicious prosecution even farther. In *Lumpkin*, the court held that the evidence presented a jury question on plaintiff's malicious prosecution claim against a defendant named Heatherly who had neither sworn out a warrant against the plaintiff nor testified before the grand jury which indicted the plaintiff. The evidence recounted in that case showed that Heatherly had refused the prosecutor's recommendation to dismiss the criminal charges against Cofield and that Heatherly had insisted that the case be prosecuted to the fullest extent. *Lumpkin*, 536 So.2d at 65. The court said that "there was evidence to support the claim against Heatherly, including evidence that he refused to follow the prosecutor's recommendation that the case be dismissed." *Id.* Thus, participation in the grand jury process and swearing out a warrant are not the only ways a defendant can instigate a proceeding.

■■■ Although Tate admits that he participated in the investigation of the Morrison murder, he argues that he did not "instigate" the prosecution against McMillian and cannot be liable for malicious prosecution. According to Tate's own affidavit, he located witnesses against McMillian, took statements, interviewed witnesses including Myers, the key witness for the prosecution in McMillian's trial, arrested McMillian for sodomy, turned over the results of his investigation to the District Attorney and helped decide which witnesses should receive the reward money. The warrant for McMillian's arrest for the Morrison murder names Tate as a witness. According to McMillian, Tate attended McMillian's trial for the Morrison murder. As discussed in Counts Two and Three, there is evidence from which a reasonable jury could conclude that Tate intentionally withheld exculpatory evidence from McMillian's defense attorneys and that Tate improperly coerced Myers' into testifying against McMillian. All of this evidence is sufficient to raise a jury question as to whether Tate instigated the prosecution against McMillian. To the extent that Tate seeks summary judgment on Count Twenty

due to a lack of evidence indicating that Tate's instigated a prior judicial proceeding against McMillian, his request is due to be DENIED.

### *Lack of Probable Cause*

■■■ Tate, Ikner and Benson all cite probable cause for their actions. The mere fact that the plaintiff in a malicious prosecution action arising from a criminal charge was acquitted of the charge does not prove that there was no probable cause to believe him guilty. *Robinson*, 602 So.2d at 354. The malicious prosecution plaintiff has the burden of proving a negative—i.e., the complete absence of evidence from which a reasonable jury could infer that there probable cause from which the defendant could have instituted the suit in question. *See, Eidson v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala.1988) (citation omitted). Probable cause is defined as "[a] reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged." *Id.* (citation and internal quotation marks omitted); *see also Pearson v. Delchamps, Inc.*, 578 So.2d 1086, 1088 (Ala.1991). Other courts characterize probable cause for the purposes of malicious prosecution claims as

> such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty.

*Hanson v. Couch*, 360 So.2d 942, 947 (Ala. 1978).

■■■ "The question is not whether the [malicious prosecution] plaintiff was guilty of the thing charged, but whether the [malicious prosecution] defendant acted in good faith on the appearance of things [at the time suit was filed]." *Eidson*, 527 So.2d at 1285 (internal quotation and citations omitted). A grand jury indictment is prima facie evidence of the existence of probable cause. *Lumpkin*, 536 So.2d at 64. However, a plaintiff can overcome such a prima facie showing by offering evidence showing that the indictment was "induced by fraud, subornation, suppression of testimony, or like misconduct

of the party seeking the indictment." *National Sec. Fire*, 447 So.2d at 140. If the necessary facts on the issue of probable cause are in dispute, there must be a submission of those facts to the jury, but if the necessary facts are not in dispute, a court may determine if those undisputed facts amount to probable cause as a matter of law. *See, Hanson*, 360 So.2d at 945. *Accord, Delchamps*, 613 So.2d at 1238.

In Counts Two and Three, the court found factual issues in dispute on the questions of whether Defendants intentionally kept exculpatory evidence from McMillian and whether Defendants intentionally tampered with witnesses. These same factual disputes are relevant to the probable cause determination, and so a jury question exists precluding summary judgment on the want of probable cause element of McMillian's common law malicious prosecution claim.

### Malice

 Malice, for purposes of a malicious prosecution action, may be inferred from want of probable cause. *Kitchens*, 456 So.2d at 47. Malice may also be inferred from the circumstances surrounding and attending prosecution. *Eubanks v. Hall*, 628 So.2d 773, 775 (Ala.Civ.App.1993). This is because malice is incapable of positive, direct proof and must out of necessity rest on inferences and deductions from facts which are heard by the trier of fact. *National Sec.*, 447 So.2d at 140. Thus, for purposes of a malicious prosecution claim, malice may be inferred from the conduct of the defendant if no other reasonable explanation for his actions exists. *Eubanks*, 628 So.2d at 775. "Personal ill will or a desire for revenge is not essential to the existence of malice." *Delchamps*, 613 So.2d at 1239.

 Just as the issue of want of probable cause cannot be determined as a matter of law because material issue of fact are in dispute, the court also finds that McMillian has produced sufficient evidence of malice on the part of Tate, Ikner and Benson to create a jury question. This precludes summary judgment on McMillian's malicious prosecution claim.

### Damage to McMillian

 In Alabama, it is a settled rule of law that damages suffered as a result of mental distress are recoverable in a common law malicious prosecution claim. *See, Goodwin v. Barry Miller Chevrolet, Inc.*, 543 So.2d 1171 (Ala.1989); *National Sec. Fire & Casualty Co. v. Bowen*, 447 So.2d 133; *United States Fidelity & Guar. Co. v. Miller*, 117 So. 668, 670 (Ala.1928).

 McMillian does not submit either an affidavit or deposition testimony in which he says that he suffered mental distress as a result of the prosecution as a whole. He does discuss a particular type of mental anguish he suffered while on Death Row as a pre-trial detainee.[51] The murder prosecution against McMillian caused him to be in a position to be hurt as he was. Moreover, should the jury believe McMillian's allegations, it would be reasonable for the jury to believe he had suffered mental distress as a result.[52] The court cannot therefore say that Defendants are entitled to summary judgment on McMillian's malicious prosecution claims.

Defendants' Motions for Summary Judgment on Count Twenty are due to be DENIED.

### c. Count Twenty–One: State Law Abuse of Process Claim

In Count Twenty–One, McMillian alleges that Tate, Ikner and Benson committed the state law tort of abuse of process by their actions in instigating and effectuating the arrest and prosecution of McMillian. Specifically, McMillian contends that Defendants used the sodomy warrant to arrest McMillian as a means of constructing evidence for the murder charge by having Hooks look at McMillian's impounded truck. Additionally, McMillian claims that the murder warrant

---

51. See Count Twenty–Five.

52. Tate properly notes that to successfully avoid summary judgment McMillian must demonstrate that a question exists for the jury on each issue. McMillian has not submitted an affidavit in which he discusses the emotional price he has paid for these events. Nor did McMillian's own attorney examine him about these or any other issues at his deposition. The evidence is scant on this issue, but the court finds that it is sufficient to raise an inference.

was an abuse of process in that it was driven by an ulterior motive, namely racism.

Tate asserts that there is insufficient evidence to take McMillian's abuse of process claim to a jury. Tate argues that he was just doing his duty and that there was sufficient support for the warrant for McMillian's arrest. Ikner and Benson state that Count Twenty–One fails due to a total lack of evidence.

For the following reasons, the Motions for Summary Judgment filed by Defendants are due to be DENIED as they apply to Count Twenty–One.

### i. Elements of an Abuse of Process Claim

 McMillian must offer proof of the following elements to establish that the facts of this case fit the pattern of the Alabama common law tort of abuse of process: (1) malice, (2) the existence of an ulterior purpose, and (3) the wrongful use of process. *See, Triple J Cattle, Inc. v. Chambers,* 621 So.2d 1221, 1225 (Ala.1993). Thus in abuse of process cases, the plaintiff bears the burden of showing that the process was used for an illegal purpose. *Warwick Dev. Co. v. GV Corp.,* 469 So.2d 1270, 1274 (Ala.1985). The key issue in abuse of process cases is not the existence of a valid use for which process could be used, but rather "whether there was an ulterior purpose in filing this action and a willful act in the use of process not proper in the regular conduct of the proceeding." *Id.* Although courts often confuse malicious prosecution claims and abuse of process claims, the Supreme Court of Alabama has distinguished them by explaining that "malicious prosecution concerns the wrong in the issuance of the process, while abuse of process rests on the wrongful **use** of process after it has been issued." *Id.* Moreover, lack of probable cause is not an element of the abuse of process tort under Alabama law. *Drill Parts & Serv. Co. v. Joy Mfg. Co.,* 619 So.2d 1280, 1288 (Ala.1993).

### ii. Factual Analysis of Abuse of Process Claim

*Collecting Evidence to Frame McMillian as the Ulterior Motive*

 In his August 28, 1992 affidavit, Myers states that he "was told to make up allegations about McMillian sexually assaulting me so that local law enforcement could arrest McMillian." (Myers 8/28/91 Aff. p. 2.) McMillian argues that this statement supports his abuse of process claim. Aware that Myers does not identify who told him to make up the allegations, McMillian points out that it is undisputed that Myers was in the Monroe County jail at the time he first made the sodomy allegations against McMillian and that during Myers' incarceration there he was questioned by Tate, Ikner and Benson. (Tate Aff. pp. 8–10.) Moreover during his deposition, Myers indicated that Benson pressured him. (Myers Depo. p. 215.) The fact that Myers has given other sworn statements which contradict his affidavit simply creates a credibility question for the jury. *See, Lane v. Celotex Corp.,* 782 F.2d 1526, 1530–33 (11th Cir.1986). The fact that the Defendants deny acting with any ulterior motive or with malice creates a genuine issue of material fact for the jury.

It is also undisputed that McMillian was arrested on the sodomy charge while in his truck. After McMillian's arrest for allegedly sodomizing Myers, Tate drove the truck to the jail where it was inventoried and held until McMillian could authorize its release or drive away in it. (Tate Aff. pp. 10–11.) While the truck was in the possession of the law enforcement officers, Benson took Hooks to the jail where McMillian's truck was parked and they looked over the truck. Later that day during the course of Hooks' interview, Benson and Hooks went outside again and reexamined McMillian's truck. (Benson Depo. pp. 164–166.)

A reasonable jury could view the evidence as establishing that Tate, Ikner and Benson used the sodomy charge to obtain access to McMillian's truck so that they could allow Hooks to view it and to build evidence against McMillian in support of a murder arrest warrant. The court cannot say as a matter of law that no material issues of fact exist which preclude summary judgment for the Defendants on this count. Thus, Defendants' Motions for Summary Judgment on Count Twenty–One are due to be DENIED.

*Race Discrimination as the Ulterior Motive*

█ Additionally, McMillian asserts that a reasonable jury could infer that the prosecution of McMillian was an attempt by Tate to punish McMillian for having a relationship with a white woman. In support of this theory, McMillian again points to racist statements Tate allegedly made to McMillian. *See,* (McMillian Depo. V.I pp. 300–02.) This evidence, viewed in the light most favorable to McMillian, is evidence which a reasonable jury might decide supports the malice, ulterior motive and wrongful use of process requirements of the abuse of process prima facie case against Tate. A reasonable jury could view the evidence as establishing that Tate used the murder charge to punish McMillian for inter-racial dating. Thus, Tate's Motion for Summary Judgment on Count Twenty–One is due to be DENIED.

**d. Counts Twenty–Two and Twenty–Three: False Imprisonment**

█ In Counts Twenty–Two and Twenty–Three, McMillian alleges that Defendants committed the common law tort of false imprisonment when they detained him on Death Row as a pretrial detainee and when they instigated and effectuated the incarceration of McMillian for a crime he did not commit. McMillian alleges that the role of the D.O.C. Defendants makes them liable under Count Twenty–Two. Tate, Ikner and Benson moved for a dismissal of these counts. On February 18, 1994, the court dismissed Counts Twenty–Two and Twenty–Three for failure to state a claim. The court based its dismissal of Counts Twenty–Two and Twenty–Three on the lack of support for McMillian's contention that holding a pretrial detainee in one prison cell instead of another constitutes false imprisonment.

The court reaffirms its previous holding that false imprisonment claims are meant as a means of recovering for the fact of a wrongful detention as opposed to the place of the detention. The facts of this case simply do not fit within the false imprisonment paradigm. For these same reasons, the court holds that the D.O.C. Defendants' Motion for Summary Judgment on Count Twenty–Two is due to be GRANTED.[53]

**e. Count Twenty–Four: Fraud**

In Count Twenty–Four, McMillian alleged that Defendants' actions in suppressing and withholding exculpatory evidence from McMillian constituted common law fraud. On February 18, 1994, the court dismissed Count Twenty–Four for failure to state a claim.

**f. Count Twenty–Five: Outrageous Conduct and Pretrial Detention on Death Row**

█ In Count Twenty–Five, McMillian alleges that Tate, Ikner, Benson, and the D.O.C. Defendants committed the tort of outrage[54] by their actions which caused McMillian to be incarcerated on Death Row as a pre-trial detainee. This count was dismissed as barred by the applicable two-year statute of limitations on February 18, 1994 as it applied to Ikner and Benson. The D.O.C. Defendants did not file a Motion to Dismiss, nor have they ever contended that this claim against them is barred by the statute of limitations. As for Tate, because he is a sheriff, he is subject to a special ten-year statute of limitations. § 6–2–33(3), Code of Alabama. Unlike federal law which, as was pointed out in the discussion of Count One, holds that only one statute of limitations may be applied in each state to § 1983 claims, state law contains no such requirement. Consequently, this claim is still viable as it applies to Tate.

Specifically, McMillian alleges that Tate, acting with the assistance of the D.O.C. Defendants, intentionally placed McMillian on Death Row before he had been tried or sentenced. McMillian contends that Tate's behavior included concocting a cover story for the transfer involving McMillian's safety. According to McMillian, such behavior is extreme and outrageous. McMillian also claims that there is sufficient evidence to

---

**53.** Count Twenty–Three applied only to Tate, Ikner and Benson.

**54.** This tort is more properly designated as outrageous conduct and is also sometimes referred to as intentional infliction of emotional distress.

send the issue of the severity of his resultant emotional distress to a jury.

Tate contends that he is due summary judgment on Count Twenty–Five for the following reasons: McMillian fails to create a genuine issue of material fact as to whether Tate caused McMillian's incarceration on Death Row as a pre-trial detainee, the actions alleged are not of the kind for which the tort of outrage is available; and McMillian has not created an issue of fact as to whether he suffered any emotional distress as a result of his pre-trial incarceration on Death Row.

The D.O.C. Defendants argue that they are entitled to a grant of summary judgment on this count because McMillian fails to create a genuine issue of fact as to whether he suffered emotional distress as a result of his placement on Death Row. This is the sole basis on which the D.O.C. Defendants' Motion for Summary Judgment on Count Twenty–Five rests.

For the reasons explained below, the Motions for Summary Judgment of Tate and the D.O.C. Defendants on Count Twenty–Five are due to be DENIED.

### i. Elements of the Tort of Outrageous Conduct

■■■■■■ Alabama law recognizes the tort of outrageous conduct. *See, American Road Serv. Co. v. Inmon,* 394 So.2d 361, 365 (Ala.1980). The tort occurs when a defendant's extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to plaintiff. *Id.* The emotional distress caused must be "so severe that no reasonable person could be expected to endure it." *Id.* The extreme and outrageous conduct is "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.*

The Alabama Supreme Court recently characterized this tort as "a very limited cause of action that is available in only the most egregious circumstances." *Thomas v.*

*BSE Indus. Contractors, Inc.,* 624 So.2d 1041, 1044 (Ala.1993). In fact, there are clearly discernable fact patterns which have been held to constitute the tort of outrageous conduct. These include the following: cases involving wrongful conduct in the context of family burials; cases where insurance agents employed heavy-handed, barbaric means in attempting to coerce an insured into settling an insurance claim; and cases involving egregious sexual harassment. *Id.* However, the Alabama Supreme Court has never held that these are the only factual scenarios which give rise to a claim of outrageous conduct.

### ii. Factual Analysis of Outrageous Conduct by Detention on Death Row [55]

#### *McMillian's Emotional Distress*

■■■■ It is undisputed that McMillian spent months on Death Row as a pre-trial detainee and that at least one prisoner was executed during this period. Moreover, it is clear that the placement of McMillian on Death Row before he had been tried or convicted for his alleged crime was in direct violation of the policies of the Alabama Department of Corrections. (Shinbaum Depo. p. 25.) McMillian contends that although it is difficult for him to talk about the hurt that his pre-trial incarceration on Death Row caused him, he was, in fact, hurt. At his deposition, he spoke of his pre-trial experience on Death Row, specifically his experience of the execution of another Death Row inmate, as painful.

> A: It just—they just really—it just does something to you. You can't hardly—I mean, it just hurts you, you know.
>
> Q: You didn't go down there and witness the execution yourself, did you?
>
> A: No. No. You can see all the motion. I am up high and you can see the ambulance when they come in. And the time the execution is over with, you can see all the people go out. Some of them be crying and some be, you know—

(McMillian Depo. V.II pp. 280–281.) Moreover, in his affidavit, Myers testifies that

---

**55.** The court hereby incorporates by reference the analysis of the factual issues discussed in Count One to the extent that those factual issues also support McMillian's claim in Count Twenty–Five.

Tate, Ikner, and Benson came by to speak with him after Ritter's execution. In the course of a discussion regarding the execution, Myers states that Tate, Ikner, and Benson said something to the effect that "I bet you [McMillian's] ass is so tight you couldn't get a safety pin (or a nail) in there." (Myers Aff. 8/18/94 p. 1.) This evidence, taken as true, indicates that Tate was well aware that McMillian's presence on Death Row, especially at the time of Ritter's execution, was probably causing McMillian to suffer psychologically.

Viewing these facts in the light most favorable to McMillian, this court cannot say as a matter of law that no reasonable jury could hear the evidence and conclude that McMillian had not suffered the kind of emotional distress for which the tort of outrageous conduct provides recovery. The only argument the D.O.C. Defendants make in support of their Motion for Summary Judgment on Count Twenty–Five is that McMillian fails to offer evidence of emotional problems. Therefore, the D.O.C. Defendants' Motions for Summary Judgment on Count Twenty–Five is due to be DENIED. Additionally, to the extent that Tate argues that this element of the tort of outrageous conduct is unsupported his Motion is also due to fail.

### Intentional Outrageous Conduct

 District Attorney Pearson filed the actual motions to transfer McMillian to the care and custody of the Department of Corrections. (Pearson Aff. p. 3.) Prior to filing the motions, Pearson discussed the Conecuh County jail break-in with Tate, Ikner and Benson. According to Pearson's Affidavit,

all of these law enforcement officials expressed to [him] their concern for the safety and well-being of Mr. McMillian and Mr. Myers. Afterwards, we decided for

their safety, it would be best to transfer them from the local county jails.

(Pearson Aff. p. 3) (emphasis added). Pearson does also indicate that none of these individuals expressed to Pearson a wish to see McMillian or Myers on Death Row. Clearly, the evidence supports an inference from which a reasonable jury could conclude that Tate had the ability to influence the decision to transfer McMillian out of the county jail system and into the hands of the D.O.C. Given the evidence of Tate's prior conversations with McMillian in which he made threatening remarks [56] and the evidence of other conversations in which Tate may have said McMillian would get the electric chair if he didn't talk,[57] a reasonable jury could conclude that Tate engineered McMillian's transfer out of either a desire to coerce a confession or statement implicating Myers out of McMillian or a racially discriminatory motive. Viewing the evidence in the light most favorable to McMillian, the non-moving party, the court cannot say as a matter of law that no evidence exists from which a reasonable jury could conclude that Tate intentionally acted in a way that caused McMillian to suffer extreme emotional distress by influencing the placement of McMillian on Death Row as a pre-trial detainee.

Finally, Tate argues that the events McMillian alleges are not of the variety for which one can bring an action for the tort of outrageous conduct. The court disagrees. Placing a person on Death Row who has not yet been tried, convicted, or sentenced for a crime, particularly as a means of coercing false testimony or confessions from him, is every bit as outrageous as the other cases in which the courts have allowed outrage actions. McMillian's allegations do describe

---

**56.** In his deposition McMillian described how Tate would take him into a room and say things like "you are a dead son of a bitch. You ain't never going to get out of this. We got all of these charges against you. You ain't never going to get out of it. You are a dead nigger and stuff like that, that's all." (McMillian Depo. V.I p. 296.) McMillian also described how right before he was transferred to Holman, Tate said he was going to stop all the "niggers from f——ing white women." *Id.* at 300–01. McMillian testified that Tate threatened to kill McMillian's daughter

and "throw her out beside the road and let the maggots eat her." *Id.*

**57.** In her affidavit, Mary Madison describes a meeting with Tate, Ikner and Benson about McMillian's arrest which took place the week of his arrest. According to Madison, "[d]uring that meeting, these men told us that Walter McMillian was going to go to the electric chair. They said that the only way he would not go to the electric chair was if he told them what he knew about the murder." (Madison Aff.)

conduct which is so outrageous in character and extreme in degree as to be beyond all possible bounds of decency and atrocious and utterly intolerable in a civilized society. McMillian will have his chance to present the facts to a jury, and they can decide if they believe the allegations. The court believes a reasonable jury could, and consequently, Tate's Motion for Summary Judgment on Count Twenty–Five is due to be DENIED.

### g. Count Twenty–Six: Outrageous Conduct & False Arrest

In Count Twenty–Six, McMillian alleges that Tate, Ikner and Benson committed the tort of outrageous conduct by their actions in instigating and effectuating the arrest, incarceration and prosecution of McMillian. Specifically, McMillian alleges that actions intentionally taken by Tate, Ikner and Benson in the course of McMillian's arrest, incarceration and prosecution for a crime he did not commit were so outrageous as to cause him severe emotional distress.

In accordance with this court's prior statute of limitations rulings on these claims, McMillian may, upon proof of his case, recover from Tate for all of his injuries resulting from his arrest, incarceration and prosecution for a crime he did not commit. The court previously held that, because of the application of the two-year statute of limitations to Ikner and Benson, McMillian could only recover for injuries he suffered after June 4, 1991 as a result of the intentional, outrageous actions of those Defendants in furtherance of his prosecution and incarceration. For different reasons, Ikner, Benson and McMillian ask the court to reconsider this ruling.

Raising the same arguments as in Count Twenty–Five, Tate, as to whom the court has held a ten-year statute of limitations to apply, contends that he is due summary judgment on Count Twenty–Six. Basically, Tate challenges McMillian's claims that he suffered severe emotional distress, that Tate intentionally acted in an outrageous fashion in conducting McMillian's prosecution and arrest, and that the conduct engaged in by Tate is beyond all possible bounds of decency.

In their brief in support of summary judgment, Ikner and Benson briefly discuss the elements of a prima facie outrageous conduct claim. Beyond that their argument is limited to bare assertions that there is no evidence in support of this claim. In fact, Ikner and Benson boldly assert that there is "certainly no evidence of any intentional wrong-doing on the part of any defendant to their knowledge." The alternate basis on which Benson and Ikner seek summary judgment on this count is a revival of their statute of limitations argument.

For the reasons stated below, the Motions for Summary Judgment of Tate, Ikner and Benson on Count Twenty–Five are due to be DENIED.

### i. Statute of Limitations Revisited

 Under Alabama law the tort of outrageous is governed by the two year statute of limitations found in Alabama Code Section 6–2–38(*l* ). *See, Archie v. Enterprise Hosp. & Nursing Home,* 508 So.2d 693, 695 (Ala.1987). This section of the Code of Alabama provides that "[a]ll actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years." Ala.Code § 6–2–38(*l* ) (1975). Where the outrageous acts of the defendant and the consequent injury occur repeatedly, the Supreme Court of Alabama characterizes the tort as a "continuous tort." *See, e.g., Continental Casualty Ins. Co. v. McDonald,* 567 So.2d 1208, 1216–17 (Ala. 1990); *Garrett v. Raytheon Co.,* 368 So.2d 516, 521 (Ala.1979). The statute of limitations on continuous torts begins to run on the last day on which the plaintiff was injured by defendants and expires after the statutorily prescribed time passes. *Id.* Although the cause of action is still viable until the statutorily prescribed period is exhausted, the plaintiff's recovery for a continuous tort is limited to only those damages incurred within the period of limitations. *Id.*

McMillian argues for reconsideration of this court's ruling on the statute of limitations. He asserts that because the outrageous actions of Ikner and Benson were not discovered until within two years prior to the filing of the suit, his suit to recover for these

actions is not barred by the statute of limitations. In asking the court to reconsider its prior ruling on the applicability of the statute of limitations to this count, McMillian cites no authority for his position that Alabama law implements a discovery rule in the statute of limitations context. This could be because Alabama has squarely rejected such a rule. *See, e.g., Garrett,* 368 So.2d at 520–21. Thus, in Alabama the statute of limitations begins to run on the date of the injury rather than on the date when plaintiff became aware of the injury. *Id.* To the extent that McMillian argues that the statute of limitations did not begin to run until he knew of the existence of his claim, his argument fails.

Similarly, Ikner and Benson's request for a more favorable ruling on the statute of limitations issue is due to be denied. In a sentence at the end of their brief, Ikner and Benson refer the court to the statute of limitations argument which they made in their motion to dismiss. Their initial argument was that because most of the actions taken by Ikner and Benson which allegedly caused McMillian's emotional distress took place more than two years before the filing of the Complaint, the claims were time-barred. Ikner and Benson point out that McMillian's arrest occurred in June 1987. McMillian's trial ended in a conviction in August 1988. This suit was not filed until June 1993.

Relevant events which Ikner and Benson fail to mention include the many post-trial evidentiary hearing which were held in 1992. Benson testified at one of these hearings [58] and, if he lied about his earlier alleged wrong-doing in obtaining the conviction of McMillian, he acted in a way that continued the incarceration, and thus, the injury to McMillian. Clay Kast also testified at this hearing and his affidavit indicates that the hearing occurred in April 1992. (Kast Aff. p. 2) It was at this hearing that Kast claims Ikner approached him in a threatening way. *Id.* Thus, both Ikner and Benson committed

acts within the statutory period which a reasonable jury may find contributed to McMillian's emotional distress of being incarcerated for a crime he did not commit. Therefore, the court reaffirms its prior ruling on the statute of limitations. McMillian may recover from Ikner and Benson for any acts within the statutory period which constitute the tort of outrageous conduct and any damage he suffered within the statutory period which arose from the previous outrageous actions of Ikner and Benson. In essence, what remains of this claim against Ikner and Benson is McMillian's claim for the emotional distress he suffered from June 4, 1991.

### ii. Factual Analysis of Outrageous Conduct

As previously explained in Count Twenty–Five, the tort of outrageous conduct consists of the following elements: (1) intentional or reckless conduct by the defendant which was (2) extreme, outrageous, beyond all bounds of decency and utterly intolerable in a civilized society and which (3) caused emotional distress "so severe that no reasonable person could be expected to endure it." *Mohacsy v. Holiday Inns, Inc.,* 603 So.2d 956, 959 (Ala. 1992).

The intentional, outrageous conduct to which McMillian points in support of his claim in Count Twenty–Six is the alleged actions of Tate, Ikner and Benson in the course of arrest, incarceration, and prosecution of McMillian. The other claims in this opinion summarize the evidence from which a reasonable jury could conclude that Tate, Ikner and Benson intentionally suppressed exculpatory evidence and improperly influenced witnesses. Additionally, McMillian also bases this claim, as it applies to Tate, on the evidence which supports an inference that McMillian was subjected to this prosecution to punish him for his inter-racial dating.

In light of the impact of the ruling on the statute of limitations, the court notes that while McMillian may recover from Tate dam-

---

**58.** The Court of Criminal Appeals remanded McMillian's case to the trial court with instructions for it to conduct a hearing to determine whether McMillian's conviction was obtained by perjured testimony and other issues in McMilli-

an's Rule 32 petition. From the opinion of the Court of Criminal Appeals, it seems Benson testified at a hearing and denied pressuring Myers in any way to get him to implicate McMillian. *See, McMillian v. State,* 616 So.2d at 939.

ages suffered during the course of the investigation, arrest, prosecution and incarceration of McMillian, caused by Tate's actions, McMillian may only recover from Ikner and Benson for damages he can prove he suffered from June 4, 1991 to the present as a result of their acts. Thus, Ikner and Benson are liable only for McMillian's suffering during the period of his incarceration.

■■■■ The intentional outrageous acts of Tate, Ikner and Benson which led to the arrest, prosecution, and incarceration of McMillian for a crime he maintains he did not commit are well documented in the previous counts. McMillian offers evidence from which a jury could infer that Ikner and Benson intentionally and improperly handled exculpatory evidence. McMillian offers evidence from which a jury could infer that Ikner and Benson intentionally and improperly influenced witnesses who then testified against McMillian. Thus, McMillian offers enough evidence of these allegedly outrageous, intentional actions to survive a motion for summary judgment on this count.

In order to survive Defendants' Motions for Summary Judgment on this count's claim, McMillian must also offer evidence that supports an inference that he suffered the kind of severe emotional distress this cause of action is meant to remedy. The court recognizes that this element of the prima facie case exists so that frivolous claims for sham injuries will not bring profits to a plaintiff. This is not that kind of case. The court finds the undisputed fact that McMillian spent several years on Alabama's Death Row raises an inference sufficient to save this claim from summary judgment, especially since he testified at his deposition about the pain that his first experience with the execution of a fellow prisoner caused him. Therefore, Defendants' Motions for Summary Judgment are due to be DENIED as they apply to Count Twenty–Six.

### h. Count Twenty–Seven: Liability of Monroe County

In Count Twenty–Seven, McMillian alleges that Monroe County is liable for the wrongs committed by Tate and Ikner as they are described by McMillian in Counts Eleven through Twenty–Six. On February 18, 1994, the court dismissed Count Twenty–Seven for failure to state a claim.

## V. CONCLUSIONS

For the aforementioned reasons, it is hereby the ORDER of the court that Defendants' Motion for Summary Judgment is due to be GRANTED in part and DENIED in part. Specifically,

(1) the Motions for Summary Judgment of all Defendants named in Count One are DENIED as they apply to Count One;

(2) The Motions for Summary Judgment of Tate, Ikner, and Benson are DENIED as they apply to Count Two;

(3) the Motion for Summary Judgment of Barnett is GRANTED as to Count Two. Since this is the only claim remaining against Barnett, judgment is entered in favor of the Defendant Mike Barnett and against the Plaintiff, and Mike Barnett is DISMISSED as a party defendant.

(4) the Motions for Summary Judgment of Tate, Ikner, Benson and the D.O.C. Defendants are DENIED as they apply to Count Three;

(5) qualified immunity protects Tate, Ikner and Benson from the allegations McMillian makes in support of Count Four, and the Motions for Summary Judgment of Tate, Ikner and Benson are GRANTED as to Count Four;

(6) qualified immunity protects Tate, Ikner and Benson from the allegations McMillian makes in support of Count Five, and the Motions for Summary Judgment of Tate, Ikner and Benson are GRANTED as to Count Five;

(7) qualified immunity protects Tate, Ikner and Benson from the allegations McMillian makes in support of Count Six, and the Motions for Summary Judgment of Tate, Ikner and Benson are GRANTED as to Count Six;

(8) qualified immunity protects Tate, Ikner and Benson from the allegations McMillian makes in support of Count Seven, and the Motions for Summary Judgment of Tate, Ik-

ner and Benson are GRANTED as to Count Seven;

(9) qualified immunity protects Tate from the allegations McMillian makes in support of Count Nine, and Tate's Motion for Summary Judgment is GRANTED as to Count Nine;

(10) Defendants are not entitled to summary judgment on McMillian's state law claims on the basis of absolute or discretionary immunity;

(11) the Motions for Summary Judgment of Tate, Ikner and Benson are DENIED as they apply to Count Twenty, McMillian's common law malicious prosecution claim;

(12) the Motions for Summary Judgment of Tate, Ikner and Benson are DENIED as they apply to Count Twenty–One, McMillian's common law abuse of process claim;

(13) the court reaffirms its previous ruling that Counts Twenty–Two and Twenty–Three fail to state a claim for false imprisonment; thus, they must be dismissed as they apply to Tate, Ikner and Benson;

(14) the D.O.C. Defendants' Motion for Summary Judgment on Count Twenty–Two is GRANTED;

(15) the Motions for Summary Judgment of Tate and the D.O.C. Defendants are DENIED as they apply to Count Twenty–Five, McMillian's common law outrageous conduct claim arising out of his pre-trial detention on Death Row;

(16) the Motions for Summary Judgment of Tate, Ikner and Benson are DENIED as they apply to Count Twenty–Six, McMillian's common law outrageous conduct claim arising out of the actions of these defendants in conducting McMillian's prosecution and arrest.

In the interests of clarity, the court notes that the following claims remain for trial by jury:

(1) McMillian's Count One federal law claims for his wrongful incarceration on Death Row as a pre-trial detainee as they apply to Tate, Ikner, Benson, and the D.O.C. Defendants;

(2) McMillian's Count Two federal law claims of unconstitutional suppression of certain enumerated pieces of exculpatory evidence as they apply to Tate, Ikner, and Benson;

(3) McMillian's Count Three federal law claims that his constitutional rights were violated by Tate's treatment of Kelly and by the acts of Tate, Ikner, Benson and the D.O.C. Defendants which may have amounted to known use of Myers' perjured testimony to convict McMillian;

(4) McMillian's Count Twenty claims against Tate, Ikner and Benson for common law malicious prosecution;

(5) McMillian's Count Twenty–One claims against Tate, Ikner and Benson for the common law tort of abuse of process;

(6) McMillian's Count Twenty–Five claims against Tate and the D.O.C. Defendants for common law outrageous conduct as it applies to the actions taken by Tate and the D.O.C. Defendants in incarcerating McMillian on Death Row as a pre-trial detainee;

(7) McMillian's Count Twenty–Six claims for common law outrageous conduct as it applies to the actions taken by Tate, Ikner and Benson in effectuating the arrest, investigation and prosecution of McMillian for murder.